NO. 16-4035

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

**JOHN LEGRAND,**
**Appellant,**

v.

**UNITED STATES OF AMERICA,**
**Appellee,**

---

## APPEAL FROM
## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
## CIVIL ACTION NO. 3:12-CV-0743

---

## <u>AMENDED APPENDIX - VOLUME I</u>
## BRIEF OF APPELLANT, JOHN LEGRAND

Stephen M. Greecher, Jr., Esquire
Kevin L. Hall, Esuire.
**TUCKER ARENSBERG, P.C.**
2 Lemoyne Dr., Ste. 200
Lemoyne, PA 17043
Telephone: (717) 234-4121
Facsimile: (717) 232-6802
sgreecher@tuckerlaw.com
khall@tuckerlaw.com
*Attorneys for Appellant*

# TABLE OF CONTENTS TO AMENDED APPENDIX-VOLUME I

Table of Contents

Notice of Appeal                                                A1-2

Order of District Court Granting
Judgment                                                       A3

Memorandum Opinion of District Court
in Support of Judgment with Findings of
Fact and Conclusions of Law                                   A4-17

Transcript of Trial                                           A18-119

Docket Entries                                                A120-139

Certificate of Service

HBGDB:165472-1 030512-169771

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN LEGRAND,
       Plaintiff,                    Civil No.: 3:12-cv-0743

     v.                           (Malachy E. Mannion, J)

UNITED STATES OF AMERICA,     Electronically Filed
       Defendant.

## **NOTICE OF APPEAL**

Notice is hereby given that John LeGrand, Plaintiff, in the above-named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the September 6, 2016 Order, Docket No.: 3:12-CV-743, entering final judgment in favor of Plaintiff John LeGrand and against Defendant United States of America in the amount of $2,500.00.

                    Respectfully submitted,

                    */Stephen M. Greecher, Jr.*

                    Stephen M. Greecher, Jr., Esq.
                    Pa. ID: 36803
                    Tucker Arensberg, P.C.
                    2 Lemoyne Drive, Suite 200
                    Lemoyne, Pa 17043
                    (717) 234-4121
                    sgreecher@tuckerlaw.com

Dated: 11/02/16            Attorney for Plaintiff

HBGDB:160814-1 030512-169771

A1

## CERTIFICATE OF SERVICE

I, Stephen M. Greecher, Jr., hereby certify that on November 2, 2016, I electronically mailed the foregoing Plaintiff's Notice of Appeal to the following address:

J. Justin Blewitt, Jr.
Assistant U.S. Attorney
Joanne M. Hoffman
Special Assistant U.S. Attorney
228 Walnut Street, 2nd Floor
PO Box 11754
Harrisburg, Pa 17108
Phone: 717-221-4482
Fax: 717-221-2246
Justin.blewitt@usdoj.gov.

*/sStephen M. Greecher, Jr.*

A2

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN LEGRAND, | : | |
| Plaintiff, | : | CIVIL ACTION NO. 3:12-0743 |
| v. | : | (MANNION, D.J.) |
| United States of America | : | |
| Defendant. | : | |

# O R D E R

Based upon the memorandum issued this same day, **IT IS HEREBY**

**ORDERED THAT:**

(1)   Judgment is awarded in favor of the plaintiff and against

the defendant in the amount of $2,500.00; and

(2)   the Clerk of Court is directed to **CLOSE** this case.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: September 6, 2016**
O \Mannion\shared\MEMORANOA - DJ\CIVIL MEMORANDA\2012 MEMORANOA\12-0743-01-order.wpd

A3

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JOHN LEGRAND,                           :

    **Plaintiff,**                          :        **CIVIL ACTION NO. 3:12-0743**

    **v.**                                  :              **(MANNION, D.J.)**

UNITED STATES OF AMERICA                :

    **Defendant.**                         :

## <u>MEMORANDUM</u>

The plaintiff, John Legrand ("Legrand"), brings this action under the Federal Tort Claims Act ("FTCA"), <u>28 U.S.C. §2671</u>, <u>et seq.</u>, for injuries he received as a result of ingesting chicken infected with salmonella bacteria on June 25, 2011, while incarcerated at the United States Penitentiary - Canaan ("USP Canaan"), in Waymart, Pennsylvania. The defendant has exhausted his administrative remedies, and the court has jurisdiction under <u>28 U.S.C. §1346(b)</u>.

The defendant, the United States of America (the "Government"), admits liability, and the only issue for the court's determination is the damages to which the plaintiff is entitled. On August 10, 2016 the court conducted a non-jury trial. As a result of the trial and the evidence presented, pursuant to <u>Fed. R. Civ. P. 52(a)</u>, the court makes the following findings of

fact and conclusions of law based on a preponderance of the evidence.

## FINDINGS OF FACT

1.    On June 25, 2011, plaintiff John Legrand was incarcerated at USP Canaan in Waymart, Pennsylvania. At the time, he was working for the binding department in UNICOR, the prison's manufacturing facility, overseeing quality assurance of the binding of pamphlets. He also regularly exercised.

2.    During the evening meal on June 25, 2011, the prison served fajitas containing chicken that was contaminated with salmonella bacteria. The plaintiff consumed two servings of the fajitas. That evening, after eating the chicken fajitas, the plaintiff became ill. He vomited and had diarrhea.

3.    The plaintiff's symptoms worsened in the immediate days thereafter. On June 26, 2011, the plaintiff suffered from the following: vomiting, diarrhea, abdominal cramps, bloating, chills, aches, eye irritation, and headaches. He involuntarily defecated in his pants multiple times, at least once in the presence of his cellmate, which he testified caused him embarrassment. He was seen by a medical professional, who prescribed for him Tylenol and anti-nausea medicine. The plaintiff was also given Gatorade for hydration. (Gov't Ex. B at 4).

A5

4.    Many other inmates also contracted food poisoning by eating the tainted fajitas during the evening meal, including the plaintiff's cellmate. The plaintiff and his cellmate argued over the toilet since there was only one toilet in their cell.

5.    As a result of the salmonella outbreak, USP Canaan was placed on full lockdown from June 26, 2011 through June 30, 2011, during which inmates were not allowed out of their cells. On June 30, 2011, a modified lockdown was instituted, allowing inmates to move outside of their cells and into the unit common areas. On July 13, 2011, the institution returned to normal operation, and all lockdowns were released. Some units were released from any form of lock down before July 13, 2011, but not the plaintiff's unit.

6.    During the period of full lockdown lasting approximately four to five days, the plaintiff and his cellmate ran out of toilet paper because USP Canaan was not willing to unload vans containing supplies without inmate assistance. There is uncontroverted testimony that when the plaintiff and his cellmate exhausted their supply of toilet paper, they resorted to using their sheets and reusing the sheets after washing them with soap. When they ran out of soap, they resorted to washing their sheets with toothpaste. When their toothpaste ran out, they just used water. During this time period, USP

3

Canaan failed to provide the plaintiff and his cellmate with a resupply of toilet paper and soap, resulting in unsanitary conditions further exacerbated by the inmates' lack of access to showers.

7.    The court reviewed the pertinent medical records and prison records of the plaintiff, which indicate the following:

a)    On a July 1, 2011, Health Services Clinical Encounter, or prison medical consultation, the plaintiff complained of a headache and was prescribed ibuprofen. (Gov't Ex. B at 5-7).

b)    On a July 21, 2011, Health Services Clinical Encounter, the plaintiff complained of a rash on his foot and was prescribed nystatin cream. He also complained of bloating. The provider noted that the plaintiff had internal hemorrhoids. (Gov't Ex. B at 8-9).

c)    On an August 4, 2011, Health Services Clinical Encounter, the plaintiff presented with multiple complaints. He complained of occasional diarrhea and bloating, and he stated that "when he eats he feels like the food sits in his stomach for hours." (Gov't Ex. B at 11). He also complained of itchy, watery eyes and pain during urination. The plaintiff's urine was tested for blood, resulting in a determination that there may have been a trace of

4

blood. The provider noted, "upon review of the test srtip [sic] I think that the blood reading should have registered as a trace instead of negative." (Id.). During the same encounter, the provider noted that the plaintiff did not have diarrhea or abdominal pain at that time. The provider requested a gastroenterology consultation for the plaintiff.

d)    On August 7, 2011, the plaintiff filed a grievance letter stating that he was still experiencing symptoms of food poisoning from the salmonella infection, and that his request for a stool test was denied. (Pl's Ex. 15).

e)    On an August 16, 2011, Health Services Clinical Encounter, the plaintiff complained of abdominal pain and said that he noticed blood in his urine. He also requested and was refused a stool test for salmonella. (Gov't Ex. B at 14).

f)    On August 24, 2011, the plaintiff filed another grievance letter reporting the same troubles he reported in his August 7, 2011 letter. He stated that he was "still having some active symptoms of salmonella poison in my body, like, urinating blood with light burning pain, joint pain, bad headaches, stomach pain, some diarrhea, feeling like I want to vomit after consuming meals

5

A8

and/or food and eye irritation." (Pl's Ex. 16). He also objected to the repeated denial of his request for a stool test.

g)    On August 31, 2011, the plaintiff had a gastroenterology consultation with an outside provider. The provider found that the plaintiff had gastroesophageal reflux disease ("GERD") and prescribed omeprazole for him. The provider also noted a provisional diagnosis of epigastric pain and diarrhea, and recommended an esophagogastroduodenoscopy ("EGD"), or upper gastrointestinal study, as well as a colonoscopy. (Gov't Ex. B at 16).

h)    Stool samples taken from the plaintiff on August 29, 2011, and August 30, 2011, tested positive for the presence of salmonella. (Pl's Exs. 3-4).

I)    On an October 27, 2011, Health Services Clinical Encounter with McDaniel Holloway, M.D., the plaintiff denied abdominal pains or any changes in bowel habits. The plaintiff also stated that "he was ill during the salmonella incident, however he is doing better now." (Gov't Ex. B at 20).

j)    On December 2, 2011, the plaintiff tested negative for the presence of salmonella, which the plaintiff testified brought him

6

some relief. (Gov't Ex. B at 28).

k)       On November 7, 2012, the plaintiff had a colonoscopy. The results were normal, but the provider found that the plaintiff had internal hemorrhoids. (Pl's Ex. 8). The provider also recommended that the plaintiff undergo an upper gastrointestinal endoscopy to rule out the source of bleeding.

l)       On January 11, 2013, the plaintiff was taken to the emergency room at Wayne Memorial Hospital due to abdominal pain. The plaintiff had a C.A.T. scan of his abdomen showing that he had kidney stones. (Gov't Ex. B at 31-39). He was also found to have constipation.

m)      On August 13, 2014, the plaintiff had an abdominal ultrasound due to epigastric discomfort. The results were normal. (Gov't Ex. B at 49).

n)       On two separate Health Services Clinical Encounters on April 24, 2015, and May 20, 2015, the plaintiff presented with epigastric pain and discomfort such that he had to sleep upright in a semi-seated position. (Gov't Ex. at 51-52). He also stated he felt as though food was shooting up through his throat.

o)       On June 17, 2016, the plaintiff finally underwent an EGD at

7

Stonewall Jackson Memorial Hospital with findings of gastroesophagitis and a hiatal hernia. The plaintiff testified that the results somewhat put his mind at ease. (Gov't Ex. at 63).

8.    The Government called Dr. Holloway as a witness. Dr. Holloway is a retired physician who specialized in emergency medicine. He was the medical officer at USP-Canaan at the time of the salmonella outbreak.

9.    Dr. Holloway testified that the length of symptoms from a salmonella infection vary from person to person. People can possess symptoms for a week, several weeks, or several months. Dr. Holloway also testified that although the plaintiff tested positive for salmonella at the end of August, the plaintiff was not necessarily symptomatic. Salmonella bacteria sheds through the stool, so the test may simply have indicated this shedding. Dr. Holloway further testified that it may take weeks or months for a person's system to fully clear of salmonella bacteria, and yet the person may be asymptomatic.

10.    Dr. Holloway testified that the general symptoms of a salmonella infection include: abdominal cramps, nausea, fever, diarrhea, and generalized malaise. He said that it does not cause GERD or joint pain, but it possibly gives eye irritation. He also said that diarrhea does not necessarily lead to hemorrhoids.

8

11.    The pertinent medical records indicate that the plaintiff was diagnosed with GERD, which Dr. Holloway testified affects the upper digestive tract and the esophagus. Treatment involves decreasing acid in the stomach to prevent reflux back into the esophagus. Further, Dr. Holloway testified that "epigastric" refers to the upper digestive tract, which is where the plaintiff continued to experience pain.

12.    The plaintiff testified that, as late as July 21, 2011, he was still vomiting and had diarrhea, requiring him to relieve himself every half hour. He also stated that he still suffered symptoms at the beginning of August, albeit less frequently. By the end of October, his symptoms had cleared up except for the bloating.

13.    The credibility of the plaintiff's testimony is contradicted by other evidence. After the prison lifted the full lockdown on June 30, 2011, the plaintiff resumed working at UNICOR without interruption, for six and a half hours a day for up to six days a week, leading the court to conclude that his symptoms were not as severe as alleged.

14.    Other inconsistencies weaken the plaintiff's testimony. The plaintiff testified that, prior to becoming ill, he weighed approximately 257 pounds, and that he lost an immense amount of weight due to his sickness from food poisoning. The medical records from the Bureau of Prisons

9

indicate that on May 26, 2011, the plaintiff weighed 229 pounds. (Gov't Ex. B at 1). On August 16, 2011, he weighed 231 pounds ( Id. at 14). On October 27, 2011, he weighed 226 pounds. (Id. at 1). The evidence shows that the plaintiff's weight marginally fluctuated, and that during the period when his symptoms were allegedly at their height, he actually gained weight between May and August 2011.

15.    The plaintiff also testified that he was on full lookdown and was not allowed out of his cell for two to three weeks when the parties stipulated that the period of full lookdown lasted several days, from June 26 through June 30, 2011.

16.    The plaintiff called Kevin Spotts ("Spotts") as a witness to testify as to the plaintiff's diminished state after he contracted food poisoning. Spotts resided in the cell next door to the plaintiff and worked out with the plaintiff. The court gives some weight to Spotts' testimony that the plaintiff was affected by the salmonella infection physically and emotionally. For example, Spotts testified that the plaintiff could not work out as vigorously and instead of running four laps, the plaintiff could only run half a lap and walk another half a lap. Spotts also testified that before June 25, 2011, the plaintiff smiled and joked a lot, whereas after, he appeared depressed. Spotts also observed that the plaintiff suffered symptoms, including diarrhea

10

A13

and vomiting, for at least three weeks to one month.

17.    However, Spotts' testimony is to be given only limited weight. Spotts testified that the plaintiff appeared to have lost fifteen to twenty pounds, which is unsupported by the record. Spotts also testified that he and the plaintiff had been working out for approximately six months before the incident, but the plaintiff arrived at USP Canaan less than two months beforehand.

18.    At closing, plaintiff's counsel argued that the plaintiff was still afflicted with symptoms from food poisoning through the end of August, and by the end of October, his symptoms generally cleared. The defendant argued that the plaintiff was very ill for one week and had occasional diarrhea and minimal symptoms for one to three weeks thereafter. The defendant further argued that most of the problems that plaintiff experienced after July were unrelated to the salmonella food poisoning and related to his GERD. The court finds that the plaintiff suffered symptoms from the salmonella infection for a period of approximately 2-3 weeks from consumption, decreasing steadily over time.

19.    The court finds that the plaintiff has failed to establish by a preponderance of evidence that the source of his reported problems after this time period was the salmonella infection. The plaintiff testified that he

11

experienced epigastric pain and diarrhea at the end of August. As Dr. Holloway stated, epigastric pain refers to the upper digestive track, which is generally unaffected by a salmonella infection. The plaintiff was diagnosed with GERD and a hiatal hernia, which causes many of the digestive problems that the plaintiff described, such as the feeling of food shooting up through his throat. During cross-examination, the plaintiff admitted that he experienced migraines prior to the incident. He also acknowledged that he was diagnosed with kidney stones, which may have caused the burning sensation during urination. In addition, the plaintiff was found to have constipation, which Dr. Holloway testified can lead to internal hemorrhoids, which can then cause bleeding.

20.    Finally, the plaintiff claims that, over the ensuing months and years, he was concerned and distressed that the salmonella had caused an injury to his digestive system resulting in ongoing abdominal problems and acid reflux. The plaintiff made repeated requests that the EGD be carried out, and the record reflects that he had to wait five years to receive the testing, after which he discovered that the source of many of his digestive problems was a hiatal hernia. The plaintiff maintains that he should be compensated for the emotional distress during this period.

21.    While the Bureau of Prisons inexcusably delayed administering

12

the plaintiff's EGD for years, the plaintiff is not entitled to damages for emotional distress over a physical condition that was not caused by the defendant. The plaintiff experienced acid reflux, and as Dr. Holloway testified, food poisoning from salmonella does not cause GERD. Moreover, GERD affects the upper intestinal tract, and salmonella bacteria generally resides in the lower intestinal tract.

22.    As a result of the negligent service of the chicken fajitas contaminated with the salmonella bacteria and the plaintiff's consumption of it, the plaintiff suffered pain, mental distress, embarrassment, humiliation and the loss of the enjoyment of life in varying degrees spanning 2-3 weeks from June 25, 2011.

23.    The Government's negligence was the factual cause of the plaintiff's injuries.

24.    Legrand suffered damages in the amount of $2,500.00.

### CONCLUSIONS OF LAW

1.    Under the Federal Tort claims Act, the district court should apply the "law of the place where the act or omission occurred." 28 U.S.C. §1346(b).

2.    Accordingly, since the act or omission occurred in Waymart, Pennsylvania, the Court applies the law of Pennsylvania.

13

A16

3.    The Government has admitted liability.

4.    The damages are non-economic and include pain and suffering, embarrassment and humiliation, and the loss of the ability to enjoy the pleasures of life. McManamon v. Washko, 906 A.2d 1259, 1281-82 (Pa. Super. 2006); see also Pa. R. Civ. P. 223.3.

5.    The plaintiff has proven his damages by a preponderance of the evidence.

6.    Judgment will be entered in favor of the plaintiff and against the United States of America in the amount of $2,500.00.


An appropriate order shall follow.



s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: September 6, 2016**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-0743-01.wpd

14

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   JOHN LEGRAND              :
                               :
 4                             :
                               :
 5       vs                    :    12-CV-743
                               :
 6                             :
                               :
 7   UNITED STATES OF AMERICA  :
                               :
 8                             :

 9


10
         BEFORE:       THE HONORABLE MALACHY E. MANNION
11
         PLACE:        COURTROOM NO. 3
12
         PROCEEDINGS:  NONJURY TRIAL
13
         DATE:         WEDNESDAY, AUGUST 10, 2016
14

15

16   APPEARANCES:
17
     For the Plaintiff:
18
     STEPHEN M. GREECHER, JR.
19   TUCKER ARENSBERG, P.C.
     2 LEMOYNE DRIVE, SUITE 200
20   LEMOYNE, PA 17043

21   For the Defendant:

22   JOANNE M. HOFFMAN
     JUSTIN BLEWITT
23   U.S. ATTORNEY'S OFFICE
     235 NORTH WASHINGTON AVE
24   P.O. BOX 309
     SCRANTON, PA 18501
25
```

2

1                          INDEX TO WITNESSES

2

3     FOR PLAINTIFF:        DIRECT    CROSS    REDIRECT   RECROSS

4     KELVIN SPOTTS           6

5     JOHN LEGRAND           15        54        60

6

7

8

9     FOR DEFENDANT:

10    McDANIEL HOLLOWAY      62        82        88

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE COURT:  This is the matter of the John Legrand

2  against the United States.  The civil number is 3:CV-12-743.

3  We're here for a trial today based upon this particular matter.

4  And is the plaintiff -- Mr. Greecher, are you and your client

5  ready to proceed?

6          MR. GREECHER:  Yes, Your Honor.

7          THE COURT:  All right.  Is the government as well

8  ready to proceed?

9          MS. HOFFMAN:  Yes, Your Honor.

10          THE COURT:  Now, before we actually begin with the

11  case, it's my understanding that the government has conceded

12  liability and this case is about damages; is that correct?

13          MS. HOFFMAN:  Correct.

14          THE COURT:  And that's your understanding as well,

15  Mr. Greecher?

16          MR. GREECHER:  Yes, sir.

17          THE COURT:  All right.  Then we'll proceed -- I know

18  we have scheduled 9:45 the first witness by tele -- a video

19  conference.  But in the interim if, Ms. Hoffman, there are any

20  -- I'm sorry, Mr. Greecher, the plaintiff in the case -- if

21  there's an opening statement that you would wish to make

22  concerning the case.

23          MR. GREECHER:  Yes, very briefly, Judge.  It's my

24  pleasure today to represent Mr. Legrand in this case against

25  the government.  Mr. Legrand is 52 years old.  He grew up in

4

1  Baltimore.  He didn't finish high school, but he got a decent

2  job.  Then he made some very bad decisions over the course of

3  the next several years.  He will spend a long time in prison.

4  And he's been most recently at F. C. I. Gilmer down in West

5  Virginia.  Before that he was in Florida.  Then he was in North

6  Carolina, and prior to that he was up here in Canaan, U.S.P.

7  Canaan where he entered the federal system in May 2011.

8         So he was at U.S. P. Canaan on June 25th, 2011, the

9  day that the chicken fajitas were served.  And Mr. Legrand

10  unfortunately ate the chicken fajitas.  And not only did he eat

11  them, he happened to be towards the end of the chow line.  He

12  had the opportunity to go back for seconds because no one else

13  was around, and did he so.

14         Now, as you noted, Judge, the government has conceded

15  negligence.  They acknowledge he ate the fajitas.  They concede

16  causation.  They acknowledge their negligence resulted in his

17  injuries in which are salmonella poisoning.  And so it will be

18  -- the conclusion of the case will be up to Your Honor to

19  determine what amount of damages is appropriate for Mr.

20  Legrand's physical pain, for the emotional distress he endured,

21  for the embarrassment and also for how this upset -- how he

22  lived in his life in prison.  There were things he wasn't able

23  to do because he was so sick.  We all had a stomach virus.

24         This is of a magnitude beyond that.  Mr. Legrand and

25  Mr. Spotts will explain how sick Mr. Legrand was.  I will let

5

1  him speak to that, and we can then proceed.

2          THE COURT:  All right.  Thank you, Mr. Greecher.  Ms.

3  Hoffman, do you wish to make an opening statement?

4          MS. HOFFMAN:  Very briefly, thank you.  The United

5  States does concede liability in this case, and, Mr. Legrand,

6  we do sincerely apologize for making you sick.  It was

7  obviously not intentional.  It was very unfortunate.  We do

8  apologize.  Next the illness -- it was there.  It did last.

9  But our evidence will show that he was sick for about a week,

10  week and a half and he got increasingly better.

11          He was very ill in the beginning.  But as days went

12  by, he did get a little better each and every day until he was

13  fine again.  So we're just going to show that the sickness was

14  limited in duration.  It wasn't months or years and not

15  continuing until the present today.  He was sick.  He's better.

16  We are sorry he got sick.

17          THE COURT:  All right.  What is the name of the first

18  witness?

19          MR. GREECHER:  Kelvin Spotts.

20          THE COURT:  It's my understanding Mr. Spotts is in

21  Texas.

22          MR. GREECHER:  He's at U.S.P. Beaumont.

23          THE COURT:  Is there any disagreement that Mr.

24  Legrand has exhausted his administrative remedies?

25          MR. GREECHER:  It's a federal tort claim.  He filed

6

1  his administrative claim, and that's all --

2          THE COURT:  But his S. F. 95 when he exhausted his

3  appropriate administrative remedies, that's correct.  So

4  everyone stipulates to the fact that he has exhausted his

5  administrative remedies and we are properly before the Court

6  jurisdiction?

7          MS. HOFFMAN:  Correct.

8          THE COURT:  Can you hear us?

9          THE WITNESS:  I can.

10          THE COURT:  All right.  Gentlemen in Beaumont, are

11  you ready then?  Thank you.  Mr. Spotts, my name is Judge

12  Mannion.  We're here in the matter of John Legrand against the

13  United States.  And Mr. Legrand's counsel, Mr. Greecher, is

14  calling you as a witness on behalf of Mr. Legrand.  And so let

15  me ask you if you would -- we need to swear you in as a witness

16  before we begin.  Raise your right hand, and the clerk will

17  administer the oath to you.

18          KELVIN SPOTTS, called as a witness, being duly sworn,

19  testified as follows:

20          THE COURT:  All right.  Mr. Greecher?

21  DIRECT EXAMINATION

22  BY MR. GREECHER:

23  Q.   Yes, good morning, Mr. Spotts.  My name is Steve Greecher.

24  I represent Mr. Legrand.  Do you have any trouble hearing me?

25  A.   No, I hear you well.

7

```
 1  Q.    Okay.  Can you tell us your date of birth, sir?
 2  A.    I can't hear you.
 3  Q.    Tell us your date of birth.
 4  A.    10/22/65.
 5  Q.    Where did you grow up?
 6  A.    Atlanta, Georgia.
 7  Q.    How far did you go in school, Mr. Spotts?
 8  A.    14 years.
 9  Q.    A couple years of college?
10  A.    Yes, sir.
11  Q.    Okay.  And you're currently in federal prison?
12  A.    Yes, I am, sir.
13  Q.    And was there a time when you were in prison here in
14  Pennsylvania at U.S.P. Canaan?
15  A.    Yes, I was there from 2010 to 2013.
16  Q.    Did you know -- while you were at U.S.P. Canaan, did you
17  know John Legrand?
18  A.    Yes.
19  Q.    How is it you knew him?
20  A.    He had moved into our dorm, and he stayed next door to me.
21  We used to work out together.
22  Q.    And do you recall what unit that was?
23  A.    I want to say -- it was on the blue side -- I want to say
24  B. A. if I am correct.  Okay.  I get confused.
25  Q.    You've been in a couple different prisons over the years?
```

8

1  A.    Yes, that's why I get confused.

2  Q.    Fair enough.  Understood.  So you said you knew John

3  because he was your neighbor basically?

4  A.    Right.

5  Q.    Did he -- you worked out with him?

6  A.    Right.

7  Q.    What did that consist of?

8  A.    Burpees, pushups, running laps on the outside track,

9  pullups, stuff like that.

10  Q.    How often would you and John work out?

11  A.    We worked out a good six months.

12  Q.    Did -- do you recall the salmonella outbreak at Canaan?

13  A.    Yes, I do.

14  Q.    It's our understanding that happened after the evening

15  meal on June 25, 2011.  Does that sound accurate?

16  A.    Sounds fair.

17  Q.    And do you recall -- did you eat at that meal?

18  A.    Yes, I did.

19  Q.    What did you have?

20  A.    It was chicken with rice -- with a shell where you make

21  fajitas.

22  Q.    After that did you personally become ill?

23  A.    I couldn't hear you.

24  Q.    Did you become ill?  Did you get sick?

25  A.    Yes, I got sick.

Case: 16-4035    Document: 003112599701    Page: 28    Date Filed: 04/20/2017
Case 3:12-cv-00743-MEM    Document 246    Filed 11/07/16    Page 9 of 102

9

1  Q.    And what were your symptoms?

2  A.    My symptoms consisted of throwing up and diarrhea.

3  Q.    Did you note -- did you have a chance on the 25th or the

4  26th to see John?

5  A.    Yes, on the 25th we went to the locker after chow, and we

6  worked out a little bit.  We just walked some laps because it

7  was a Saturday.  On Sunday --

8  Q.    So the 25th was a Saturday?

9  A.    Yes.  Sunday that morning, that's when we got up, went to

10  eat, came back.  We went to the law library, came back from the

11  law library.  They locked us down and did the 10:00 count.

12  Once they did the 10:00 count, they let us out to go to chow.

13  As we was walking back from chow, that's when he had said that

14  he wasn't feeling well, and I told him my stomach was the same

15  way.

16       As we went back to the unit I -- he went in his room, and

17  I went in my room.  I went to the outside field.  He stayed

18  back.  When I was at the outside field, that's when the

19  symptoms hit me and I started spitting up.  They called a move

20  on the compound and sent us back into the unit, which we went

21  back into the unit.  As I go past John's door, I see him

22  standing over the toilet spitting up.  So I go in and ask him,

23  are you all right.  He's, like, no, man, I'm sick.  He said,

24  I'm sick, can you please get the officer.  So I went and got

25  the female officer that was on.  I think her name was -- Miss C

10

1  at the time.

2  Q.    Who?

3  A.    We used to call her Miss C.  I told her, would you please

4  come help my friend, he's not feeling well, he's spitting up.

5  Can you please contact medical for him.  When she came over to

6  look at him, another inmate called -- was talking about a

7  person who was down and that he was sick, too, and that he need

8  to call medical.  So as she was getting ready to call medical

9  for John Leggrand, she ran to the back and called medical and

10 saw the other guy down at his -- spitting up as well.  And she

11 called medical for everybody.  It was about three incidents in

12 the unit that happened pretty much all at the same time.

13      She contacted medical, but the outbreak was so large that

14 they locked us all down at that moment.  And nobody got to go

15 to medical.  So when -- she locked down the whole unit, and

16 nobody never came to see him.

17 Q.    Did -- while you were on lockdown -- describe what you

18 mean -- what were the restrictions?  Were you allowed out of

19 your cell?  What did that mean?

20 A.    We were on lockdown.  We were fed while we were in the

21 cell.  They give us three meals, basically bag lunches, peanut

22 butter and jelly sandwiches, stuff like that.  We remained that

23 way.  While we were on lockdown I was hollering down to John

24 that I had spit up myself.  I hollered down to him had he seen

25 medical.  He said, no, medical hadn't came by.  I said, if you

11

1  seen them, please holler and let me know, I am trying to sign

2  up for medical myself.  I keep spitting up.  I can't hold

3  nothing down.  And he was, like, all right, I got you.  And

4  then that was it.  Then I went to sleep.  Medical hadn't come.

5  So the next day medical didn't come.

6  Q.   Do you recall pushing your panic button in your cell?

7  A.   I can't hear you.

8  Q.   Did you push the panic button in your cell at any time?

9  A.   Yeah, I pushed the panic button several times, but the

10 officer had turned them off.

11 Q.   Did John push his as far as you knew?

12 A.   The whole range pushed it.  That's why the officers turned

13 them off.

14         THE COURT:  Mr. Greecher, why don't you pull that mic

15 closer to yourself?  That will probably make it better.

16 BY MR. GREECHER:

17 Q.   Is that better?

18 A.   A lot.

19 Q.   How long did the lockdown last so that such that you

20 weren't allowed out of your cell?

21 A.   If I'm correct, we were locked down for, like, almost two

22 weeks -- two to three weeks before they allowed us out.  They

23 let us out on the flat.  That's when I was able to see John and

24 talk to him, and he -- you could see he wasn't coping with this

25 well at all.  He looked like he pretty much had a stroke, and

12

1   he wasn't responsive real well because I asked him a couple

2   questions and he would just shake his head.  And then, you

3   know, he would tell me -- when he could tell me, he was, like,

4   man, I keep throwing up and spitting up, man, these people

5   won't come see me.

6        I'm, like, man, you just got to tough it out, man.  I

7   said, hopefully they'll get to us I said because I was in this

8   type of situation back in Beaumont during the hurricane.  I

9   was, like, but you just have to tough it out, man, try to put

10  what you can in your stomach.  He said, man, I'm not able to

11  hold down nothing.  I said, all right, I said, just do the best

12  you can.

13  Q.   Did -- you said that John seemed like he had a stroke.

14  What caused you to come to that -- come to that conclusion or

15  that observation?  What did you see that caused you to conclude

16  that?

17  A.   You can just -- you can just look at his facial expression

18  and see how he wasn't the normal person that I was working out

19  with just six months prior.  His response -- his motor skills

20  wasn't -- his speech was a little slurred.  You know what I'm

21  saying?  He wasn't all the way there.

22  Q.   Did -- after the -- did you observe John having any of the

23  symptoms after the lockdown regarding throwing up or diarrhea

24  or anything of that nature?

25  A.   What I do recall is he always sit outside of his door,

13

1  which is not normal.  And when you're in the dayroom you can

2  see when people go use and their bathroom a lot because they

3  put a towel up or they'll put up some type of blinder in the

4  door so you can't look in.  And he was always going into his

5  cell and he was leaving because -- it was -- he was, like, man,

6  I'm telling you, I got diarrhea, man, I can't hold nothing

7  down, everything I eat is running right through me.

8  Q.   Did you notice anything about how John looked?

9  A.   Well, he lost a lot of weight.  He had lost at least

10 anywhere from 15 to 20 pounds.  That's how I knew it affected

11 him way more than it affected me.

12 Q.   What was -- how was John handling this from a mood or

13 emotional perspective?

14 A.   I can't hear that.  Say again.

15 Q.   How was John handling this whole situation from a mood or

16 emotional perspective?

17 A.   He looked like he was depressed, like, he wasn't -- like,

18 the reason I said depressed is because I stayed next to him.

19 He's usually a very -- you know, he smiled a lot, joked around,

20 hi, how you doing, what are we going to do today -- you know

21 what I'm saying.  During that period of time, like I said, his

22 conversation was -- he was not there.  You can just tell he was

23 not himself.

24 Q.   From what you observed -- well, you said you and John

25 worked out together prior to this breakout of salmonella.  Did

14

1  you -- did you work out afterwards?

2  A.   Yes, when they start let us outside for an hour or two

3  hours, I would have to say, come on, John, let's go out and

4  walk the track, get the fresh air, you need it.  And he

5  couldn't do the normal reps of what we used to do.  That's when

6  -- once again, I took a mental note of it because normally he

7  can knock out 200 pushups no problem.  But he was stopping at

8  75 -- you know what I'm saying.  He used to run at least four

9  laps around the track.

10        But he couldn't do nothing but, like, walk before he'd gas

11  out.  I was, like, all right, let's walk one, run one.  He

12  couldn't -- at one period he had gotten to where he couldn't

13  run the whole lap.  So we would have to run, like, half a lap

14  and walk the rest of it.  So, no, he wasn't himself.

15  Q.   Was there a time after the salmonella outbreak where John

16  didn't even workout at all?

17  A.   Yes, but that's when we were just in our dorm.  I worked

18  out in the dorm as well.  And he was always sitting outside the

19  door, and he wouldn't do any pullups, dips or nothing.

20  Q.   From what you could observe, just from what you saw, how

21  long was John feeling the worst of these symptoms, the diarrhea

22  and everything else?

23  A.   Say one more time.

24  Q.   How long was John suffering -- how long was he suffering

25  from the diarrhea and vomiting from what you can tell?

15

1  A.    At least a month after -- anywhere from three weeks to a

2  month he wasn't himself afterwards.

3  Q.    Can you tell us between the two of you who was sicker, you

4  or John?

5  A.    John was sicker.  You can look at -- I don't eat that much

6  as it is, but you can see the difference.  And you -- once

7  again, you can see how it was taking a toll on him.  I bounced

8  back faster.  I didn't each as much of the food that day.  I

9  think I probably ate, like, a half of a fajita.  You know, I

10  get full and didn't want it so --

11  Q.    Fair enough.

12        MR. GREECHER:  That's all of the questions I have,

13  Mr. Spotts.  Thanks.

14        THE COURT:  Ms. Hoffman?

15        MS. HOFFMAN:  Nothing for this witness, thank you.

16        THE COURT:  Mr. Spotts, we appreciate your being

17  available for purposes of testifying.  And that's all we will

18  need from you then.  Thank you very much.  You have a good day.

19        MR. GREECHER:  Thanks.  Mr. Legrand, sir.

20        THE COURT:  Mr. Legrand, take the stand, please.

21        JOHN LEGRAND, called as a witness, being duly sworn,

22  testified as follows:

23  DIRECT EXAMINATION

24  BY MR. GREECHER:

25  Q.    Good morning, John.  Can you give us your date of birth?

16

1   A.    11/24/1963.

2   Q.    Where were you born?

3   A.    Baltimore.

4   Q.    And did you grow up in Baltimore, go to school there?

5   A.    Yes, sir.

6   Q.    How far did you go in school?

7   A.    11th.

8   Q.    And at that point what did you do?

9   A.    I started working down Dunbar Marine Towing.

10  Q.    So that's working on the docks?

11  A.    Yes, sir.

12  Q.    What other type work did you do?

13  A.    Forklift operator, warehouse management, supervisor and

14  machine operator and forklift operator at McCormick's Spice

15  Mill, working on the docks.  I load cars off the ship.  I

16  worked for Sealy mattress production line and a carnival ride

17  operator.

18  Q.    That was kind of a seasonal job then, the carnival

19  operator?

20  A.    Yeah, it was just an extra job.

21  Q.    Now, so you had a bunch of good jobs.  You got yourself in

22  trouble?

23  A.    Yes.

24  Q.    And you entered federal prison?

25  A.    Yes, sir.

17

1  Q.    And since when have you been federal prison?

2  A.    Since May '11, somewhere around there.

3  Q.    And were you --

4        THE COURT:  May 11th what year?

5        THE WITNESS:  I'm sorry, 2011.

6  BY MR. GREECHER:

7  Q.    Now, in terms of the -- I have mentioned in my opening you

8  have a lengthy sentence?

9  A.    Yes, sir.

10 Q.    How much is left?

11 A.    I have 40 years, and I have almost seven years in.

12 Q.    Was there a time in -- that you were at U.S.P. Canaan here

13 in Lackawanna County?

14 A.    Yes.

15 Q.    When was that?

16 A.    2011, May.

17 Q.    Until when?

18 A.    2013, I believe, September.

19 Q.    And while you were at U.S.P. Canaan, did you know Mr.

20 Spotts?

21 A.    Yes.

22 Q.    What type of interaction did you have with him?

23 A.    We always talked and joked and stuff like that.

24 Q.    How close did he live to you?

25 A.    Next door.

18

1  Q.   This incident we talked about was in June of 2000 -- June

2  25th, 2011, correct?

3  A.   Yes.

4  Q.   Mr. Spotts -- he said you'd been working out for, like,

5  six months.  Was that longer you have been working out at that

6  point?

7  A.   About six months.

8  Q.   You got there in May and got sick in June.

9  A.   Excuse me?

10  Q.   You got there in May 2011 and became sick in June 2011?

11  A.   Right.

12  Q.   You guys had been working out a month and a half or two

13  months at that point?

14  A.   Yes, after when I got sick from the poison, I didn't

15  workout anymore but after got a little bit better.  I started

16  working out.  That was, like, in 2012, something like that.

17  Q.   Okay.  When you were at U.S.P. Canaan, did you -- did you

18  have a job?

19  A.   Yes.

20  Q.   And what did you do?

21  A.   I work in the unit core, quality assurance.

22  Q.   And unit core is a manufacturing type facility?

23  A.   Yes, sir, it's a binding company.

24  Q.   Binding company.  What type of things did you bind?

25  A.   It was fliers.  We make books, stuff for Verizon, H. B.

A35

19

1  O., Showtime, like, pamphlets.  It would just cut --

2  Q.    You've been in other institutions other than Canaan.  What

3  type of work have you done in those institutions?

4  A.    When I was transferred down to Coleman one, which is

5  Coleman Florida, I was a number one cook.  I worked in the

6  kitchen, number one cook.

7  Q.    How about at Gilmer, do you have a job?

8  A.    Yes.

9  Q.    What do you do there?

10  A.    Clean showers.

11  Q.    Okay.  That's kind -- they call it an orderly position?

12  A.    Yes.

13  Q.    You were at U.S.P. Canaan June 25th, 2011?

14  A.    Yes, sir.

15  Q.    What unit?

16  A.    B. 1.

17  Q.    Did you remember your cell number?

18  A.    109.

19  Q.    Do you recall the evening meal on that day?

20  A.    Yes.

21  Q.    What was it?

22  A.    Chicken fajita.

23  Q.    Now, why in all the meals you've had you remember that

24  one?

25  A.    That's the meal that got me sick and thought I was going

20

1  to die.

2  Q.    And what time did you have this meal?

3  A.    Evening, evening meal.

4  Q.    Do you know what time during the day?

5  A.    After 4:00 -- after 3:00 count -- 4:00 count I mean.

6  Q.    4 or 5:00 in that range -- I missed the --

7  A.    Yes.  Yes, sir.

8  Q.    Did you have the -- did you take advantage -- could you

9  get seconds?

10 A.    Well, I asked the supervising officer in the chow line if

11 I can get another tray, and he said yes, but I had to wait

12 until after they do the last call.  So I waited until the end

13 of last call so me and about 20 or -- 20 or 30 other people got

14 back in line, too.  Some of them didn't get a chance to get the

15 food because it ran out.  I was able to get some, and maybe six

16 guys behind me was able to get some, too, second serving.

17 Q.    You had two servings of the fajitas?

18 A.    Yes, sir.

19 Q.    Let's try to go through this as close as we can day by

20 day, all right?

21 A.    Yes, sir.

22 Q.    On the 25th, the day you ate the fajitas, tell us how you

23 felt the rest of that day.

24 A.    Later on that night, I felt kind of -- my body just didn't

25 feel right.  I feel this bubbling in my stomach, and my nerves

21

1  didn't feel like -- felt like I was kind of chilly.  I didn't

2  know what was going on.  And I threw up one time, and then I

3  had to use the bathroom.  At that time I felt like it was gas,

4  but it wasn't.  It was diarrhea.

5  Q.    And when did that -- did that happen during the night?

6  A.    During the evening.  It was close to locking time.

7  Q.    That happened while you were in your cell for the evening?

8  A.    Yes.

9  Q.    How did you do the next day, the 26th?

10  A.    It got worse during the middle of the night until the

11  morning time.

12  Q.    When you say it got worse, this is important.  You got to

13  tell us how worse and what really was happening to you.

14  A.    My head was hurting.  My stomach was hurting.  I felt cold

15  and shaking.  My teeth was rattling.  I pushed the panic

16  button, and I asked the officer, you know -- I told him I was

17  sick, if I can see medical.  And he said that -- it's been so

18  long -- he said he was going to make a call or something, and

19  nobody didn't come.  There was a few people that were in the

20  unit that got sick, too.

21  Q.    Can you tell us -- did -- how often were you having

22  symptoms during the 25th?

23  A.    It was, like -- it just, like, gradually started because I

24  went out with Spotts, you know, later on that evening.  I went

25  out with Spotts.  I said, man, I feel bad and, you know.  And

A38

22

1  while we was at the library, I kept running back using the

2  bathroom, you know, because I thought I had to relieve myself.

3  Q.    This is when you went to the library with Mr. Spotts?

4  A.    Yes, sir.  And on the way back, I told him -- I said, man,

5  I feel real sick, something was wrong.  I don't know what it

6  is.  My eyes is hurting.  My stomach hurt real bad.  And he

7  said he was feeling sick, too.

8  Q.    Were you throwing up at all?

9  A.    When we got back to the unit, Spotts went to his cell

10  first, and then I went my cell.  In my cell I just started

11  throwing up.  And while I was throwing up, I accidentally had a

12  bowel movement on myself.

13  Q.    You soiled your pants?

14  A.    Yes, sir.

15  Q.    Over the ensuing several days, did that happen on other

16  occasions?

17  A.    Yes, sir.

18  Q.    So there came a time then when the -- there was a

19  lockdown, correct?

20  A.    Yes.

21  Q.    When did that start?

22  A.    On the 26th.

23  Q.    Did you -- this time of the day when you said you -- you

24  were throwing up and you soiled your pants, about what time did

25  that happen?

23

1  A.    It was -- it kept happening.  I can't give a specific

2  time.  It just kept -- it's, like, really every half an hour,

3  and then it went down to every 15 minutes I had to use the

4  toilet and throw up.

5  Q.    Did you have a cell mate?

6  A.    Yes.

7  Q.    Was he having problems also?

8  A.    Yes.

9  Q.    How many toilets do you have in your cell?

10 A.    One.  And when he had developed the same sickness that I

11 did, we were arguing over the toilet.  There was a couple times

12 when I had to sit down and use the toilet he was right behind

13 me throwing up in the sick.  And then after I finished, it was

14 vice versa.

15 Q.    I gave you the stack of exhibits, right?

16 A.    Yes.

17 Q.    Let's look at -- you mentioned there was -- you did have

18 interaction with the guard.  The 26th, did anybody come by and

19 at least check on everybody?

20 A.    Once we were locked down, a lady came past.  She was going

21 to cell to cell asking what symptoms did they have.  She was

22 covered up like she was really trying to protect herself.  That

23 got everybody scared because we didn't know what was going on.

24 And when we asked her, she said she wasn't allowed to give us

25 any information .  She just wanted to know what our symptoms

24

1  were.

2  Q.   Do you want to look at what exhibit one is?  Take your

3  time, John, because -- if you get them mixed up, we will get

4  them straightened out for you.

5  A.   Yes.

6  Q.   What's the title of that document in the left-hand corner?

7  A.   Medical emergency flow sheet.

8  Q.   Okay.

9        MR. GREECHER:  Judge, do you want a set of these to

10  look at?

11        THE COURT:  I don't need them right now.  But that's

12  your Plaintiff's Exhibit 1, right?

13        MR. GREECHER:  Yes.

14        THE COURT:  If you have a set, give them to me.

15        MR. GREECHER:  I have a set.

16  BY MR. GREECHER:

17  Q.   The inmate name on that is you?

18  A.   Yes.

19  Q.   Do you see the date 6/26/11?

20  A.   Yes.

21  Q.   And then it talks about what is the symptoms that are

22  recorded there?

23  A.   It just said diarrhea and aches.

24  Q.   And you were having those problems?

25  A.   Yes, I was having more than just aches though.

1  Q.    Understood.  Was this -- during the lockdown, was this the

2  only contact you had with anybody that was --

3  A.    That was it.

4  Q.    -- remotely medical?

5  A.    Yes, that was it.  They never came back.  She said someone

6  would be right around to see us, but no one ever came.  So she

7  just wanted to know was what our symptoms.  That was it.  She

8  had her face covered up like she was trying to protect herself

9  and paper things on her shoes.  She had protective gear on.

10 Q.    When you saw that, what did you think?

11 A.    I was frightened.  She was nervous, and act like she

12 couldn't talk.  She didn't want to tell what was going on.

13 Everybody was banging on the door, what is going on, what's

14 happening to us.  She said she was not allowed to give the

15 information to us.  She just wanted to know what our symptoms

16 were.  And a lot of people was making little rumors, experiment

17 going on, and we was really sick and worried.  I felt I was

18 going to die the way I was feeling.  I was weak.  I got --

19 could barely walk, and I had to sleep on the top bunk.  I had

20 to sleep on the floor next to the toilet because I had an

21 accident on the bunk where I relieved myself because I couldn't

22 get down in time to sit on the toilet.

23 Q.    Did -- so on the -- so your symptoms continued on the

24 27th, the next day?

25 A.    Yes, sir.

26

1  Q.    And why don't you tell us how you did during the period of

2  the lockdown, what were your symptoms, how you were feeling,

3  how things were working out with your cellmate?

4  A.    It increased to the point that my head was hurting real

5  bad.  My teeth was rattling.  I was shaking.  My muscles hurt.

6  My stomach was hurting.  My -- I had kept relieving myself, and

7  it was, like, a battle for the toilet because he had -- he was

8  suffering the same time I had, too.  When I tried to urinate a

9  few times it was burning.  It had, like, a little burning

10 feeling to it.

11 Q.    Did you have -- I mean, I know you mentioned you soiled

12 your pants on more than one occasion.  You had an accident in

13 your bunk.  Any other hygiene issues you guys faced while you

14 were in the cell during the lockdown?

15 A.    Yes, when on lockdown we ran out of toilet paper.  We

16 constantly asked the officer why we didn't have toilet paper.

17 He said, well, we can't unload the truck because we don't have

18 an inmate to unload the truck so you have to do the best you

19 can and try to reserve some of the toilet paper.  When we ran

20 out of toilet paper, we end up using our shirts to wipe ourself

21 and use the soap we had left for our shirts so we can reuse it.

22 Then we ran out of soap, and end up using toothpaste -- using

23 toothpaste.  And then after that, it was just water to try to

24 cleanse it out, clean our shirts.  And we used our sheets.

25 When we came off lockdown, they issue us new sheets because a

27

1 lot of people had used their sheets the same way that we did

2 because we didn't have no toilet paper.

3 Q.    And when did you get new sheets and new toilet paper and

4 so forth?

5 A.    After we came off lockdown.

6 Q.    Do you remember the best you can recall -- when you say

7 lockdown, when you were totally confined to your cell, how long

8 was that you weren't allowed out of your cell period?

9 A.    Close to two weeks, three weeks.  We weren't allowed to

10 take showers or nothing.  They fed us in a cell that was

11 infested because -- it was a mess.  And we didn't have nothing

12 to clean ourselves, nothing to wash our bodies with.  They

13 didn't give us anything.

14 Q.    What were you eating at this time?  Describe the nature of

15 the meals, what you guys were being fed.

16 A.    The first two days when I was on lockdown, they fed us

17 from the kitchen until the health department came and shut it

18 down because they felt the kitchen was in bad condition with --

19 salmonella bacteria was all over the place.  What they did,

20 they gave us -- me and my cellie three packages of oodles of

21 noodles apiece which was, jalapeno chilly pepper , oodles of

22 noodles.  They came from the commissary.  That was for lunch

23 and dinner.  They give us a cup of watered down broth and rice.

24 It was salty.  And they gave us a little cup of Gatorade, about

25 something like this Styrofoam cup of Gatorade.  We had that for

28

1 lunch and dinner for three days.  For breakfast we had a fruit,

2 powdered milk, cereal or they would give us a bagel, powdered

3 milk and a fruit.  That was it.  That was for the first three

4 days -- I mean after they close the kitchen down.  And then the

5 camp took over, and they started preparing meals for us, and

6 they started cooking food.

7 Q.   While you were still lockdown, you mentioned earlier you

8 had your -- you were afraid when you saw the lady --the health

9 care person come by the unit.  In terms of this how you were

10 doing emotionally and -- how were you dealing with this whole

11 situation?

12 A.   I was stressed out bad.  I was worried.  I was definitely

13 embarrassed because of me passing my bowels on myself.  Nobody

14 would tell us nothing.  We all were scared, you know, wondering

15 what was going on.  And every time we see the guard, we bang on

16 the door.  We kept pushing the panic button all day, all week

17 for, like, two weeks.  And they kept saying that medical is on

18 the red side, which is on the other side of the compound.  And

19 once they finish -- I mean on the blue side -- and once they

20 finish the blue side, they would be over here.  Nobody never

21 came.  Nobody never came.

22 Q.   Let's go to our next exhibit on the packet you have.  It

23 might be easier, John, if you take the clip off and just take

24 number one away and set it aside since we are done with that.

25 Are you on exhibit two?

29

1  A.    Yes.

2  Q.    Okay.  Let's look at -- at the bottom of exhibit two since

3  -- I have the pages numbered.  Okay.  Let's look at page one.

4  First of all, what is this document?

5  A.    This is a clinical encounter health service.

6  Q.    There is a woman here named Rita Carey.  Do you recognize

7  that name?

8  A.    Yes.

9  Q.    What was her role in the prison as you recall?

10 A.    She was the one who -- people that's, like, was sick --

11 they would come to see her and, you know, tell her what the

12 problems is.  She will determine if you should see the doctor

13 or not.

14 Q.    The document I have in front of you is dated July 1, 2011,

15 correct?

16 A.    Yes.

17 Q.    So that's seven or eight days after the -- you ate the

18 salmonella?

19 A.    Right.

20 Q.    Can you see there where it says under chief complaints

21 objective?

22 A.    Yes.

23 Q.    And P. T. I think we can accept is patient.  Tell us what

24 it says.

25 A.    P. T. is here for sick call.  Right side headache behind

30

1    the eye, several days, noted that it is worse today.

2    Q.    Now, at that point were you still having the salmonella

3    symptoms?

4    A.    Yes.

5    Q.    And what type of symptoms were you having?

6    A.    Diarrhea, throwing up, headache, pain in my eye.

7    Q.    Did you --

8    A.    I had a big migraine headache like my eyes want to pop out

9    or something.  It was behind my eye.

10   Q.    Do you recall whether or not you had mentioned those

11   symptoms to Ms. Carey at that time?

12   A.    Yes, I did.  I did mention to her, but I don't recall -- I

13   don't recall if she wrote it down or not or what she did with

14   the information I gave her.  I did mention it to her.

15   Q.    But you were having the headache behind your eye?

16   A.    Yes.

17   Q.    Okay.  Flip over to page 4 of that same exhibit.  Do you

18   see they are numbered at the bottom?  Do you see it, John?

19   A.    Page two.

20   Q.    No, page four down at the bottom right corner.  Let me

21   give you a hand.  This is another health services encounter,

22   correct?

23   A.    Yes.

24   Q.    And the date on this one is what?

25   A.    July 21, 2011.  11:27 a.m. in the morning.

31

1  Q.   And again this is the -- you saw Ms. Carey again, correct?

2  A.   Yes.

3  Q.   And what are you complaining about then?

4  A.   She put down that I came to sick call for a burning rash

5  on the bottom of my feet, also bloated after eating for several

6  weeks, noted to have internal hemorrhoids.

7  Q.   Tell us about the bloating symptoms.  When did they start?

8  A.   Started when we started getting food cooked by the camp.

9  I realized I couldn't hold anything down.  No matter what I ate

10 it always felt my stomach was bloated.

11 Q.   Did it -- let me ask this way.  Did those symptoms begin

12 before or after you had the chicken fajitas?

13 A.   After.

14 Q.   You were describing symptoms.

15 A.   It felt bloated.  And as far as the hemorrhoids when I

16 told her -- I was embarrassed.  I told her that I probably

17 keep, you know, having diarrhea, something was hanging up my

18 butt about an inch or so.  She said -- that's a hemorrhoid she

19 said, that's what happened because the diarrhea takes a toll on

20 people, wrap it around your finger and put cold water on it and

21 push it back up.

22 Q.   So your hemorrhoids had become -- come out while you had

23 all the diarrhea?

24 A.   Whatever it was.  Something was -- from the diarrhea was

25 causing my inside to come out.  When I told her about it, she

A48

32

1  pulled me to the side.  She didn't want nobody to hear it.  She

2  said, take some toilet paper, wrap it around your finger and

3  put cold water and push it back up.  That come from you having

4  diarrhea from straining or something.

5  Q.    Were you still having the diarrhea symptoms at that point?

6  A.    Yes.

7  Q.    Still throwing up or did that --

8  A.    Yes, still throwing up.

9  Q.    How often?

10  A.    Every half an hour.  It would go away I guess because I

11  had a second helping.

12  Q.    Now, let's go to the page -- move ahead to page 7.

13        THE COURT:  Can I just stop you for a second?  So,

14  Mr. Legrand, on July 21, you're saying you were still throwing

15  up every half hour?

16        THE WITNESS:  Yes, every half hour.  I still had

17  diarrhea, like, every 15 minutes.  I still had it.

18        THE COURT:  All right.  Go ahead.

19  BY MR. GREECHER:

20  Q.    Let's move on what we have at page 7, this is the August

21  4, 2011 entry.

22  A.    Yes.

23  Q.    This is -- again, you saw Ms. Carey?

24  A.    Yes.

25  Q.    Why don't you read that for us?

33

1  A.    Okay.

2  Q.    We will skip down to -- read the whole thing.  I'm sorry.

3  A.    August 4, 2011 at 11:27.

4  Q.    Subjective, page 7.

5  A.    Excuse me.  On August 4, 2011 at 11:27 a.m., chief

6  complaint, P. T. is here for sick call with multiple

7  complaints.  P. T -- itchy, watery eyes, several weeks.  In

8  other words she said I had this several weeks.  P. T. has a

9  optometry consult pending, referring to commissary for eye

10 drops.  P. T., pain with urinating -- having pain with

11 urinating, plus two weeks and a half -- that I'm having

12 problems.  She state that no burning, no fever, chill or no

13 discharge, occasional diarrhea and bloated stomach, also that

14 when he eats he feels like the food sits in his stomach for

15 hours.  No diarrhea, no abdominal pain currently.

16 Q.    At this point you were still having symptoms but they were

17 getting less frequent?

18 A.    Yes, yes, yes.

19 Q.    And on that day at least you weren't having diarrhea or

20 abdominal pain?

21 A.    Not on that particular day, but not -- I was having but

22 not as much as I was having before.  But I was still having

23 diarrhea and sometimes throw up because the food was set and it

24 would come up.

25 Q.    Now, let's flip over to page ten at the bottom.

34

1    A.    Excuse me?

2    Q.    Page ten on the bottom there.

3    A.    August 16th, 2011, 12:09 p.m.

4    Q.    Now, I will point out something.  Were you having

5    abdominal pain at that time?

6    A.    Yes.

7    Q.    And you asked specifically at that time to check your

8    weight, and it said you weighed 231.

9    A.    Yes.

10   Q.    Do you see on the bottom line on that note?  Did ask to

11   check weight which was 231.  Do you see that?

12   A.    Yes.

13   Q.    Now, did that represent more or less than you weighed

14   before you were -- you had the salmonella?

15   A.    I weighed less because I was weighing 257.

16   Q.    Now, let's make this -- complicate things for us.  Let's

17   go to exhibits 15 and 16.  Do you have exhibit 15 in front of

18   you?

19   A.    Yes, sir.

20   Q.    And what's the date on exhibit 15?

21   A.    8/7/2011.

22   Q.    Roughly the same time as a couple of these last doctor

23   notes or clinic notes we have looked at?

24   A.    Yes, sir.

25   Q.    And what is this document?

35

1  A.    I was filing a B. P. 8 because Ms. Pano (ph.) Refused to

2  give me a stool sample.

3  Q.    You don't need to read it.  These are symptoms one through

4  seven that you listed there?

5  A.    Yes, sir.

6  Q.    Okay.

7  A.    No. 1, still had bowel problems, diarrhea, two, stomach

8  pain cramps, three, bad headaches, No. 4 still urinating blood

9  with pain, No. 5, had eye irritation off and on, No. 6 still

10  having some joint pain off and on, No. 7, still using the

11  toilet for bowel movement six to seven times a day.

12  Q.    Let's look at a note of -- let's look at exhibit 16.

13  A.    August 11, 2011.

14  Q.    The next one.  The date by your signature?

15  A.    Oh, I'm sorry.  August 24th.

16  Q.    What is this again?

17  A.    Another complaint about problems I was having.  August 11,

18  2011 I spoke with A. H. S. R. Mr. Dunton, during lunchtime

19  before -- I mean during lunchtime here at U.S.P. Canaan main

20  kitchen line, and August 16th of 2011 I spoke with P. A. Mrs.

21  Carey at medical department in the morning at U.S.P. Canaan .

22  I spoke with both of them regarding the effects that I am still

23  having as a result of being inflicted with salmonella bacteria

24  poisoning from consuming chicken fajita here at U.S.P. Canaan

25  food service on June 25th, 2011 at dinnertime in the main line

A52

36

1  -- in the main kitchen.  I had request several times since then

2  to have a stool culture test conducted on me to see if I, in

3  fact, still have salmonella poisoning in my body.

4  Q.    Why did you want a stool sample?

5  A.    Because I wanted to know what was wrong, and other people

6  that worked in the kitchen was given stool samples.  They was

7  able to find out what was wrong with their body.  I was not

8  allowed to find out what was going on with my body.

9  Q.    Were you still having symptoms as of the 24th when you I

10 will filled out the document that we marked exhibit 16?

11 A.    Yes.

12 Q.    Were you having them less often as they had been

13 previously?

14 A.    No, I was still having problems.

15 Q.    Okay.  Were they less severe, let's say, then they had

16 been?

17 A.    Not when I first got it, but it did calm down some.  But I

18 still was experiencing the effects from --

19 Q.    At that point here on August 24th when you filed this

20 document, what did you report your symptoms as?

21 A.    Still having symptoms of salmonella poisoning in my body

22 by urinating blood with light burning pain, joint pain,

23 headaches, diarrhea, feeling like I wanted to vomit after

24 consuming meals or food.  My eye irritation, I have explained

25 several times to Mr. Dunton and Ms. Pano (ph.) That I never

A53

37

1  experienced -- never experienced none of these health problems

2  before until I got salmonella food poisoning from this

3  institution during the evening meal.  I was denied once again

4  by Mr. Dunton and Ms. Pano on the 8th and on -- on the 8th --

5  of my 8th and 14th Amendment right to have a stool culture test

6  done.  I even asked could they put it in writing stating why I

7  was denied.  I was told no.  I am still being treated with

8  deliberate indifference, requested for -- relief requested.  I

9  wish I had -- I wish to have a stool culture and given an

10 accurate diagnosis as to the symptoms that I am having, plus I

11 want a written answer as to why I am not receiving adequate

12 medical care.

13 Q.    Let's do these next couple -- probably easier from up

14 here.  Put your stack back together.  When did you first hear

15 it was suspected you guys had been infected with salmonella?

16 Was it while you were on lockdown or sometime after that?

17 A.    Afterwards.

18 Q.    Now, you as we just seen, you were pretty adamant about

19 getting a stool sample.  Let me ask you to look at exhibit four

20 --  exhibit three.

21 A.    Exhibit 3 is a stool sample of a -- test result.

22 Q.    This says the stool sample was collected 8/29/11 and

23 received August 30, 2011.  Do you see up here in the block?

24 A.    Yes.

25 Q.    What was the result?

Case: 16-4035    Document: 003112599701    Page: 57    Date Filed: 04/20/2017
Case 3:12-cv-00743-MEM  Document 246  Filed 11/07/16  Page 38 of 102

38

1  A.    Salmonella culture, the result was verified that I have

2  salmonella bacteria stereotype C.  I don't know what that

3  means.

4  Q.    Okay.  And if you go to exhibit four.

5  A.    This one was in August 30th.

6  Q.    Exhibit 3 is August 30th, okay.  Exhibit four, is that

7  another stool sample result?

8  A.    Yes.

9  Q.    This talks about collection date 8/30/2011, receipt date

10 9/7/1 1.  This is from the Pennsylvania Department of Health,

11 correct?

12 A.    Yes.

13 Q.    It's also positive?

14 A.    Yes.

15 Q.    This could actually be the same test we just looked at

16 given the dates, correct?

17 A.    No, I think they did a second test.

18 Q.    You had two close together, and they were both positive?

19 A.    Yes.

20 Q.    Let's go to the rest of the story then because you were --

21 you wanted to keep after this issue.  You eventually had a

22 another test, right?

23 A.    Yes.

24 Q.    That's exhibit five?

25 A.    Yes.

39

1  Q.    What's the date of that one?

2  A.    This was December 2nd, 2011, and it was done at Wayne

3  Memorial hospital laboratory.

4  Q.    And that was a sample collected November 29th, 2011,

5  right?

6  A.    Yes.

7  Q.    And at that point what was the result?

8  A.    Negative for salmonella poisoning.

9  Q.    Good.  Let's go to the next time when we talk about

10 exhibit 2 at page 13 at the bottom.  That's an entry from --

11 October 27th, 2011, correct?

12 A.    Yes.

13 Q.    And who did you see at that time?

14 A.    Dr. Holloway.

15 Q.    And is he back in the courtroom here?

16 A.    Yes.

17 Q.    And why don't you tell us how you were doing at that time?

18 A.    Chief complaint, 47-year-old-male with A. X. -- I don't

19 know what that means -- or T. I. A. -- I don't know what that

20 mean, and may -- and may at another facility -- I don't know --

21 I don't understand what it's saying, but I can go down some.

22 He was hospitalized.  M.R.I. was essentially negative.  M.R.I.

23 was essentially negative.  P. T. is being scheduled for a

24 follow-up with neurologist.  P. T. was recently seen by G. I.

25 and is awaiting schedule for colon -- colonoscopy.  Today P. T.

40

1    denies any chest or abdominal pain, nor change in bowel or

2    urinal habits.  No sub -- no -- I don't know what S. O. B.

3    stand for unless a medical term they use.  No dark stool, no P.

4    R. B. prior rectum.  I don't know what that means.  They have a

5    couple abbreviations I don't understand what it is.

6    Q.    Why don't you go down to -- okay.  It says -- at this

7    point you're saying no change in bowel or urinary problems, no

8    shortness of breath, dark stools, et cetera.  You say -- you

9    talk a little bit -- states he was ill during salmonella.  Why

10   don't you read that for us?

11   A.    Stated he was ill during the salmonella incident.

12   However, he is doing better now related to his -- related to

13   that.  He is trying to exercise more and denied any pain today

14   at this encounter.

15   Q.    So by the time you get to this visit with Dr. Holloway in

16   October, had the diarrhea and the vomiting -- had that part of

17   your symptoms cleared up?

18   A.    Yes, but except for my -- I still had bloated stomach

19   problems.  I had soft stool but not as bad as I had it when I

20   had the salmonella food poisoning.  I still had a little

21   problem but not that bad.

22   Q.    Did the soft stool eventually take care of it itself also?

23   A.    I still have that problem.

24   Q.    Did -- now, you mentioned -- it's mentioned in there about

25   the colonoscopy.  Take a look at exhibit six.  Do you see the

41

1  handwritten parts on exhibit six?

2  A.   Yes.

3  Q.   What's the date on the bottom?

4  A.   8/31/11.

5  Q.   What does it say?

6  A.   Stool --

7  Q.   No.  What is underlined there?

8  A.   Oh, blood in diarrhea.

9  Q.   Were you having those symptoms then?

10 A.   Yes.

11 Q.   It says check stool and check colonoscopy, correct?

12 A.   Correct.

13 Q.   Okay.  Up above where it talks about -- see where it's

14 written, it says provisional diagnosis?

15 A.   Yes.

16 Q.   And what is it stating there?

17 A.   Stomach problems, bloody something.

18 Q.   Bloody or bloating?

19 A.   Bloated stomach.  And -- it's the handwriting.

20 Q.   Fair enough.

21 A.   Okay.

22 Q.   It says next to allergies --

23 A.   Yes.  Salmonella, I guess, poisoning 6/26/11.

24 Q.   That's the date your symptom got bad?

25 A.   Blood in urine off and on.

A58

42

1  Q.    6/26/11 is the date your symptoms really got bad?

2  A.    Right.

3         THE COURT:  I am a little confused here as to the

4  dates.  The typewritten dates on the consultation request

5  indicate as of August 4th seems to be all symptomology you're

6  referring to, but there's a handwritten date of August 31, 2011

7  at the bottom, which I am wondering is just a sign -- a time

8  somebody signed off on that because this appears to be

9  generated August 4th, not August 31.

10        MR. GREECHER:  That's the -- I am not sure which date

11  it is, Judge.  There's another signature by Dr. Dubacheck of

12  9/6/11.  That may be the date of his signature.

13        THE COURT:  Yeah.  Do you know the answer to that,

14  Ms. Hoffman?

15        MS. HOFFMAN:  I believe I do.

16        THE COURT:  Tell us what it is.

17        MS. HOFFMAN:  I absolutely will.  Generally when a

18  prison doctor requests an outside consultation, they will make

19  a document like this consultation request.  I can only assume

20  -- and Dr. Holloway can confirm when he testifies -- this

21  consultation was requested on August 4th, and the handwritten

22  notes are actually from the outside doctor who came in and

23  participated in the consultation.

24        THE COURT:  On August 31.

25        MS. HOFFMAN:  August 31.

43

1              THE COURT:   That makes sense.

2    BY MR. GREECHER:

3    Q.   You mentioned bloating a couple times.  Can you tell us --

4    did that symptom resolve?

5    A.   No, sir.

6    Q.   And what other type of symptoms had you -- were you having

7    other than -- you said the diarrhea settled down and vomiting

8    settled down.  What other symptoms did you have going forward?

9    A.   Acid reflux.

10   Q.   Were you -- was this a problem you had before this

11   incident?

12   A.   This occurred after the incident.

13   Q.   Now, before we get into that, now you -- by the time you

14   get this -- you have your stool samples and were you advised of

15   the results initially?

16   A.   Uh-huh.

17   Q.   You found out they were positive?

18   A.   Yes.

19   Q.   What -- how do you feel about that?

20   A.   I was upset, very upset because I was never told and I was

21   being denied the treatment they have for it.  But I was being

22   denied and --

23   Q.   How about when you found out subsequently -- were you

24   advised after the December stool sample that they come back

25   negative?

44

1  A.    I was relieved.

2  Q.    Fair enough.

3  A.    I was relieved.

4  Q.    Now --

5  A.    Up until that point I was still stressed out because when

6  I got the last result verified again, and I was, like, I never

7  heard it last this long like this in someone's system.  I was

8  worried about what affect it might have did for my body not

9  getting treatment I needed for it.

10 Q.    For the acid reflux and the bloating feeling, were you

11 seeking any care or evaluations?

12 A.    Evaluation, they was testing different types of medicine

13 on me.

14 Q.    How were they working?

15 A.    They would -- it would last for a minute, but then it seem

16 like it wasn't working.

17 Q.    How about were you trying to get any -- in addition to

18 medicine, were you trying to get some testing done on yourself?

19 A.    Yes, I've been asking -- well, the doctor right here that

20 we just read, he scheduled for me to have a G. E. D. done to

21 find out what was going on and --

22 Q.    E. G. D. where they stick something down your throat?

23 A.    Yes, he was stating the poison can cause the -- mess up

24 the lining in your stomach.  When he saw me he did not know

25 that Canaan had salmonella outbreak until I told him about it.

A61

45

1  He said this could be your problem here because it mess up the

2  lining of your stomach and up here and cause your food to come

3  up.  He said he wanted to get one immediately done.  I was

4  scheduled to have one done, but they kept postponing.  They

5  rescheduled it, and approved it again and postpone it and

6  postpone it.  This went on for years.  It was -- in Florida the

7  same situation.  I was seen.  They approved again, and it was

8  postponed, scheduled and postponed.  It just went on for years.

9  Q.    So while this whole -- we will go through some records to

10 show what you just told us.  But tell us what is going through

11 your mind -- you want to have this test, doctors have

12 recommended the E. G. D., these other studies.  What is going

13 through your mind when this is being put off?

14 A.    I was scared.  I was wondering it if they was trying to

15 hide something from me.  The lady said when it first happened

16 -- she couldn't provide any information about what was going

17 on.  So now I am terrified because I keep going back to the

18 cell and going back to Ms. Pano, you know, when I catch them in

19 the hallway or something, when am I going to get this done.

20 They say, we don't know when it's been rescheduled, we are not

21 allowed to tell your when you are going to go.  Weeks and

22 months passed and I asked again.  They said, oh, the region

23 denied but they turn around and approved it again.  This kept

24 going on and on and on with no -- cancelling with no specific

25 reason of telling me why it was cancelled.

46

1  Q.    Let's take a look at exhibit seven.  Are you back in order

2  there?

3  A.    Yes.

4  Q.    That's a note from -- going ahead in time here.  June 8,

5  2012, correct?

6  A.    Yes.

7  Q.    What was your complaints at that point?

8  A.    Reported increasing acid reflux, occasional vomiting when

9  laying down at night, note that he has been propping himself up

10  with a blanket to sleep.  Asked him when he had G. I. test

11  done, and he told me that E. G. D. colonoscopy is still pending

12  regional medical approval, also dark urine in the morning

13  thinking he may have blood in his urine.

14  Q.    So you mentioned colonoscopy.  Let's go to exhibit eight.

15  A.    Exhibit eight?

16  Q.    Yes.

17  A.    Okay.

18  Q.    What's the date on this document?

19  A.    November 7th, 2012 at 7:20 a.m.

20  Q.    This is your colonoscopy, correct?

21  A.    Yes.

22  Q.    That got taken care of.  Flip over to the next page where

23  it says recommendations.  Do you see it?

24  A.    Yes.

25  Q.    What's the third one down?

47

1  A.    Perform upper G. I., appointment to be scheduled.

2  Q.    Upper G. I. endoscopy?

3  A.    Right.

4  Q.    Is that your understanding when they stick the tube down

5  your throat and take a look?

6  A.    Yes, that was November 7th, 2012.

7  Q.    December -- let's go to exhibit nine.  That's what is the

8  date on that one?

9  A.    December 21, 2012 at 11:12 a.m.

10  Q.    Okay.  And in here the administrative note, what does it

11  say -- tell us what it says here where it says

12  gastroenterologist recommended.  What does that say?

13  A.    History of -- I can't pronounce that --

14   h-e-m-a-t-c-h-e-k-s-i-a.

15  Q.    It states your colonoscopy was normal.  What's the

16  gastroenterologist recommending at the end of the line?

17  A.    He recommended U. G. I. to rule out source of bleeding.

18  Result of colonoscopy by revealed internal hemorrhoids -- that

19  I have hemorrhoids.

20  Q.    Let's go to exhibit ten.  That's 6/28/13, correct?

21  A.    6/28/13, 10:59 a.m.

22  Q.    What's the first line in the subjective read?

23  A.    The complaint one or?

24  Q.    Where it says subjective right under complaint one?

25  A.    49-year-old with multiple concerns, first want to know if

48

1    he is -- if his consult had been approved to go out, secondly

2    stated since he was young he has had a pinching pain right side

3    of his lower -- of his chest, lower end, stated this pain comes

4    once a week, last one to three minutes, also want his ear

5    checked.

6    Q.    Now, are the tests you were asking about -- is that the

7    test we are talking about, the upper G. I. endoscopy?

8    A.    Yes.

9    Q.    Let's move over to exhibit 11.  Since 9/9/2014, correct?

10   A.    Yes.

11   Q.    And what's the subjective note there?

12   A.    Skin problem frontal feet.

13   Q.    Go down to complaint two.

14   A.    Complaint two, medication he is on --

15   Q.    Read into your mic, please.

16   A.    The medication he's on for gastro G. E. R. D. is not

17   working.  He's demanding an endoscopy to be seen -- to see if

18   inside stomach -- wait a minute, I'm sorry.  He is demanding a

19   endoscopy to is see the inside of his stomach, saying -- says

20   once he had food poisoning and that destroyed his stomach,

21   denied rectal bleeding.

22   Q.    Were you concerned the salmonella had done some permanent

23   damage to your stomach at that point?

24   A.    Yes.

25   Q.    Do you recall at that point what medication you were

49

1 having for gastritis and GERD?

2 A.    Excuse me.  Say again.

3 Q.    What medication were you on that wasn't working?

4 A.    I think it was Xanax, some -- they gave me different

5 types.  I can't recall what they were.  I do have it in my

6 papers over there.  They kept giving me different type

7 medicine.  And I kept asking if I would have got the G.E.D.

8 done -- I mean the G. I. done -- look down my stomach maybe

9 they can find what medication they can use if there's a problem

10 to help.  But they said they want to keep trying different

11 medicine to see what would work.

12 Q.    Let's look at exhibit 12.  And the date of that document?

13 A.    December 22, 2014, 11:42 p.m.

14 Q.    For this visit and the prior one, what facility were you

15 at?  C. O. P. is that Coleman?

16 A.    Yes.  Yes, it is.

17 Q.    And why don't you -- where it says subjective here -- it

18 says -- where it says long standing.

19 A.    Long standing G. E. R. D. is gastro -- gastro pain and

20 discomfort to the point that he has to sleep in a semi sitting

21 position, stating it started with a food poisoning last year,

22 deny nausea, vomiting, bloody stool.

23 Q.    Were you still worried at this point the end of 2014 that

24 your -- you suffered some permanent damage internally from that

25 salmonella?

50

1  A.    Yes.

2  Q.    Had you your E. G. D. done yet?

3  A.    Yes, I just had it done.

4  Q.    As of December 2014?

5  A.    No.

6  Q.    Let's go to exhibit 13.

7  A.    5/18/15 11:10 a.m. in the morning I have e-mailed the

8  primary care provider.

9  Q.    Where were you at that point?

10  A.    U.S.P. Coleman one located in Coleman, Florida.

11  Q.    Were you at Coleman or Gilmer.  This is May 2015.

12  A.    Oh, I'm sorry, Gilman, I'm sorry -- F. C. I.

13  Q.    What were you asking for in this e-mail?

14  A.    Before I came here from U.S.P. Coleman one located in

15  Coleman, Florida there on a waiting list to see -- the waiting

16  list to go out for surgery for the doctor to look down inside

17  my stomach.  I was told that when I got here to F. C. I. Gilmer

18  it was -- it was showing up on my medical records I need

19  surgery.  I had been waiting since 2012 for the surgery to be

20  done when I was at U.S.P. Canaan, which is located at Waymart,

21  Pennsylvania but then I was transferred to U.S.P. Coleman one.

22  I am still having problems holding my food down in my stomach,

23  and I'm still having very bad stomach pains, lower chest pains.

24  All of this is from a poison I had from U.S.P. Canaan.  Please,

25  I need help.  Thank you.

51

1  Q.   Had somebody at Coleman told you that the salmonella had

2  caused you some damage inside your stomach?

3  A.   At Coleman?

4  Q.   Yes.

5  A.   The consultant, the one we just read, he said that

6  sometimes salmonella poison and bacteria can get into the

7  lining of your stomach.

8  Q.   When you heard that, how did that make you feel?

9  A.   I was scared, upset.  A couple times I was vomiting up

10 blood also.  So I was worried.

11 Q.   Let's look at exhibit 14.  It's another e-mail.

12 A.   July, 15, 2015 10:27 p.m.

13 Q.   You are at Gilmer?

14 A.   F. C. I. Gilmer.

15 Q.   What were you -- who were you e-mailing and why?

16 A.   Caretaker and provider that works in the medical

17 department.

18 Q.   And what were you looking for?

19 A.   I stated in my message to her, good morning, Ms. Wilson, I

20 want to know if you received my e-mail I sent to you this

21 morning because I was typing too slow -- I was typing too slow

22 and my timing ran out when I tried to submit it to you.  I was

23 inquiring about when I would get my blood work done because you

24 told me you would speak to the person who does the blood work

25 to see if I can be moved up and that I was -- and that I would

52

1   be seen a few days after the holiday, Fourth of July. That day

2   is long gone and I'm still waiting. I'm still having -- I am

3   still having -- I'm still having with the acid reflux -- I

4   misspelled something -- that is getting worse to the point that

5   I am afraid to go to sleep at night. It had my chest and

6   throat feel like it's on fire. I have been vomiting up blood

7   around 1:00 in the morning and have been feeling needle pains

8   around my stomach and having a hard time swallowing my food

9   sometimes due to the acid reflux.

10       The many different medications that has been given to me

11  he is not working. I have that in big letters. I need to see

12  the outside doctor to look down inside my stomach. I have been

13  approved by region office since 2011 to be seen by an outside

14  doctor to look down in my stomach. The doctor could have found

15  out what is going on with my stomach before I start -- before I

16  started to suffer with more pain and new pain -- and new

17  problems, I'm sorry. I have a right to know what's going on

18  with my health due to this poison.

19  Q.   Did you finally get the -- at this point here, were you

20  still worried about what was going on with you?

21  A.   Yes.

22  Q.   Did you eventually have the E. G. D. we have been

23  discussing?

24  A.   Yes, I had made several more complaints to her that I

25  needed this done so I can find out what's going on. And when I

53

1   said I was going to get an attorney or write to the B. O. P.

2   office in Washington D. C., and -- to see what they can do to

3   get something done because it shouldn't taken me all this time

4   to get a G. -- G. I. done on my stomach.  That's when they

5   scheduled me.

6   Q.    And when was it done?

7   A.    It was done June 17.

8   Q.    I'm sorry.  You said that, didn't you?  That was June

9   17th.  That would have been of this year?

10  A.    Yes, sir.

11  Q.    And what's your understanding what it showed?

12  A.    That I have a hernia inside my stomach.

13  Q.    Did it show any other changes that you're aware of,

14  irritation or anything?

15  A.    No, no.

16  Q.    Once you found out -- I have -- I just got the report the

17  other day.  It talks about chronic gastritis and a couple other

18  things.  Was that explained to you?

19  A.    No, I kept trying to ask because the pain I was having,

20  and it was like it was pushed aside.

21  Q.    At least since you've had that test and you've gotten some

22  results, did that put your mind somewhat at ease?

23  A.    Yes.

24  Q.    Fair enough.

25        MR. GREECHER:  That's all of the questions I have,

54

1  Judge.

2        THE COURT:  We are going to take a ten-minute break

3  before we get into cross examination.  And so if Mr. Legrand

4  needs to use the facilities, the marshals will do that.  Let's

5  take ten minutes and come back.

6        (A brief recess was taken.)

7  CROSS EXAMINATION

8  BY MS. HOFFMAN:

9  Q.   Mr. Spotts (sic), I only have a few questions.  I am told

10 I don't speak loudly.  If you don't hear me please, tell me so,

11 and I will repeat the question, okay.  Thank you.  Now, when

12 you first entered the U.S.P. Canaan, you were employed as -- it

13 was -- you were employed as an ordinarily; is that correct?

14 A.   U.S.P. Canaan, one?

15 Q.   Yeah, at Canaan.  When you came in what were you employed

16 as?

17 A.   I worked unit core.

18 Q.   It's my understanding bindery is unit core; is that

19 correct?

20 A.   Excuse me.

21 Q.   Bindery, that's unit core?

22 A.   Yes.

23 Q.   Did you have a job before that?

24 A.   Before I -- first time into the B. O. P. are you saying

25 outside?

55

1  Q.    No, sir.  We have records that indicate from June to

2  September before you started unit core you worked in general

3  maintenance.  Do you have any recollection of that?

4  A.    I don't understand that.

5  Q.    What was your prison job when you entered U.S.P. Canaan?

6  A.    I worked in unit core.

7  Q.    What you do in unit core?

8  A.    I was a curet.

9  Q.    How many hours did you work?

10 A.    Sometimes six hours a week -- I mean six hours and a half

11 a day sometimes six days a week.

12 Q.    Okay.  Did you miss any amount of time in unit core?

13 A.    Yes.

14 Q.    Okay.  When did you -- what period of time did you miss at

15 your job at unit core?

16 A.    I can't remember.  I'm trying to think back.  I can't

17 remember.  I know -- I can't recall.  I know I missed some

18 time.  I know I missed time from food poisoning.

19 Q.    And did you miss hours a day?  Did you miss days, weeks?

20 How often were you absent from your position?

21 A.    I guess the whole time I was on lockdown.

22        MS. HOFFMAN:  Okay.  I would like to actually note

23 for the Court with that point we stipulated that the lockdown

24 lasted from June 26 until June 30.  That was a full lockdown.

25 When June 30 the lockdown became modified which meant that

56

1  inmates could leave their cells and go their common areas and

2  the institution came off to -- off all kinds of lockdown on

3  July 13th.  So there's been some testimony today regarding the

4  time inmates were in their cells.  I just want to note for the

5  Court that counsel and I already stipulated full lockdown only

6  lasted June 26 to June 30.

7         THE COURT:  As part of that stipulation June 26 to

8  June 30 was full lockdown.  I understand that.  You referred to

9  modified lockdown as inmates were allowed to go to the common

10  area.  Does that include work?

11         MS. HOFFMAN:  That, Your Honor, I do not know.  I can

12  find out in a second, but off the top of my head --

13         MR. GREECHER:  They were allowed out into the --

14  right outside their cells, yes.

15         MS. HOFFMAN:  The dayroom area.

16         THE COURT:  That's not work.  So July 13th would be

17  the time when they would be back in regular -- the institution

18  was working normally?

19         MS. HOFFMAN:  Correct.  There were some units that

20  were released from lockdown prior to that.  Mr. Legrand was not

21  residing in one of the units that were released early.  So yes,

22  Mr. Legrand would have been released from full lockdown July 13

23  of 2011.

24         THE COURT:  Okay.

25  BY MS. HOFFMAN:

57

1  Q.    Now, Mr. Legrand, I just -- again a couple of questions.

2  You and Mr. Spotts -- you worked out together?

3  A.    Yes.

4  Q.    Okay.  And he indicated you had worked out prior to the

5  outbreak; is that correct?

6  A.    Yes, that's correct.

7  Q.    And how long prior to the outbreak had you worked out?

8  A.    About a couple weeks.

9  Q.    Couple weeks.  So it wasn't months?

10  A.    No, no.  I mean, afterwards we had -- you know, tried --

11  he tried to get me work out.  My body wasn't -- you know.  I

12  might go in the yard with him and/or might do some pushups on

13  the tier and I couldn't do it.

14  Q.    Okay.

15  A.    I wouldn't say I really worked out because my body wasn't

16  -- I was weak.  He was trying to build me back up in so many

17  words.

18  Q.    You indicated -- and Mr. Greecher -- your counsel pointed

19  out some documents that you had at times suffered from burning

20  urination?

21  A.    Yes.

22  Q.    Were you diagnosed with kidney stones?

23  A.    Yes.

24  Q.    Multiple times?

25  A.    Not multiple times, no.

58

1  Q.   We went over your medical record on the 21st of July you

2  had a headache --

3        THE COURT:  Is there a document number or --

4        MS. HOFFMAN:  I apologize, yeah.  It was Plaintiff's

5  Exhibit 2, page one, encounter July 1, 2011 was a report for a

6  headache.

7  BY MS. HOFFMAN:

8  Q.   Mr. Legrand, have you ever been diagnosed with a migraine?

9  A.   Migraine before?  I stated I had migraine headaches but

10  not diagnosed.  I had migraine headaches before.

11  Q.   You also indicated when we went over Plaintiff's Exhibit

12  No. 2 pages one through three, and pages four through five --

13  -- Exhibit No. 2 -- and actually it would be pages one through

14  five that encompasses two different encounters, July 1 and July

15  21, and then also page seven which was an encounter from August

16  4th.

17        You indicated when you reported to the health services

18  July 1, July 21 and August 4 you were still suffering from

19  vomiting and diarrhea every 15 minutes to a half hour; is that

20  correct?

21  A.   Yes.

22  Q.   But the physician assistant who saw you on each of those

23  encounters didn't write it down on the first or the 21st but

24  yet she wrote it down on the 4th; is that correct?

25  A.   On the first they didn't write it down, but I did tell her

59

1   the problems I was still having.

2   Q.   How about the 21st, July?

3   A.   Yes.

4   Q.   You told them, but they neglected to write it down?

5   A.   Yes.

6   Q.   August 4th --

7   A.   It was the same time when I went to see Ms. Pano on this

8   time on the 21st I asked her, you know, again, you know, about

9   the food poisoning, was I -- not by the food but what was wrong

10  with us.  And she kept saying at the time just stomach virus.

11  She didn't tell me exactly what it was.  She said it was

12  stomach virus.  That's from Ms. Pano.

13  Q.   August --

14  A.   I told her the symptoms I was having.

15  Q.   When you appeared on the 4th you mentioned you had

16  occasional diarrhea, but she documented it at that time; is

17  that correct?

18  A.   That is correct.  I was upset.

19  Q.   Okay.

20        MS. HOFFMAN:  I don't believe I have anything more

21  for him, Your Honor.  Thank you.

22        THE COURT:  Any redirect?

23        MR. GREECHER:  May I ask counsel something first?

24  REDIRECT EXAMINATION

25  BY MR. GREECHER:

60

1  Q.   Did you enjoy working out, Mr. Legrand?

2  A.   Did I enjoy working out, yes.

3  Q.   When you couldn't do it because you were sick, did you

4  miss it?

5  A.   Right.

6  Q.   Was that -- how did that fit into your life-style in

7  prison?

8  A.   Well, in prison I mean, you have to stay healthy and

9  strong at all times.  And by me not being able to work out and

10 -- I felt weak and vulnerable, kind of nervous a little bit

11 because I am in -- Canaan is very bad and I felt worried a

12 little bit.

13 Q.   Thank you.

14         MR. GREECHER:  That's all I have, Judge.

15         THE COURT:  Any recross based on that?

16         MS. HOFFMAN:  No, thank you.

17         THE COURT:  You may step down, Mr. Legrand.  Do you

18 have any other witnesses?

19         MR. GREECHER:  No, sir.  We rest.  We'd like to move

20 our exhibits into evidence which one is one through 16.

21         THE COURT:  Any objection to the exhibits?

22         MS. HOFFMAN:  No, Your Honor.

23         THE COURT:  They're admitted.

24         THE WITNESS:  May I say something?

25         THE COURT:  Yes, go ahead.

61

1          THE WITNESS:  When she stated about --

2          THE COURT:  Something about --

3          THE WITNESS:  Lockdown.  When they said the common

4  area, we was only allowed to stay inside -- in the common area

5  we was only allowed to stay inside the unit.  We could not

6  leave, and we was in the unit -- we didn't officially come out

7  of lockdown until, like, three weeks.  It wasn't no week or

8  couple days.

9          We had to stay in the unit because the kitchen was

10  still shut down.  It failed another test.  When they shut it

11  down the first time the health department came and again gave

12  them time to clean up in the kitchen.

13          THE COURT:  She said they came off -- lockdown

14  released by the agreement of parties July 13th which would have

15  been almost three weeks from the time the incident occurred.

16          THE WITNESS:  That's incorrect.

17          MR. GREECHER:  That's -- three weeks is three weeks.

18          THE COURT:  It's three weeks.  You're saying it was

19  about three weeks.

20          THE WITNESS:  When we came off lockdown we had to

21  stay in the unit for another couple more weeks.  The kitchen

22  failed inspection again.  So they kept us inside the unit.

23          THE COURT:  Okay.  Okay.  Do you have any other

24  questions you want to ask related to that, any cross you want

25  to ask related to that?

62

1          MS. HOFFMAN:  No, Your Honor.

2          THE COURT:  Thank you, Mr. Legrand.  Plaintiffs

3  rested.  So the government ready to proceed?

4          MS. HOFFMAN:  Yes, Your Honor.  We would like to call

5  Dr. Holloway to the stand, please.

6          MCDANIEL HOLLOWAY, called as a witness, being duly

7  sworn, testified as follows:

8  DIRECT EXAMINATION

9  BY MS. HOFFMAN:

10  Q.   Hi, Dr.  Holloway.

11  A.   Hi.

12  Q.   I would like to ask you a couple questions about your time

13  at Canaan, your profession and Mr. Legrand, okay?

14  A.   Okay.

15  Q.   What is your present position?

16  A.   I'm currently retired.

17  Q.   Okay.  Where did you retire from?

18  A.   F. C. I. Berlin in New Hampshire.

19  Q.   What was your position?

20  A.   Clinical director.

21  Q.   So you are a medical professional?

22  A.   Yes.

23  Q.   Can you briefly describe for the Court your medical

24  background?

25  A.   I did my internship in Detroit, Michigan in internal

63

1  medicine.  I did my residency in emergency medicine at McGill

2  University.

3  Q.   I have previously shown you exhibit A.  Can you identify

4  that document?

5  A.   Yes.

6        THE COURT:  Do you have a copy of your exhibits for

7  me as well?

8        MS. HOFFMAN:  Yes, Your Honor.

9        THE COURT:  Thank you.

10        THE WITNESS:  This is my C. V.

11        MS. HOFFMAN:  At this time I would like to move

12  exhibit A. into evidence.

13        THE COURT:  Okay.  Is there any objection to that?

14        MR. GREECHER:  Which is exhibit A?

15        MS. HOFFMAN:  C. V.

16        MR. GREECHER:  Yes, no problem, Judge.

17        THE COURT:  Okay.  It's admitted.

18        MS. HOFFMAN:  Thank you.

19  BY MS. HOLLOWAY:

20  Q.   Dr. Holloway, how many years have you served as a medical

21  professional in the prison setting?

22  A.   About nine years.

23  Q.   And how many years were you at Canaan prior to the

24  salmonella outbreak?

25  A.   Almost five.

64

1  Q.   Can you describe the nature of your duties prior to the

2  salmonella outbreak?

3  A.   I was the medical officer at Canaan at the time.

4  Q.   So you saw patients?

5  A.   Correct.

6  Q.   How did you first become involved in responding to the

7  salmonella outbreak?

8  A.   I was at home and I was called by H. S. A. to return to

9  the facility because we were having an outbreak of something we

10  weren't sure what and the clinical director was going inside

11  and I was to return.

12  Q.   What did you do after you received that phone call?

13  A.   I prepared -- I was coming back from Canada, so I drove

14  back to the facility.

15  Q.   When did you arrive?

16  A.   I arrived on Sunday.

17  Q.   Sunday the 26th of June?

18  A.   Yes.

19  Q.   And what role did you play in addressing the problem?

20  A.   When I -- we treat -- we went around door to door to see

21  who was the sickest ones because we had some that were more

22  sick than others and we -- those that were the most sick we

23  sent to the hospital.

24  Q.   Did that process start with your arrival?

25  A.   No, that been going on before I got there.

65

1  Q.   What was the nature of the response from medical at the

2  prison that Sunday, Monday and immediately thereafter?

3  A.   When I there Sunday we were going door to door and get the

4  name and symptoms, trying to identify to who we send to the

5  hospital.   Monday -- I guess would be the 27th, I believe, it

6  was Monday we start bringing them over dorm by dorm actually

7  sending them into the health unit.   We were sending them there.

8  Q.   When say brought them over, the inmates over to the health

9  services unit?

10  A.   Yes.

11  Q.   Did you offer the inmates having symptoms hydration?

12  A.   Yes.

13  Q.   What was the nature of the hydration?

14  A.   Gatorade.

15  Q.   Okay.

16  A.   Encouraged to drink water in the meantime.

17  Q.   And what other steps were taken -- what other treatment

18  was given to those that were symptomatic?

19  A.   Those that were having nausea and vomiting we give them

20  antinausea medication.

21  Q.   Anything else, hydration, antinausea medication?

22  A.   Attempt to give them Tylenol for fever.

23  Q.   For fevers, okay.   How long after the outbreak were you

24  still seeing inmates with symptoms?

25  A.   It went on for a few weeks I would say, active symptoms,

A82

Case: 16-4035   Document: 003112599701   Page: 85   Date Filed: 04/20/2017
Case 3:12-cv-00743-MEM   Document 246   Filed 11/07/16   Page 66 of 102

66

1  probably a few weeks.  It was sporadic.

2  Q.   What types of symptoms were you seeing?

3  A.   Some cramping and occasional soft stool and diarrhea.

4  Q.   Were the affected being seen in health services?

5  A.   They come into health services.

6  Q.   Now, I have previously given you exhibit B., which is an

7  excerpt of Mr. Legrand's medical records.  Do you recognize

8  that document?

9  A.   Yes.

10       MS. HOFFMAN:  I would like to introduce exhibit B.

11  and move for its admission.

12       THE COURT:  Any objection?

13       MR. GREECHER:  No, sir.

14       THE COURT:  Admitted.

15       MS. HOFFMAN:  Thank you.

16  BY MS. HOFFMAN:

17  Q.   Now, Dr. Holloway, we are going to go slightly out of

18  order but not terribly.  It shouldn't be too confusing for us.

19  The first thing I want to turn your attention to is page one,

20  and at the very bottom there's a section for, I guess, a

21  history of Mr. Legrand's weight.  Do you see that?

22  A.   Yes.

23  Q.   And on May 26th, 2011 when he entered U.S.P. Canaan, how

24  much did he weigh?

25  A.   229 pounds.

67

1  Q.   Okay.  Now, we're going to skip ahead to page 14.  And now

2  this is an administrative note that Mr. Greecher and Mr.

3  Leggrand already discussed.  However, the very last line --

4  second to last line and the last line there's note Mr. Legrand

5  had asked the health services provider to check his weight.  On

6  August 16th what was Mr. Legrand's weight?

7  A.   231 pounds.

8  Q.   So a month before the outbreak he was 229, and six weeks

9  after he was 231, correct?

10  A.   Yes.

11        THE COURT:  What page was that by the way?

12        MS. HOFFMAN:  14, sorry.

13  BY MS. HOFFMAN:

14  Q.   Just as a side note back in -- to page one of exhibit B.,

15  on October 27th, what was Mr. Legrand's weight?

16  A.   226 pounds.

17  Q.   226, thank you.  Now, a lot of this is going to seem

18  familiar as we did go over it with Mr. Legrand.  I just have a

19  couple questions on a number of the documents that are the same

20  that we have submitted -- plaintiff and counsel for the

21  defense.  So we are going to start on page four, and that is

22  the -- what we call triage sheet which is labeled a medical

23  emergency flow sheet.  Do you recognize that document?

24  A.   Yes.

25  Q.   What's the date of the document?

68

1  A.    6/28.

2  Q.    What does the 6/26 on the bottom corner mean?

3  A.    That's the nurse's note.

4  Q.    What does -- what does --

5  A.    I guess this is the note that they -- maybe they saw him

6  and they wrote down symptoms he was suffering at that time.

7  Q.    So he was -- correct me if I am not understanding.  He was

8  seen 6/28 and indicated that since 6/26 he had been suffering

9  aches and diarrhea; is that correct?

10  A.    Yes.

11  Q.    And this document also lists vital signs, correct?

12  A.    Yes.

13  Q.    How were his vitals?

14  A.    Blood pressure was fine, heart rate slightly elevated,

15  respiratory rate was fine and oxygen saturation was normal.

16  Q.    Did he have a fever?

17  A.    Slight temperature, 100.8.

18  Q.    Elevated heart rate and fever, is that typical signs of

19  dehydration?

20  A.    Early signs.

21  Q.    And I see on the far right he was given Tylenol, Gatorade

22  and a medication I'm not going to begin to pronounce.  That was

23  a --

24  A.    Antinausea.

25  Q.    We have a discussed a couple minutes ago the standard

1  treatment is Tylenol and hydration and Mr. Legrand received

2  some antinausea shot.  That does indicate -- there was no

3  question he wasn't feeling well June 28th, correct?

4  A.    Right.

5  Q.    The next thing we are going to look at is page 5 to 7.

6  And this was the July 1, 2011 encounter where Mr. Legrand

7  reported because he had a headache that had been occurring for

8  several days.  Do you see that encounter?

9  A.    Yes.

10  Q.    Is there any mention of stomach issues?

11  A.    No.

12  Q.    Is it generally the practice of the B. O. P. medical staff

13  to document what the inmate complains of in that subjective

14  section of the medical report?

15  A.    Yes.

16  Q.    Now, in this record, were Mr. Legrand's vital signs

17  normal?

18  A.    Normal.

19  Q.    So there was no fever?

20  A.    No.

21  Q.    No elevated heart rate?

22  A.    No.

23  Q.    If -- I'm sorry.  Dr. Holloway, can you verbalize your

24  answers?

25  A.    Yes, vital signs were completely normal.

70

1    Q.    The court reporter can't record head shaking.

2    A.    Thank you.

3    Q.    Okay.  So his temperature was fine.  His heart rate was

4    fine.  Whereas three or four days prior he had an elevated

5    heart rate and elevated temperature, which were preindications

6    of dehydration?

7    A.    Correct.

8    Q.    Okay.  No signs of dehydration July 1?

9    A.    No, none.

10   Q.    No mention of any stomach issues?

11   A.    No mention.

12   Q.    What was the plan of care that day?

13   A.    Plan July 1st was -- he was given Ibuprofen for the

14   headache and call for sick call as needed.

15   Q.    Now, as we turn to page eight and nine, the next time that

16   Mr. Legrand reported to medical was July 21, 2011.  Do you see

17   that encounter?

18   A.    Yes.

19   Q.    What was the primary complaint he arrived for?

20   A.    The patient received complaint -- sick call complaining of

21   burning rash on the bottom of the feet.

22   Q.    Okay.  What else did he note?

23   A.    He also complained of bloating after eating for several

24   weeks, patient noted having internal hemorrhoids.

25   Q.    He had a complaint for several weeks he had experienced

A87

71

1  bloating after eating, correct?

2  A.    Correct.

3  Q.    Okay.  Were his vital signs normal on July 21?

4  A.    Yes, vital signs normal July 21.

5  Q.    No fever, no elevated heart rate?

6  A.    No, nothing.

7  Q.    Thank you.  Now, again moving ahead to pages 11 to 13.

8  Now, this encounter is dated August 4th, 2011.  So it's

9  approximately two weeks later?

10  A.    Yes.

11  Q.    Okay.  And what did Mr. Legrand say in reference to the

12  bloating?

13  A.    Patient complained of occasional diarrhea and bloating.

14  Patient also noted when he eats he feels the food sits in his

15  stomach for hours.  No diarrhea or abdominal pain currently.

16  Q.    If you look at page 12 of that same encounter, three

17  quarters of the way down the page, and the gastroenterology

18  consult was requested?

19  A.    Yes.

20  Q.    And what does it say the reason for the request is?

21  A.    47-year-old male complains of bowel changes and bloating

22  over the last few months.

23  Q.    So two weeks prior it had been a few weeks, correct?

24  A.    Correct.  Patient complained of uncomfortable fullness for

25  hours after eating, no dysphasia.  Please evaluate.

72

1  Q.    What is dysphasia?

2  A.    Difficulty swallowing.

3  Q.    Okay.  Thank you.  Back to page 11, that same encounter,

4  the provider noted at that time on August 4th, that Mr. Legrand

5  was or was not suffering from diarrhea or abdominal pain.

6  A.    Correct.

7  Q.    Was or was not?

8  A.    Was not suffering, no diarrhea, no pain currently.

9  Q.    And forgive me.  This may be a repeat question.  Were his

10  vital signs normal August 4th?

11  A.    Yes, normal, yes.

12  Q.    Was his abdomen examined?

13  A.    Yes.

14  Q.    Anything unusual discovered on that examination?

15  A.    Bowel sounds were normal.  Abdomen was soft, non-tender,

16  no guarding or rebounding, no epigastric tenderness, no

17  suprapubic tenderness, no flank tenderness, normal exam.

18  Q.    He did have a stool sample that was positive for

19  salmonella; is that correct?

20  A.    Correct.

21  Q.    Okay.  Now, what does it mean to test positive for

22  salmonella during a stool sample?

23  A.    It means they have identified the organism in that sample.

24  Q.    And does that mean the person is necessarily suffering

25  from physical discomfort associated with salmonella while it's

73

1  in the stool?

2  A.    No, it just contained salmonella.

3  Q.    Salmonella is an organism; is that correct?

4  A.    Correct.

5  Q.    And it sheds?

6  A.    Yes.

7  Q.    So when it's removing itself from the body it sheds

8  through the system; is that correct?

9  A.    Through the stool, yes.

10  Q.    Thank you.  Now, on August 31, 2011 -- this is page 16 to

11  18.  This is the -- I'm sorry just page 18.  That is the

12  consult?

13  A.    Yes.

14  Q.    Okay.  And this document is -- I just want to clarify for

15  the Court that a prison employee requested this consult August

16  4th; is that correct?

17  A.    Yes.

18  Q.    And then an outside doctor came in and performed the

19  consult which resulted in handwritten notes August 31, correct?

20  A.    Correct.

21  Q.    Now, this gastroenterologist indicated at the top where

22  plaintiff pointed out that it says that there was bloating

23  after meals and there's blood in the urine and there's

24  different types of things, is that the subjective statements of

25  Mr. Legrand during this consultation?

74

1   A.    That would be, yes.

2   Q.    How do you know that?

3   A.    Just by the wordage.

4   Q.    Okay.  So what's written there isn't a diagnosis, it is

5   the subjective complaints of the individual being examined?

6   A.    Correct.

7   Q.    Now, also on this document, I believe the second to last

8   handwritten line -- the last line -- it indicates that the

9   doctor would like to check for blood in the diarrhea.  Is that

10  what that says?

11  A.    Bloody diarrhea.

12  Q.    And above that --

13  A.    Above that is assessment plan, A. P.

14  Q.    Give me a second.  You can see the word salmonella kind of

15  appears in the exhibit there.  What does that say?

16  A.    Symptoms, salmonella exposure 6/26/11.

17  Q.    Again, that is a note of what he's -- the -- the outside

18  doctor is being told?

19  A.    Yes.

20  Q.    Subjective statement, okay.  What did this doctor

21  prescribe to Mr. Legrand?

22  A.    Looked like he prescribed omeprazole.

23  Q.    What is that used to treat?

24  A.    Treat the reflux, GERD.

25  Q.    Did this dysphasia we talked about earlier, difficulty

75

1  swallowing, did Mr. Legrand complain of that this during this

2  consult?

3  A.    Complained of food -- yes, at the top, six hours for food

4  to digest, yes.

5  Q.    And now, not just during the Canaan outbreak but over your

6  years of service, you have seen a number of people infected

7  with salmonella; is that correct?

8  A.    Correct.

9  Q.    And is dysphasia a symptom and generally flows from

10 salmonella?

11 A.    No.

12 Q.    What are the -- what are the generalized symptoms of

13 salmonella poisoning?

14 A.    You have abdominal cramps, fever, nausea, vomiting and

15 diarrhea and general malaise.

16 Q.    Malaise?

17 A.    Meaning just feeling tired, weak.

18 Q.    Okay.  Now, we indicated this doctor described medication

19 for GERD.  What is GERD?

20 A.    That is a -- it's a disorder that's -- upper G. I. tract

21 of the esophagus -- you are treating to decrease acid in the

22 stomach to prevent reflux back into the esophagus.

23 Q.    What types of things can aggravate GERD?

24 A.    It can be medications.  It can be alcohol, drugs.  It can

25 be diet.  It can be -- also family, genetics can be involved.

76

1  Q.   Skipping ahead to page 28, that is the stool sample

2  collected November 29th of 2011.  And we're all in agreement

3  that at that time Mr. Legrand was negative for salmonella?

4  A.   Yes, it was negative.

5  Q.   And pages 29 and 30 are the report from the colonoscopy

6  well as the note from B. O. P. staff after reviewing that

7  report.  And again I think we're all in agreement that the

8  results indicated he had internal hemorrhoids, correct?

9  A.   Correct.

10  Q.   But otherwise it was -- I know page 29 is hard to read.

11  A.   I can't read that.

12  Q.   It's the recommendations.  Mr. Greecher went over them.

13  That's fine.  Page 30, recitation of the report indicates that

14  the colonoscopy was normal.  Is that correct?

15  A.   It only revealed internal hemorrhoids.

16  Q.   Okay.  Pages 31 to 44, this is a visit to the Wayne

17  Memorial hospital emergency room.  Is that correct?

18  A.   Correct.

19  Q.   And this was in January 2013?

20  A.   Correct.

21  Q.   Mr. Legrand was taken to the emergency room because he had

22  abdominal pain?

23  A.   Yes.

24  Q.   And while he was there, there was a C.A.T. scan of his

25  abdomen and several other tests?

77

1   A.   Yes.

2   Q.   What were the findings?

3   A.   He had mild right-sided hydronephrosis without urethral

4   calculus, finding secondary to recently passed calculus, which

5   is a stone.

6   Q.   Anything else?

7        THE COURT:   What page is that by the way?

8        MS. HOFFMAN:   31.

9   BY MS. HOFFMAN:

10  Q.   Down under pelvis, anything under there that --

11  A.   No bowel wall thickening or obstruction, no free air or

12  flee fluids, lymph nodes are not enlarged, urinary bladder is

13  unremarkable, appendix is normal, moderate to large amounts of

14  stool throughout the colon.

15  Q.   So ultimately his visit to the E. R. resulted in a

16  diagnosis of kidney stones and constipation?

17  A.   Yes.

18  Q.   Can constipation cause internal hemorrhoids?

19  A.   Yes.

20  Q.   Do internal hemorrhoids cause bleeding?

21  A.   Yes.

22  Q.   Now, on page 49, Mr. Legrand had another abdominal

23  ultrasound.  And what were the results of that test?

24  A.   Ultrasound of the abdomen -- unremarkable abdomen

25  ultrasound.

78

1  Q.    So the ultrasound was normal?

2  A.    Normal, yes.

3  Q.    Pancreas, spleen, all good?

4  A.    All good, yes.

5  Q.    Now, let's skip to pages 52 to 54.  This encounter is

6  dated from May of 2015, and it looks like a new intake.  So

7  that means Mr. Legrand arrived at a new institution, correct?

8  A.    This looks like he saw a surgeon.

9  Q.    I'm sorry?

10 A.    This may have been a consultant -- specialist -- page 50?

11 Q.    Page 52.

12 A.    Yes.

13 Q.    That is an encounter May 20th, 2015.  That means he just

14 got into that institution and they were doing a medical review?

15 A.    Yes, he must be seen within 14 days, yes.

16 Q.    And at that time Mr. Legrand complained what -- did he

17 state to the medical provider on that day?

18 A.    Main complaint G. I. states for several years now, he has

19 had trouble with a sticking feeling in his mid-chest, states he

20 doesn't have reflux though -- though but then later tells me

21 when he lies down he has food shoot up into his throat and

22 mouth.

23 Q.    That's good.  Thank you.  So this medical provider notes

24 that he has an assess -- his assessment on page 53 is Mr.

25 Legrand suffers from esophogeal reflux?

A95

79

1   A.   Yes.

2   Q.   He's on medication for that?

3   A.   Yes.

4   Q.   And on page 54, did the medical provider make a note of

5   anything that may be affecting Mr. Legrand's issues?

6   A.   He had E. G. D. pending and consultation request.  He must

7   have went in and looked at his commissary purchases and he

8   stated commissary needs some serious work and weight loss may

9   make a dig difference.  And there's a list of the commissary

10  purchases.

11  Q.   Okay.  So we discussed that GERD is -- salmonella is an

12  affliction of the lower G. I., tract?

13  A.   Yes.

14  Q.   And GERD is an affliction of the upper G. I. tract?

15  A.   Correct.

16  Q.   And the -- I am not going to make you recite all of them.

17  But number of items listed on the commissary list are foods

18  that would contribute to discomfort in the upper G. I. tract.

19  Is that possible?

20  A.   Correct, spicy fire balls, atomic fire balls, spicy beef,

21  jalapeno -- stuffed jalapeno chips, peanuts, Doritos.

22  Q.   The only other point I would like to make on that

23  particular document is in the other category, it also says that

24  -- makes some reference to the joint pain that Mr. Legrand had

25  been stating he was suffering as a result of the salmonella.

80

1   What does it say about the joint pain?

2   A.   Joint pain workup is negative for rheumatoid cause.

3   Q.   What does rheumatoid mean?

4   A.   Arthritic related.

5   Q.   Okay.  Now, page 55, Mr. Legrand had mentioned when he

6   testified or -- I'm sorry -- from these exhibits there was some

7   eye irritation.  Has Mr. Legrand ever been diagnosed with

8   cataracts?

9   A.   Yes, this was a routine three-month follow up.  He was

10  diagnosed with bilateral -- left eye -- I'm sorry -- bilateral

11  cataracts and is pending retinal specialty evaluation.

12  Q.   Bilateral means both eyes?

13  A.   Both eyes.

14  Q.   And pages 56 to 60 are some X-ray results.  I assume they

15  were done based upon Mr. Legrand's complaints of joint pain he

16  believes was caused by salmonella.  What did those X-rays show?

17  A.   Showed some mild degenerative disc disease, negative

18  except for mild D. D. D., which is aging.

19  Q.   So no arthritis?

20  A.   You can't diagnose arthritis with a plain film like that,

21  no.

22  Q.   Page 63 to 65, this is the E. G. D. I believe.  Is that

23  what it is called?

24  A.   57?

25  Q.   63 to 65.  It's --

81

1   A.    Yes.

2   Q.    What did that show?

3   A.    They did a biopsy, and it's the biopsy report.  It showed

4   mild reflux.

5   Q.    Mild reflux?

6   A.    Yes, gastritis, yes.

7   Q.    Now, we have discussed that salmonella affects the lower

8   G. I. tract and GERD affects the upper G. I. tract, correct?

9   A.    Correct.

10  Q.    Can salmonella get outside of the G. I. tract?

11  A.    Yes, it's possible.

12  Q.    And what happens when salmonella gets outside of the G. I.

13  tract?

14  A.    That person is what we call septic.

15  Q.    Septic is a condition that you --

16  A.    When the bacteria spread into other parts of the body.

17  Q.    Including the bloodstream?

18  A.    Yes.

19  Q.    That makes a person extremely sick?

20  A.    Extremely sick.

21  Q.    Now, we talked about what salmonella symptoms are.  Again,

22  given that you treated a number of people inmates and other

23  people with salmonella in your experience, have you ever seen

24  salmonella to cause burning in urination?

25  A.    No.

82

1  Q.   Kidney stones?

2  A.   No.

3  Q.   Do kidney stones cause burning in urination?

4  A.   Yes.

5  Q.   How about joint pain?

6  A.   No.

7  Q.   How about eye irritation?

8  A.   The salmonella?

9  Q.   Salmonella cause your eyes to be irritated?

10  A.   It could but in long term.

11      MS. HOFFMAN:  I don't think I have anything else for

12  him.  Thank you.

13      THE COURT:  All right.  Mr. Greecher?

14      MR. GREECHER:  Yes.

15  CROSS EXAMINATION

16  BY MR. GREECHER:

17  Q.   There was a commissary list you were shown.  Do you recall

18  that?

19  A.   If I can find it, yes.

20      MS. HOFFMAN:  54.

21  BY MR. GREECHER:

22  Q.   Do you know whether Mr. Legrand was eating that stuff or

23  trading it in the prison?

24  A.   Doesn't say -- I can't tell from that.

25  Q.   That's right.  Just talk about a couple of the exhibits.

83

1   I think it's page three.  The entry where it says 6/26/11 at

2   the bottom.

3   A.    Which page?

4         MS. HOFFMAN:  Page four.

5         MR. GREECHER:  Page four.

6   BY MR. GREECHER:

7   Q.    On that date, Mr. Legrand had a temperature, right?

8   A.    6/26?

9   Q.    Yes.

10  A.    He had a temperature on 6/28.

11  Q.    That's what I said.  He was seen -- when I read that up

12  above, it looks like 6/25 on the date.  You are saying that's

13  --

14  A.    6/28.

15  Q.    In any event, so he had an elevated temperature?

16  A.    Yes.

17  Q.    Not quite a fever but --

18  A.    Slight temperature, yes.

19  Q.    Not a fever but a temperature?

20  A.    Low grade.

21  Q.    He was given medication for the nausea?

22  A.    Correct.

23  Q.    That was by injection?

24  A.    Correct.

25  Q.    And he complained that he had aches and diarrhea which are

84

1  symptoms of salmonella exposure?

2  A.    Not in this.

3  Q.    6/26/14 he said he had those symptoms as of 6/26/11?

4  A.    From 6/26, yes.

5  Q.    Those are symptoms of the salmonella exposure, right?

6  A.    Aches and pains?

7  Q.    Yes, and the diarrhea.

8  A.    Aches and pains, cramping, diarrhea.

9  Q.    Sure.  We talked about -- you talked about in general what

10 the symptoms of salmonella are.  You say cramping, soft stools,

11 diarrhea, vomiting.  Those are all symptoms of salmonella?

12 A.    Yes.

13 Q.    And these -- individuals who have salmonella have varying

14 length of symptoms, correct?

15 A.    Correct.

16 Q.    Some people get better in a week, some people get better

17 in a month.  Some people can last months?

18 A.    Correct.

19 Q.    And would it be fair to say if the more salmonella you

20 consume the sicker you're going to be?

21 A.    No.

22 Q.    No, so seconds wouldn't have an effect in this case?

23 A.    No, you can't say that though.

24 Q.    Are you more likely to get sicker if the more salmonella

25 you exposed to?

85

1  A.    No, hasn't been proven, no.

2  Q.    Do you think that -- let's move ahead to the 7/21/12 entry

3  -- I mean '11 entry.

4         THE COURT:  More particularly talking about page 8?

5         MR. GREECHER:  Yes.

6         THE COURT:  Let's make sure the page numbers are

7  down.  Thanks.

8  BY MR. GREECHER:

9  Q.    It notes there the patient had internal hemorrhoids,

10  correct?

11  A.    Yes.

12  Q.    Would diarrhea cause aggravation of hemorrhoids?

13  A.    I wouldn't think so, no.

14  Q.    Would constant diarrhea where you're on the toilet on a

15  regular basis would -- is that going to cause irritation to

16  your hemorrhoids?

17  A.    I wouldn't think it would, no.

18  Q.    Would hemorrhoids come out as you're having diarrhea

19  expose them?

20  A.    Hemorrhoids are prone to come out when you are straining.

21  Q.    When people have diarrhea, once they empty themselves out

22  and continue to strain, would that be stress?

23  A.    Do you strain in diarrhea?  I don't strain in diarrhea.

24  Q.    You mentioned about the stool sample -- the reason you

25  have salmonella in the stool sample is salmonella sheds,

86

1  correct?

2  A.    Uh-huh.

3  Q.    So it's -- Mr. Legrand was still shedding salmonella by

4  the end of August 2011, which is when he had a stool sample?

5  A.    Yes.

6  Q.    Page 18.  You explained for us the different dates on

7  here.  And down at the bottom where it says A. P.  Do you see

8  where I am talking about in the handwriting?

9  A.    Yes.

10  Q.    That's assessment and plan, right?

11  A.    Yes.

12  Q.    So the assessment was especially gas pain, correct?

13  A.    Yes.

14  Q.    The plan was to -- can you read what the plan was?

15  A.    Omeprazole.

16  Q.    That's the medication?

17  A.    Medication, yes.

18  Q.    Okay.  And so even as early as August of 2011 the doctors

19  are talking about doing an E. G. D. on Mr. Legrand?

20  A.    Yes.

21  Q.    And the second item here, assessment is bloody diarrhea?

22  A.    Yes.

23  Q.    And for they want to check his stool, which we talked

24  about?

25  A.    Yes.

87

1  Q.    Also carry out the colonoscopy?

2  A.    Yes.

3  Q.    Now, you mentioned that -- some things that can cause

4  GERD, right?

5  A.    Yes.

6  Q.    Can infection can cause GERD?

7  A.    Can infection cause GERD?  Not for salmonella.

8  Q.    Can vomiting cause GERD?

9  A.    No.

10  Q.    Repeated vomiting?

11  A.    No.

12  Q.    Now, you talked about the salmonella being a lower G. I.

13  issue and GERD being an upper G. I. issue?

14  A.    Correct.

15  Q.    You're a doctor?

16  A.    Yes.

17  Q.    Correct.  Mr. Legrand, is he a doctor?

18  A.    Not to my knowledge.

19  Q.    And since he didn't finish high school, I think it's fair

20  to say he's not a doctor, right?

21  A.    Okay.

22  Q.    Now, we talked here now -- you mentioned, sir, that on

23  your qualifications you are a -- your work and efforts have

24  primarily been in the work field of emergency medicine,

25  correct?

88

1  A.    Correct.

2  Q.    Worked in prisons.  I think I saw also you did work for

3  Doctors Without Borders?

4  A.    Correct.

5  Q.    Which was written in French because I thought was pretty

6  cool on your resume -- and worked in a lot of urgent care

7  centers?

8  A.    Yes.

9  Q.    You're not an infectious disease doctor?

10  A.    Yes.

11  Q.    Salmonella is infectious disease, isn't it?

12  A.    Yes.

13          MR. GREECHER:  That's all of the questions I have,

14  Judge.

15          THE COURT:  Any redirect?

16          MS. HOFFMAN:  Only briefly, please.

17  REDIRECT EXAMINATION

18  BY MS. HOFFMAN:

19  Q.    Dr. Holloway, again we're on page 18 of this consultation

20  and the assessment and plan and noted the epigastric pain?

21  A.    Yes.

22  Q.    Where is the epigastric pain?

23  A.    Right at the breast bone.

24  Q.    Esophagus?

25  A.    Yes.

89

1  Q.    And E. G. D., that will looks at what part of the

2  digestive tract?

3  A.    Stomach, esophagus.

4  Q.    Salmonella sits where?

5  A.    In the intestine.

6           MS. HOFFMAN:  That's all I have.  Thank you.

7  BY THE COURT:

8  Q.    Doctor, let me just ask on page 28 it shows a positive

9  culture in the stool for salmonella.  And that is on November

10 29, 2011.  So three months or so after the incident occurred.

11 Is that usual, unusual?  Is there a period of time that if one

12 has salmonella that would -- if there is such a normal period

13 of time -- I don't know if there is -- that it would take for

14 it to be completely out of your system or out --

15 A.    It can take weeks or months later.

16 Q.    Would one be symptomatic during that time or can one be

17 asymptomatic but still have the salmonella in --

18 A.    At that point you're considered a carrier, which is

19 asymptomatic.

20 Q.    The E.G.E. -- the upper gastric scope -- so that according

21 what is on page 18 was first noted or recommended on August

22 31st, 2011 over -- at least according to the testimony of Mr.

23 Legrand he just got it a month ago four years later.  Am I

24 missing something in that, or is that -- assuming that Mr.

25 Legrand is correct when he got it and this is the first

90

1   indication of when it was -- have I missed something here?  The

2   upper endoscopy was first recommended August 13, 20011.

3        Any reason why it would take four years to get an

4   endoscopy recommended by a doctor?

5   A.   What happens is we write a consult.  It has to go to be

6   approved.  Once it's approved it's scheduled.  Scheduling can

7   depend on the providers, the consultants having an opening.  If

8   there's opening, they can come in as soon as possible.  If the

9   inmate is moved, the consult is still in the system.  When he

10  gets to the receiving institution, they usually get it

11  scheduled wherever it ends up.

12       THE COURT:  Any follow-up questions on my questions,

13  Mr. Greecher?

14       MR. GREECHER:  No, sir.

15       THE COURT:  All right.

16       MS. HOFFMAN:  No, Your Honor.

17       THE COURT:  You may step down.  Thank you.  It's now

18  12:30.  We will break for lunch.  Then we will come back and

19  continue.  So we will take -- break for an hour.  Be back at a

20  quarter of two.

21       MS. HOFFMAN:  Your Honor, with all due respect, the

22  defense rests.  We don't have any other witnesses.

23       THE COURT:  You don't -- I thought you had another

24  witness in the back.

25       MS. HOFFMAN:  Counsel for the Bureau of Prisons out

91

1  of the region.

2       THE COURT:  Okay.  All right.  Then that changes it

3  then.  So does the government have any additional witnesses?

4       MS. HOFFMAN:  We do not, Your Honor.

5       THE COURT:  So do you rest?

6       MS. HOFFMAN:  We do.

7       THE COURT:  Any rebuttal testimony?

8       MR. GREECHER:  I just want to -- I can ask Mr.

9  Legrand one question from right here, Judge?

10       THE COURT:  Sure.

11       MR. GREECHER:  You looked at that commissary list.

12  Is that all for you, or why did you buy that list?

13       MR. LEGGRAND:  Commissary list we are limited to two

14  things to order.  My cellie -- he might want two things, right.

15  And what I do, I get it for him and he give me something else.

16  And that's what we -- a lot of us do inside the prisons.  She

17  might want five honey buns, and I have ordered a honey bun.  So

18  I buy five extra honey buns for her, and she would turn around

19  and order what I want.  And that's what a lot of this is right

20  here because it's a limitation of what we can have, two of

21  each, three of each, five of each.  That's what that was right

22  there, Your Honor.

23       THE COURT:  Okay.

24       MR. LEGGRAND:  I know for a fact I cannot eat that

25  stuff because I know what it would do to me.  I would not try

92

1  to harm myself worse than I was feeling.

2            THE COURT:  Any cross on that?

3            MS. HOFFMAN:  No.

4            THE COURT:  Anything else?

5            MR. GREECHER:  No, sir.

6            THE COURT:  So you rest as well?

7            MR. GREECHER:  Yes, sir.

8            THE COURT:  All right.  As I said, it's now 12:44.

9  There's no more testimony to be taken in this particular

10 matter.  I am going to take it under advisement for purposes of

11 completion.  I don't know if you want to give a closing

12 statement, Mr. Greecher.

13           MR. GREECHER:  Sure.  While we're here, I might as

14 well sum up.

15           THE COURT:  Absolutely.

16           MR. GREECHER:  Just a few minutes here to wrap up

17 with Mr. Legrand's case.  He had a -- we had a chance to meet

18 him.  We know who he is.  He had a chance to explain to us what

19 happened to him.  And his symptoms were exactly what you expect

20 to have happen.  Dr. Holloway explained you would have

21 diarrhea.  You would have nausea, you have aches and pains.

22 You would be throwing up.  That's what Mr. Legrand said.  And

23 the -- the most severe symptoms lasted through the end of

24 August.  We have documentation in the medical records.  We also

25 have documentation in terms of the grievances Mr. Legrand was

93

1  filing.

2       And Mr. Legrand also acknowledged by the time he saw

3  Dr. Holloway from October that the severe symptoms, diarrhea

4  and vomiting, those things had gone away just like you expect

5  and just as -- some people get better in a week.  Some people

6  get better two weeks.  It can last months -- last a long time.

7  And when you think about it in those terms he -- he eats the

8  stuff at the end of June through July, he -- he's not feeling

9  well, it's documented in August he was having symptoms and by

10  the end of October -- sometime around the end of August, he was

11  starting to feel better and not reporting symptoms, by October

12  those worse symptoms are over.

13       Consider the conditions during lockdown.  They run

14  out of toilet paper.  They had to make do with what they had.

15  They were getting -- because of the conditions in the prison

16  they weren't being -- they were being fed but they were being

17  fed not regular meals.  They were -- Mr. Legrand during this

18  first couple weeks was really sick.  We can all -- as I said in

19  my opening -- getting sick.  We all have had a stomach virus.

20  We all had -- we know how sick we can get with that.  This is

21  another magnitude illness and how sick he continued to be in

22  the ensuing weeks and through August.  And then as we go

23  forward it begins -- those symptoms begin to dissipate.

24  Consider also you're in prison and knew you're soiling

25  yourself.  Just be -- any adult has that happen to themselves

94

1   and you can only imagine the embarrassment.  You're

2   embarrassed, humiliated.

3          Consider also the impact that while Mr. Legrand was

4   -- was ill over the ensuing weeks when he couldn't do what he

5   usually -- what he liked to do -- you are in prison.  There are

6   only certain things you can do for entertainment.  One of the

7   things he would like to do is workout.  He and Mr. Spotts

8   confirmed he wasn't able to work out.  He wasn't able to take

9   care of himself, keep up those types of activities.  So to the

10  extent you can be in prison and have a loss of life's pleasures

11  was there.

12         Let's go forward then.  We know he had these

13  additional upper -- upper G. I. symptoms, epigastric pain, GERD

14  and so forth.  He didn't know what was going on.  He knew he

15  had salmonella.  He had been tested.  He had been demanding

16  tests, and he finally got them.  And he has these new symptoms,

17  and he is told by someone down at Coleman, a physician, that,

18  hey -- this is something he was suspicious of already -- that

19  this could be related to your salmonella.  So he wants an

20  answer.

21         And he's wanted an answer from early August 2011.

22  They wanted to do the upper G. I. series.  And for whatever

23  reasons -- I know -- the prison system is a big system.  People

24  get moved around, and there's an administrative process to get

25  things approved.  He has to wait almost five years to get the

Case: 16-4035    Document: 003112599701    Page: 114    Date Filed: 04/20/2017
Case 3:12-cv-00743-MEM   Document 246   Filed 11/07/16   Page 95 of 102

95

1    testing that needs.  This entire time he's thinking what is

2    going on, what is happening.  What has happened to my insides.

3            Is this something that is going -- what is the

4    problem and how is this -- all stems from him back to the

5    salmonella.  So this is more anxiety and distress.  Obviously

6    when it first happened, as additional folks came through the

7    prison because they realize there was some kind of infection --

8    they weren't wearing regular clothes, they had protective

9    clothing.  They didn't know what was going on with him because

10   they are so sick.  His problem continues because he has

11   lingering -- but it's this continuing -- continuing problem in

12   his upper G. I. which we now know lower and upper -- he figures

13   he has this salmonella problem.  They just can't get to the

14   bottom of it because he can't get the answer, can't get testing

15   needs.

16           There's something else wearing on him, how sick am I

17   going to be, poisoned for life.  This has what he has to live

18   with.  Thankfully he had the upper G. I. now.  He had an E. G.

19   D.  He learned he has gastritis.  He found out he has a hernia.

20   That gives him some relief.  He understands what it is .  That

21   burden is taken off.  It took five years.  As we went through

22   the records, we saw repeatedly him telling the folks, you know,

23   I can't sleep lying down, I am throwing up, feel full all the

24   time.  This is going on and on, something that's wearing on him

25   until he finally gets testing.  So I ask, Judge, that you

96

1  consider the evidence.  You are the fact finder here.  So we

2  trust that you will give Mr. Legrand a fair result.  Thank you.

3        THE COURT:  Mr. Greecher, let me ask you one thing.

4  I am concerned the last part you referred to.  I -- is it your

5  position then that if Mr. Legrand thought he had some

6  connection that he didn't have that somehow he should be

7  entitled to damages based upon his own misperception, or is the

8  Bureau of Prisons required anytime an inmate thinks I think

9  something that happened here caused, you know, X. happen and I

10  think it caused Y. in me and if you don't give me a test I

11  think I need to show that, that I am somehow entitled to

12  emotional distress damages based upon not having whatever it

13  was?

14        MR. GREECHER:  I believe he -- these emotional

15  distress damages flow directly from his original exposure to

16  the salmonella.

17        THE COURT:  I get all of the emotional distress

18  damages related to -- related the illness, related to the

19  conditions.  I get all the arguments there.  That's not what --

20  my question.  My question to you is he thinks he has got

21  something he doesn't have or that there's a connection that

22  isn't in place, your argument he's entitled to damages because

23  he thought so even though it's not the case?

24        MR. GREECHER:  It's because he suffered the

25  salmonella poisoning and now he's worried about his health in

97

1  general and the specific abdominal problems he's having.

2         THE COURT:  I get them.  They are not related so I

3  mean how is that -- look --

4         MR. GREECHER:  He doesn't --

5         THE COURT:  I cannot for the life of me figure why it

6  took this long for the Bureau of Prisons to do it.  It's -- I

7  am flabbergasted by the time it took them to -- when they had

8  back in August of 2011 a doctor saying he needed a consult that

9  had been five years later.  I find that grossly improper on the

10 Bureau of Prisons' part, horrendous, unconscionable.  I don't

11 know what else to say about that.  But that's a different issue

12 than whether or not they're what I will call -- we will call it

13 anything -- what I have already said -- but whether that if it

14 turns out that it's not related to what he was -- the mere fact

15 that he thought it could be, might be, should be, would be,

16 it's hard for me to figure how that is entitled to damages when

17 he didn't have the connection that he in his own mind figured

18 he did but the Bureau of Prisons was somehow required to

19 disprove in a timely fashion anything that he thought might

20 have been not connected even though it appears that there

21 really isn't a reason to think it's going to happen.

22        THE COURT:  He was -- my argument is that he was

23 concerned he suffered -- he was worried, concerned about this

24 upper G. I. problem he had that he relates to the -- he

25 believed came on after this salmonella outbreak and that he's

98

1 concerned that he has some permanent damage because of that.

2 Now, if he wasn't in prison, you would say, well, go see -- you

3 go to a doctor, check it out and be over.  He was in prison.

4 That's where it happened.

5        That just happens to be, you know -- he's the egg

6 shell plaintiff in that respect.  He can't do anything about

7 it.  So it is just working on him all this time.  Had he not

8 had the salmonella, we wouldn't have this argument.  We

9 wouldn't have this position.  But he had this salmonella.  He

10 gets -- he developed these problems.  It's been working on him

11 months and years until he finally gets the testing done.

12        THE COURT:  Thank you.

13        MS. HOFFMAN:  I want to reiterate the government is

14 sorry that you got ill, Mr. Legrand.  We are.  However, the

15 evidence shows that he did not lose 57 pounds as he testified.

16 His fluctuated three to four pounds a month before the outbreak

17 to two months after the outbreak.  He indicated he didn't miss

18 any work aside from lockdown despite the fact he was vomiting

19 every 15 to 30 minutes for -- I believe he testified six weeks.

20 However, his medical records show that as early as July 1,

21 there were no signs of dehydration, his vitals were normal.

22 They were within line.  There was no sign he was dehydrated at

23 that time.  On August 4th, he reported he had occasional

24 diarrhea.  He testified that he had vomiting, diarrhea every 15

25 to 30 minutes into the end of August, beginning of September I

99

1  believe he said.  The record doesn't reflect that.

2         The medical record shows he has sick for a couple of

3  weeks.  He was very ill for about a week and then occasional

4  diarrhea three weeks later isn't -- it doesn't amount to the

5  four months that they are claiming he took to get better from

6  the salmonella.  The evidence also indicates that most of the

7  problems he suffered from after July and August were completely

8  and wholly unrelated to salmonella.

9         They were GERD.  As we discussed they were not

10 involved in the same part of digestive system as salmonella is.

11 I very much understand your concern about the E. G. D.  I

12 cannot address that for the Court today.  I don't have an

13 answer.  I understand the Court's concern, and I will address

14 it.  But at this moment I cannot offer you any explanation as

15 to why it took four years for him to get the test.  Again, no

16 doubt he was sick.  But we offer the evidence shows he was sick

17 for about a week, week and a half with very minimal systems for

18 a week or two after the initial outbreak.

19         THE COURT:  Anything else then?

20         MS. HOFFMAN:  No, thank you.

21         THE COURT:  Let me ask you about -- the only

22 testimony -- I was hoping I would hear some testimony from the

23 Bureau of Prisons.  The only testimony that we heard about the

24 conditions in the cell were that Mr. Legrand had to use -- had

25 no toilet paper the testimony was because the Bureau of Prisons

100

1  answer was we don't have any inmates to unload the truck.  That

2  was his testimony.

3        Now, there's been no controverting testimony about

4  that.  No one has brought any testimony forward to say that

5  isn't accurate.  If that's the case, that's also horrendous.

6  Tell the Bureau of Prisons to hire somebody or get off their

7  butts and get the toilet paper off the trucks.  That's

8  horrendous that they have to use sheets and then clean it with

9  soap and when they ran out of soap used toothpaste.  When they

10  ran out of toothpaste they sat in their cells with shit on

11  their sheets.

12        I have to say I am flabbergasted by some of the

13  things I have heard.  Do you have any argument as to that

14  wouldn't be entitled to some compensation for that kind of

15  conditions?

16        MS. HOFFMAN:  I would argue that while portions of

17  that testimony may be accurate, I believe it is more than

18  likely highly exaggerated.  They have common areas.  There are

19  --

20        THE COURT:  They weren't allowed out of their cells,

21  correct?

22        MS. HOFFMAN:  6/26 to 6/30.

23        THE COURT:  No one is disagreeing they are throwing

24  up and having diarrhea.

25        MS. HOFFMAN:  No, can't disagree with that.

101

1          THE COURT:  No testimony indicating that they didn't

2     run out of toilet paper or they had to use sheets or they

3     didn't run out of soap in trying to clean their sheets.

4          MS. HOFFMAN:  I have absolutely no information

5     related to that.

6          THE COURT:  Okay.  All right.  Thank you very much.

7     Okay.  I appreciate everybody's presentation of the evidence on

8     both sides of the case.  I know both sides have submitted

9     proposed findings of fact and conclusions of law.  If you wish

10    to supplement them in any way -- today is Wednesday.  I will

11    give you until Friday in case any side wishes to file any

12    supplemental proposed findings of fact or conclusions of law.

13    I am not saying you should.  But I thank everybody for their

14    preparation and presentation of evidence.  Have a good day.

15

16

17

18

19

20

21

22

23

24

25

102

REPORTER'S CERTIFICATE

I, LAURA BOYANOWSKI, Official Court Reporter for the
United States District Court for the Middle District of
Pennsylvania, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a true and correct transcript of the
within-mentioned proceedings had in the above-mentioned and
numbered cause on the date or dates hereinbefore set forth; and
I do further certify that the foregoing transcript has been
prepared by me or under my supervision.


_____
Laura Boyanowski, RMR, CRR
Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    Scranton, PA  18503


        (The foregoing certificate of this transcript does not
apply to any reproduction of the same by any means unless under
the direct control and/or supervision of the certifying
reporter.)

APPEAL,CANAAN,CLOSED,MEDSNR,MEDSR,PROSE,PRSLC,STANDARD

# United States District Court
## Middle District of Pennsylvania (Scranton)
### CIVIL DOCKET FOR CASE #: 3:12-cv-00743-MEM

Legrand et al v. Fenstermaker et al                    Date Filed: 04/20/2012
Assigned to: Honorable Malachy E Mannion              Date Terminated: 09/06/2016
Case in other court: 3rd Cir. USCA, 16-04035          Jury Demand: None
Cause: 28:1331 Federal Question: Other Civil Rights   Nature of Suit: 550 Prisoner: Civil Rights
                                                      Jurisdiction: U.S. Government Defendant

### Plaintiff

**John Legrand**                          represented by   **Stephen M. Greecher , Jr.**
47009-037                                                  Tucker Arensberg, P.C.
FCI Gilmer                                                 2 Lemoyne Drive, Suite 200
SPECIAL MAIL-OPEN ONLY IN THE                             Lemoyne, PA 17043
PRESENCE OF THE INMATE                                    717-234-4121
P.O. Box 6000                                             Fax: 717-232-6802
Glenville, WV 26351-6000                                   Email: sgreecher@tuckerlaw.com
                                                          *ATTORNEY TO BE NOTICED*

### Plaintiff

**Vance Baker**                           represented by   **Vance Baker**
*TERMINATED: 01/07/2013*                                   48623-053
                                                          U.S.P. Canaan
                                                          SPECIAL MAIL-OPEN ONLY IN THE
                                                          PRESENCE OF THE INMATE
                                                          P. O. Box 300
                                                          Waymart, PA 18472
                                                          PRO SE

### Plaintiff

**Eric Andrews**                          represented by   **Eric Andrews**
*TERMINATED: 01/07/2013*                                   59670-066
                                                          U.S.P. Canaan
                                                          SPECIAL MAIL - OPEN ONLY IN THE
                                                          PRESENCE OF THE INMATE
                                                          P.O. Box 300
                                                          Waymart, PA 18472
                                                          PRO SE

### Plaintiff

**Antonio Hudson**                        represented by   **Antonio Hudson**
*TERMINATED: 01/07/2013*                                   97870-071
                                                          U.S.P. Canaan
                                                          SPECIAL MAIL OPEN ONLY IN THE
                                                          PRESENCE OF THE INMATE
                                                          P.O. Box 300
                                                          Waymart, PA 18472
                                                          PRO SE

**Plaintiff**

**Terrell Johnson**
*TERMINATED: 01/22/2014*

**Plaintiff**

**Stephen Brazelton**                              represented by **Stephen Brazelton**
*TERMINATED: 02/05/2013*                                        26826-001
                                                               CANAAN
                                                               U.S. PENITENTIARY
                                                               Inmate Mail/Parcels
                                                               P.O. BOX 300
                                                               WAYMART, PA 18472
                                                               *PRO SE*

V.

**Intervenor Plaintiff**

**Terrell Johnson**                               represented by **Terrell Johnson**
*TERMINATED: 01/22/2014*                                        6029 Palmetto Street
                                                               Philadelphia, PA 19111
                                                               *PRO SE*

V.

**Defendant**

**Erika Fenstermaker**                            represented by **Justin Blewitt**
*U.S.P. Administrative Remedy Coordinator*                      U.S. Attorney's Office
*TERMINATED: 08/01/2014*                                        Prison Litigation - Civil
                                                               235 N. Washington Avenue
                                                               Suite 311
                                                               Scranton, PA 18503
                                                               570-348-2800
                                                               Email: justin.blewitt@usdoj.gov
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**Ryan**                                          represented by **Justin Blewitt**
*U.S.P. Canaan Food Service Administrator*                      (See above for address)
*TERMINATED: 08/01/2014*                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Poane**                                         represented by **Justin Blewitt**
*U.S.P. Canaan Medical Service Director*                        (See above for address)
*TERMINATED: 08/01/2014*                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Captain Breckon**                               represented by **Justin Blewitt**
*U.S.P. Canaan*                                                 (See above for address)
*TERMINATED: 08/01/2014*                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Warden Ronnie Holt**
*U.S.P. Canaan*
*TERMINATED: 08/01/2014*

represented by **Justin Blewitt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Henry Sadowski**
*Northeast Regional Office Counsel*
*TERMINATED: 08/01/2014*

represented by **Justin Blewitt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**

represented by **Justin Blewitt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joanne M Hoffman**
U.S. Attorney's Office
235 North Washington Ave
P.O. Box 309
Scranton, PA 18501
570-348-2800
Email: joanne.hoffman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Mediator**

**Mediator**
*TERMINATED: 02/05/2013*

represented by **Joseph Anthony Barrett**
Office of Clerk of Court
235 N. Washington Ave.
William J. Nealon Federal Building
Scranton, PA 18501
570-207-5662
Email: joe_barrett@pamd.uscourts.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/20/2012 | 1 | COMPLAINT against Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski, filed by Eric Andrews, Vance Baker, Antonio Hudson, John Legrand.(ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 2 | Supplement by Eric Andrews, Vance Baker, Antonio Hudson, John Legrand to 1 Complaint. (ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 3 | MOTION (Application) for Leave to Proceed in forma pauperis by John Legrand.(ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 4 | PRISONER AUTHORIZATION by John Legrand allowing prison to submit copy of prisoner's trust fund account to the court, and approving the entire filing fee to be deducted from prisoner inmate account. (ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 5 | ADMINISTRATIVE ORDER for John Legrand sent to Prison Superintendent/Warden (ao, ) Modified on 4/20/2012 (ao, ). (Entered: 04/20/2012) |

| 04/20/2012 | 6 | MOTION (Application) for Leave to Proceed in forma pauperis by Antonio Hudson.(ao, ) (Entered: 04/20/2012) |
|---|---|---|
| 04/20/2012 | 7 | PRISONER AUTHORIZATION by Antonio Hudson allowing prison to submit copy of prisoner's trust fund account to the court, and approving the entire filing fee to be deducted from prisoner inmate account. (ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 8 | ADMINISTRATIVE ORDER for Antonio Hudson sent to Prison Superintendent/Warden (ao, ) Modified on 4/20/2012 (ao, ). (Entered: 04/20/2012) |
| 04/20/2012 | 9 | MOTION (Application) for Leave to Proceed in forma pauperis by Eric Andrews.(ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 10 | PRISONER AUTHORIZATION by Eric Andrews allowing prison to submit copy of prisoner's trust fund account to the court, and approving the entire filing fee to be deducted from prisoner inmate account. (ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 11 | ADMINISTRATIVE ORDER for Eric Andrews sent to Prison Superintendent/Warden (ao, ) Modified on 4/20/2012 (ao, ). (Entered: 04/20/2012) |
| 04/20/2012 | 12 | MOTION (Application) for Leave to Proceed in forma pauperis by Vance Baker.(ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 13 | PRISONER AUTHORIZATION by Vance Baker allowing prison to submit copy of prisoner's trust fund account to the court, and approving the entire filing fee to be deducted from prisoner inmate account. (ao, ) (Entered: 04/20/2012) |
| 04/20/2012 | 14 | ADMINISTRATIVE ORDER for Vance Baker sent to Prison Superintendent/Warden (ao, ) Modified on 4/20/2012 (ao, ). (Entered: 04/20/2012) |
| 04/20/2012 | 15 | STANDING PRACTICE ORDER sent to John Legrand, Vance Baker, Eric Andrews and Antonio Hudson. (ao, ) (Entered: 04/20/2012) |
| 04/27/2012 | 16 | ORDER REFERRING CASE to Magistrate Judge Carlson for Pretrial Management.Signed by Honorable Edwin M. Kosik on 4/27/12. (lh, ) (Entered: 04/27/2012) |
| 05/01/2012 | 17 | ORDER - IT IS ORDERED that the Plaintiff's requests to proceed in forma pauperis (Docs. 3, 6, 9 and 12) are GRANTED. The Clerk of Court is directed to serve Plaintiffs complaint in accordance with F.R.C.P. 4. The Defendants are requested to waive service pursuant to Rule 4(d). Signed by Magistrate Judge Martin C. Carlson on May 1, 2012. (kjn ) (Entered: 05/01/2012) |
| 05/01/2012 | 18 | Summons Issued as to Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski and provided to USM SCR for service on Defendant(s). (kjn ) (kjn, ). (Entered: 05/01/2012) |
| 05/03/2012 | 19 | MOTION for Joinder by Terrell Johnson.(lh, ) (Entered: 05/03/2012) |
| 05/03/2012 | 20 | Application to Proceed in District Court without Prepaying Fees or Costs. (lh, ) (Entered: 05/03/2012) |
| 05/03/2012 | 21 | MOTION for Leave to Proceed in forma pauperis by Terrell Johnson.(lh, ) (Entered: 05/03/2012) |
| 05/03/2012 | 22 | PRISONER AUTHORIZATION by Terrell Johnson allowing prison to submit copy of prisoner's trust fund account to the court, and approving the entire filing fee to be deducted from prisoner inmate account.. (lh, ) (Entered: 05/03/2012) |
| 05/07/2012 | 23 | RECEIPT LETTER $ 45.83, receipt number 333023366 Vance Baker partial FF 5/7/12 |

| | | (ao, ) (Entered: 05/07/2012) |
|---|---|---|
| 05/11/2012 | 24 | MEMORANDUM AND ORDER - IT IS ORDERED that Johnsons motion for leave to proceed in forma pauperis, (Doc. 21), and a motion to join this action,(Doc. 19), are GRANTED.Signed by Magistrate Judge Martin C. Carlson on 05/11/12. (pjr) (Entered: 05/11/2012) |
| 05/15/2012 | 25 | Letter from Antonio Hudson dtd 5/14/12 requesting copy of original complaint. (ao, ) (Entered: 05/15/2012) |
| 05/15/2012 | 26 | RECEIPT LETTER $ 25.30, receipt number 333023504 John Legrand partial FF 5/15/12 (ao, ) (Entered: 05/15/2012) |
| 05/16/2012 | 27 | MOTION for Joinder by Stephen Brazelton.(lh, ) (Entered: 05/16/2012) |
| 05/16/2012 | 28 | PRISONER AUTHORIZATION by Stephen Brazelton allowing prison to submit copy of prisoner's trust fund account to the court, and approving the entire filing fee to be deducted from prisoner inmate account.. (lh, ) (Entered: 05/16/2012) |
| 05/16/2012 | 29 | MOTION for Leave to Proceed in forma pauperis by Stephen Brazelton.(lh, ) (Entered: 05/16/2012) |
| 05/16/2012 | 30 | Application to Proceed in District Court without Prepaying Fees or Costs filed by Stephen Brazelton. (lh, ) (Entered: 05/16/2012) |
| 05/17/2012 | 31 | NOTICE by Erika Fenstermaker (Blewitt, Justin) (Entered: 05/17/2012) |
| 05/17/2012 | 32 | MEMORANDUM ORDER - Here Brazeltons motion states that he too was affected by this alleged food poisoning. Therefore, Brazelton is a person who claims an interest relating to the subject of the action and is so situated that disposing of the action in [his] absence may as a practical matter impair or impede [his] ability to protect [his] interest, and should be joined as a Pltf. Accordingly, IT IS ORDERED that Brazeltons motion for leave to proceed in forma pauperis, (Doc. 29 ), and a motion to join this action, (Doc. 27 ), are GRANTED. Signed by Magistrate Judge Martin C. Carlson on May 17, 2012. (kjn ) (Entered: 05/17/2012) |
| 05/18/2012 | 33 | RECEIPT LETTER $ 18.09, receipt number 333023603 Antonio Hudson partial FF 5/18/12 (ao, ) (Entered: 05/18/2012) |
| 05/18/2012 | 34 | RECEIPT LETTER $ 7.50, receipt number 333023602 Eric Andrews partial FF 5/18/12 (ao, ) (Entered: 05/18/2012) |
| 05/23/2012 | 35 | U.S. MARSHAL - 285 FORM of Summons & Complaint on Attorney General, Washington, DC on 5/7/12 (lh, ) (Entered: 05/23/2012) |
| 05/31/2012 | 36 | MOTION for Default Judgment and/or MOTION for Summary Judgment filed by John Legrand. (Attachments: # 1 Exhibits)(pjr) (Entered: 05/31/2012) |
| 05/31/2012 | 37 | MOTION for Default Judgment and/or MOTION for Summary Judgment filed by Eric Andrews. (Attachments: # 1 Exhibits)(pjr) (Entered: 05/31/2012) |
| 05/31/2012 | 38 | ORDER denying 36 Motion for Default Judgment; denying 36 Motion for Summary Judgment; denying 37 Motion for Default Judgment; denying 37 Motion for Summary Judgment. See original order for further details. Signed by Magistrate Judge Martin C. Carlson on 05/31/12. (pjr) (Entered: 05/31/2012) |
| 06/01/2012 | 39 | MOTION for Default Judgment and/or MOTION for Summary Judgment filed by Vance Baker. (Attachments: # 1 Exhibits)(pjr) (Entered: 06/01/2012) |
| 06/01/2012 | 40 | ORDER - IT IS ORDERED that the Motion 39 for Default Judgement filed by plaintiff |

| | | |
|---|---|---|
| | | Baker is DENIED. Signed by Magistrate Judge Martin C. Carlson on 6/1/12. See Order for Details. (rc) (Entered: 06/01/2012) |
| 06/07/2012 | 41 | MOTION for Reconsideration re 40 Order on Motion for Default Judgment filed by Eric Andrews.(pjr) (Entered: 06/07/2012) |
| 06/07/2012 | 42 | MEMORANDUM ORDER - In this case, recognizing that no responsive pleadings have been filed, and mindful of the fact that leave to amend should be freely given when justice so requires, the motion to amend is GRANTED and the Plaintiff is ORDERED to file an amended complaint on or before July 9, 2012. Any amended complaint shall be complete in all respects. It shall be a new pleading which stands by itself as an adequate complaint without reference to the complaint already filed. Any amended complaint shall be titled as an amended complaint and shall contain the docket number of this case. Signed by Magistrate Judge Martin C. Carlson on June 7, 2012. (kjn ) (Entered: 06/07/2012) |
| 06/08/2012 | 43 | MOTION to Reconsider Motion for Entry of Default and Construe Motin as a Motion to Amend Federal Tort Claim filed by Vance Baker.(aaa ) (Entered: 06/08/2012) |
| 06/08/2012 | 44 | MOTION to Reconsider Motion for Entry of Default and Construe Motion as a Motion to Amend Federal Tort Claim filed by John Legrand.(aaa ) (Entered: 06/08/2012) |
| 06/11/2012 | 45 | MEMORANDUM AND ORDER - The Plaintiff is ORDERED to file an amended complaint on or before July 9, 2012. Any amended complaint shall be complete in all respects. It shall be a new pleading which stands by itself as anadequate complaint without reference to the complaint already filed. Any amended complaint shall be titled as an amended complaint and shall contain the docket number of this case. Signed by Magistrate Judge Martin C. Carlson on 6/11/12. (rc) (Entered: 06/11/2012) |
| 06/15/2012 | 46 | RECEIPT LETTER $ 9.52, receipt number 333024019 Antonio Hudson partial FF 6/15/12 (ao, ) (Entered: 06/15/2012) |
| 06/15/2012 | 47 | RECEIPT LETTER $ 31.33, receipt number 333024011 John Legrand partial FF 6/15/12 (ao, ) (Entered: 06/15/2012) |
| 06/15/2012 | 48 | RECEIPT LETTER $ 13.84, receipt number 333024012 Vance Baker partial FF 6/15/12 (ao, ) (Entered: 06/15/2012) |
| 07/19/2012 | 49 | RECEIPT LETTER $ 13.84, receipt number 333024497 Vance Baker partial filing fee 7/19/12 (lh, ) (Entered: 07/19/2012) |
| 07/19/2012 | 50 | RECEIPT LETTER $ 2.18, receipt number 333024498 John Legrand partial filing fee 7/19/12 (lh, ) (Entered: 07/19/2012) |
| 08/02/2012 | 51 | MOTION for Extension of Time to to plead or otherwise respond to Complaint by Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 08/02/2012) |
| 08/06/2012 | 52 | ORDER granting 51 Motion for Enlargement of Time. The Dfts shall respond or otherwise plead to Hudson's Original Complaint and Legrand, Andrews, and Baker's Amended Complaints by 9/10/2012. Signed by Magistrate Judge Martin C. Carlson on August 6, 2012. (kjn ) (Entered: 08/06/2012) |
| 08/08/2012 | 53 | Letter from AUSA J. Justin Blewitt, Jr. to Plaintiffs . (Blewitt, Justin) (Entered: 08/08/2012) |
| 08/09/2012 | 54 | RECEIPT LETTER $ 13.84, receipt number 333024815 Vance Baker Partial Filing Fee 8/9/12 (ts, ) (Entered: 08/09/2012) |
| 08/09/2012 | 55 | RECEIPT LETTER $ 12.56, receipt number 333024816 John Legrand Partial Filing Fee |

| | | 8/9/12 (ts, ) (Entered: 08/09/2012) |
|---|---|---|
| 08/27/2012 | 56 | MOTION to Appoint Counsel filed by John Legrand. (Attachments: # 1 Exhibits)(pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 57 | BRIEF IN SUPPORT re 56 MOTION to Appoint Counsel filed by John Legrand.(pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 58 | MOTION to Appoint Counsel filed by Vance Baker. (Attachments: # 1 Exhibits)(pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 59 | BRIEF IN SUPPORT re 58 MOTION to Appoint Counsel filed by John Legrand.(pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 60 | MOTION CONSENTING TO THE ORDERING OF DISCOVERY FROM DEFENDANT WITHOUT MY SIGNATURE filed by Vance Baker. (pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 61 | MOTION to Appoint Counsel filed by Antonio Hudson. (Attachments: # 1 Exhibits)(pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 62 | BRIEF IN SUPPORT re 61 MOTION to Appoint Counsel filed by Antonio Hudson.(pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 63 | MOTION CONSENTING TO THE ORDERING OF DISCOVERY FROM DEFENDANT WITHOUT MY SIGNATURE filed by Antonio Hudson. (pjr) (Entered: 08/27/2012) |
| 08/27/2012 | 64 | MEMORANDUM AND ORDER denying 61 MOTION to Appoint Counsel filed by Antonio Hudson, 58 MOTION to Appoint Counsel filed by Vance Baker, 56 MOTION to Appoint Counsel filed by John Legrand. Signed by Magistrate Judge Martin C. Carlson on August 27, 2012. (kjn ) (Entered: 08/27/2012) |
| 08/29/2012 | 65 | MOTION to Appoint Counsel filed by Eric Andrews. (Attachments: # 1 Exhibits)(pjr) (Entered: 08/29/2012) |
| 08/29/2012 | 66 | BRIEF IN SUPPORT re 65 MOTION to Appoint Counsel filed by Eric Andrews.(pjr) (Entered: 08/29/2012) |
| 08/29/2012 | 67 | Motion Consenting to the Ordering of Discovery From Defendant Without my Signature filed by Eric Andrews. (pjr) (Entered: 08/29/2012) |
| 08/29/2012 | 68 | MEMORANDUM AND ORDER denying 65 Motion to Appoint Counsel. Signed by Magistrate Judge Martin C. Carlson on August 29, 2012. (kjn ) (Entered: 08/29/2012) |
| 09/04/2012 | 69 | MOTION to Appoint Counsel filed by Stephen Brazelton. (Attachments: # 1 Exhibits) (pjr) (Entered: 09/04/2012) |
| 09/04/2012 | 70 | BRIEF IN SUPPORT re 69 MOTION to Appoint Counsel filed by Stephen Brazelton. (pjr) (Entered: 09/04/2012) |
| 09/04/2012 | 71 | Motion Consenting to the Ordering of Discovery From Defendant Without My Signature filed by Stephen Brazelton. (pjr) (Entered: 09/04/2012) |
| 09/05/2012 | 72 | MEMORANDUM AND ORDER denying 69 Motion to Appoint Counsel. Signed by Magistrate Judge Martin C. Carlson on September 5, 2012. (kjn ) (Entered: 09/05/2012) |
| 09/06/2012 | 73 | MOTION for Extension of Time to File *a response or otherwise plead to complaint* by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 09/06/2012) |

| 09/07/2012 | 74 | ORDER granting 73 MOTION for Extension of Time to File *a response or otherwise plead to complaint*. Defendant shall answer or otherwise respond to the complaints in the abovecaptioned actions on or before Monday, October 1, 2012. IT IS FURTHER ORDERED THAT the parties shall notify the Court in writing on or before Monday, September 24, 2012, as to whether they believe that mediation of the pending claims would be helpful, and whether they would be prepared to negotiate in good faith in an effort to resolve the pending claims. Signed by Magistrate Judge Martin C. Carlson on September 7, 2012. (kjn ) (Entered: 09/07/2012) |
|---|---|---|
| 09/10/2012 | 75 | Petitioner(s) Response To Defendant(s) Response To Plaintiff(s) Filing of Admissions and Request For Production of Documents filed by John Legrand. (Attachments: # 1 Affidavit)(pjr) (Entered: 09/10/2012) |
| 09/11/2012 | 76 | MOTION for Protective Order by Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 09/11/2012) |
| 09/11/2012 | 77 | MEMORANDUM AND ORDER 76 MOTION for Protective Order filed by Henry Sadowski, Ryan, Ronnie Holt, Erika Fenstermaker, Poane - ORDER: Accordingly, for the foregoing reasons, the Defendant's motions for protective orders staying discovery in each of the above-captioned cases are GRANTED.Signed by Magistrate Judge Martin C. Carlson on 09/11/12. (pjr) (Entered: 09/11/2012) |
| 09/14/2012 | 78 | RECEIPT LETTER $ 20.00, receipt number 333025365 Antonio Hudson partial FF 9/14/12 (ao, ) (Entered: 09/14/2012) |
| 09/14/2012 | 79 | RECEIPT LETTER $ 1.67, receipt number 333025364 Eric Andrews partial FF 9/14/12 (ao, ) (Entered: 09/14/2012) |
| 09/14/2012 | 80 | RECEIPT LETTER $ 1.48, receipt number 333025368 Vance Baker partial FF 9/14/12 (ao, ) (Entered: 09/14/2012) |
| 09/14/2012 | 81 | RECEIPT LETTER $ 22.63, receipt number 333025369 John Legrand partial FF 9/14/12 (ao, ) (Entered: 09/14/2012) |
| 09/17/2012 | 82 | MAIL RETURNED addressed to Antonio Hudson containing Order filed 7/20/12. Order remailed on 9/17/12 with inmate number. (jc) (Entered: 09/17/2012) |
| 09/20/2012 | 83 | MOTION to Appoint Counsel filed by Terrell Johnson. (Attachments: # 1 Exhibits 1 - 5) (pjr) (Entered: 09/20/2012) |
| 09/20/2012 | 84 | BRIEF IN SUPPORT re 83 MOTION to Appoint Counsel filed by Terrell Johnson.(pjr) (Entered: 09/20/2012) |
| 09/20/2012 | 85 | Motion Consenting to the Ordering of Discovery From Defendant Without my Signature filed by Terrell Johnson. (pjr) (Entered: 09/20/2012) |
| 09/24/2012 | 86 | Letter from AUSA J. Justin Blewitt, Jr. to Judge Carlson RE: Mediation . (Blewitt, Justin) (Entered: 09/24/2012) |
| 09/24/2012 | 87 | MEMORANDUM AND ORDER denying 83 Motion to Appoint Counsel. Signed by Magistrate Judge Martin C. Carlson on September 24, 2012. (kjn ) (Entered: 09/24/2012) |
| 09/25/2012 | 88 | Notice of Parites "Willing to Participate in Group Mediation" filed by Eric Andrews, Vance Baker, Stephen Brazelton, Antonio Hudson, Terrell Johnson, John Legrand. (pjr) (Entered: 09/25/2012) |
| 10/01/2012 | 89 | MOTION for Partial Summary Judgment , MOTION to Dismiss by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 10/01/2012) |

| 10/11/2012 | 90 | MOTION to Exceed Page Limitation by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 10/11/2012) |
| 10/11/2012 | 91 | BRIEF IN SUPPORT re 90 MOTION to Exceed Page Limitation filed by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski.(Blewitt, Justin) (Entered: 10/11/2012) |
| 10/12/2012 | 92 | ORDER granting 90 Motion for Leave to File Excess Pages. Signed by Magistrate Judge Martin C. Carlson on October 12, 2012. (kjn ) (Entered: 10/12/2012) |
| 10/12/2012 | 93 | ORDER - The Court will appoint Joe Barrett, Esq., to serve as a mediator in each of the above-captioned cases. The defendants and Attorney Barrett shall promptly notify the Court in writing of any cases that are resolved through mediation, shall complete all mediation sessions by December 31, 2012, and shall provide a comprehensive status report on the outcome of all mediation conferences by December 31, 2012. While these mandatory mediation efforts are on-going, all other litigation deadlines are STAYED, pending the outcome of these mediation sessions. SEE ORDER FOR COMPLETE DETAILS. Signed by Magistrate Judge Martin C. Carlson on October 12, 2012.(pjr) (Entered: 10/12/2012) |
| 10/15/2012 | 94 | RECEIPT LETTER $ 6.10, receipt number 33025833 John Legrand partial FF 10/15/12 (ao, ) (Entered: 10/15/2012) |
| 10/15/2012 | 95 | RECEIPT LETTER $ 33.84, receipt number 333025832 Vance Baker partial FF 10/15/12 (ao, ) (Entered: 10/15/2012) |
| 10/25/2012 | 96 | Letter from from Joe Barrett, ADR Coordinator to plaintiff re: Mediation. (cw) (Entered: 10/25/2012) |
| 10/25/2012 | 97 | Letter from from Joe Barrett, ADR Coordinator to plaintiff Baker re: Mediation. (cw) (Entered: 10/25/2012) |
| 10/25/2012 | 98 | Letter from Joe Barrett, ADR Coordinator to Plaintiff Legrand re: Mediation (cw) (Entered: 10/25/2012) |
| 10/31/2012 | 99 | MOTION for Order to Allow Adequate Assistance from Kelvin Andre Spotts During Mediation and Settlement Conference Being Conducted in Good Faith Scheduled for 11/13/12 thru 11/15/12 by John Legrand.(lh) (Entered: 10/31/2012) |
| 11/01/2012 | 100 | MOTION REQUESTING ORDER TO ALLOW ADEQUATE ASSISTANCE FROM KELVIN ANDRE SPOTTS DURING MEDIATION AND SETTLEMENT CONFERENCE BEING CONDUCTED IN GOOD FAITH SCHEDULED FOR 11/13/12 THRU 11/15/12 filed by John Legrand.(pjr) (Entered: 11/01/2012) |
| 11/02/2012 | 101 | ORDER denying 99 , 100 Motion for Order to Allow Adequate Assistance from Kelvin Andre Spotts During Mediation and Settlement Conference. Signed by Magistrate Judge Martin C. Carlson on November 2, 2012. (kjn) (Entered: 11/02/2012) |
| 11/05/2012 | 102 | RESPONSE by Vance Baker to 97 Letter from Mediator. (ao) (Entered: 11/05/2012) |
| 11/08/2012 | 103 | RECEIPT LETTER $ 3.84, receipt number 333026225 Vance Baker Partial Filing Fee 11/8/12 (ts) (Entered: 11/08/2012) |
| 11/08/2012 | 104 | RECEIPT LETTER $ 6.56, receipt number 333026278 John Legrand Partial Filing Fee 11/8/12 (ts) (Entered: 11/08/2012) |
| 11/08/2012 | 105 | ORDER - IT IS ORDERED that Terrell Johnsons motion for leave to proceed in forma pauperis, (Doc. 21 .), and a motion to join this action, (Doc. 19 .), are GRANTED. Signed by Magistrate Judge Martin C. Carlson on November 8, 2012. (kjn) (Entered: 11/08/2012) |

| 11/16/2012 | 106 | ORDER: IT IS HEREBY ORDERED THAT: 1.The mediation period in the above-captioned cases shall be extended until January 31, 2013.2.The above-captioned cases shall remain stayed until January 31, 2013, or further order of the Court.3.The mediator shall report to the Court on or before January 31, 2013, regarding the status of mediation efforts in each of the above-captioned cases.4.Following the receipt of the mediators comprehensive status report on the outcome of all mediation conferences on January 31, 2012, the court will set co-ordinated case management schedules for any case that has not been resolved by mediation. Status Report due by 1/31/2013.Signed by Magistrate Judge Martin C. Carlson on 11/16/12. (pjr) (Entered: 11/16/2012) |
|---|---|---|
| 11/23/2012 | 107 | Letter from Stephen Brazelton filed re: settlement. (pjr) (Additional attachment(s) added on 11/23/2012: # 1 attachments) (pjr). (Entered: 11/23/2012) |
| 11/29/2012 | 108 | REPORT OF MEDIATOR -- Settlement Reached with plaintiffs Baker, Andrews and Hudson. Settlement not reached with plaintiffs Legrand and Brazelton.(joeb) (Entered: 11/29/2012) |
| 12/11/2012 | 109 | REPORT AND RECOMMENDATIONS re 1 Complaint filed by Eric Andrews, John Legrand, Vance Baker, Antonio Hudson - IT IS RECOMMENDED that this Court should enter a 90-day order, dismissing the action with respect only to plaintiffs Antonio Hudson, Vance Baker, and Eric Andrews, without prejudice upon good cause shown within ninety (90) days, to reinstate the action if the settlement is not consummated. (See original order for further details). Objections to R&R due by 12/31/2012.Signed by Magistrate Judge Martin C. Carlson on 12/11/12. (pjr) (Entered: 12/11/2012) |
| 12/13/2012 | 110 | Letter from AUSA J. Justin Blewitt, Jr. re: waiver of right to object to R & R . (Blewitt, Justin) (Entered: 12/13/2012) |
| 12/17/2012 | 111 | Mail sent to Terrell Johnson returned as Undeliverable. Search of BOP shows Terrell Johnson located at CCM Philadelphia. Mail forwarded to that address and docket updated. (pjr) (Entered: 12/17/2012) |
| 12/17/2012 | 112 | RECEIPT LETTER $ 47.42, receipt number 333026828 Vance Baker partial FF 12/17/12 (ao) (Entered: 12/17/2012) |
| 12/17/2012 | 113 | RECEIPT LETTER $ 32.42, receipt number 333026829 John Legrand partial FF 12/17/12 (ao) (Entered: 12/17/2012) |
| 12/17/2012 | 114 | RECEIPT LETTER $ 27.84, receipt number 333026827 Antonio Hudson partial FF 12/17/12 (ao) (Entered: 12/17/2012) |
| 01/07/2013 | 115 | ORDER - MJ Carlson having reported to the court, w/out objection, that this case has been settled as to the following pltfs; Antonio Hudson, Vance Baker, Eric Andrews. This case is dismissed as to those pltfs only, w/out prejudice to the right, upon good cause shown w/in 90 days, to reinstate the action if settlement is not consummated. The court retains jurisdiction over the settlement agreement.Signed by Honorable Edwin M. Kosik on 1/7/13. (ao) (Entered: 01/07/2013) |
| 01/10/2013 | 116 | RECEIPT LETTER $ 21.40, receipt number 333027223 Eric Andrews partial filing fee 1/10/13 (lh) (Entered: 01/10/2013) |
| 01/10/2013 | 117 | RECEIPT LETTER $ 1.50, receipt number 333027224 Antonio Hudson partial filing fee 1/10/13 (lh) (Entered: 01/10/2013) |
| 01/10/2013 | 118 | RECEIPT LETTER $ 7.59, receipt number 333027225 John Legrand partial filing fee 1/10/13 (lh) (Entered: 01/10/2013) |
| 01/11/2013 | 119 | ORDER - The mandatory mediation period in this case shall be enlarged until 3/31/13. |

| | | SEE ORDER FOR COMPLETE DETAILSSigned by Magistrate Judge Martin C. Carlson on 1/11/13. (jc) (Entered: 01/11/2013) |
|---|---|---|
| 02/04/2013 | 120 | REPORT OF MEDIATOR (Settlement Reached with plaintiff Brazelton). (joeb) (Entered: 02/04/2013) |
| 02/05/2013 | 121 | ORDER that: This case is dismissed as to Stephen Brazelton only, without prejudice to the right, upon good cause shown within 90 days, to reinstate the action if the settlement is not consummated; Signed by Honorable Edwin M. Kosik on 2/5/13. (kn) (Entered: 02/05/2013) |
| 02/12/2013 | 122 | RECEIPT LETTER $ 35.84, receipt number 333027774 Eric Andrews partial FF 2/12/13 (ao) (Entered: 02/12/2013) |
| 02/12/2013 | 123 | RECEIPT LETTER $ 43.60, receipt number 333027778 Vance Baker partial FF 2/12/13 (ao) (Entered: 02/12/2013) |
| 02/26/2013 | 124 | Letter from Antonio Hudson filed indicating that he wants to reinstate the action. (pjr) (Entered: 02/27/2013) |
| 03/05/2013 | 125 | Letter from AUSA J. Justin Blewitt, Jr. to Mr. Hudson re: payment . (Blewitt, Justin) (Entered: 03/05/2013) |
| 03/08/2013 | 126 | RECEIPT LETTER $ 29.20, receipt number 333028285 Vance Baker partial FF 3/8/13 (ao) (Entered: 03/08/2013) |
| 03/08/2013 | 127 | RECEIPT LETTER $ 6.00, receipt number 333028245 Eric Andrews partial FF 3/8/13 (ao) (Entered: 03/08/2013) |
| 03/11/2013 | 128 | ORDER - The defendant and Attorney Barrett shall promptly notify the court in writing of any cases that are resolved through mediation, shall complete all mediation sessions by July 1, 2013, and shall provide a comprehensive status report on the outcome of all mediation conferences by July 1, 2013. Signed by Magistrate Judge Martin C. Carlson on 3/11/13. (aaa) (Entered: 03/11/2013) |
| 03/15/2013 | 129 | Letter from Eric Andrews filed re: settlement. (pjr) (Entered: 03/15/2013) |
| 04/08/2013 | 130 | MOTION to Reinstate Action and MOTION to Appoint Counsel filed by Antonio Hudson.(pjr) (Entered: 04/08/2013) |
| 04/09/2013 | 132 | RECEIPT LETTER $ 277.59, receipt number 333028966 Eric Andrews partial filing fee 4/9/13 (lh) (Entered: 04/10/2013) |
| 04/10/2013 | 131 | Letter from AUSA J. Justin Blewitt, Jr. to Mr. Hudson regarding settlement payment . (Blewitt, Justin) (Entered: 04/10/2013) |
| 04/10/2013 | 133 | RECEIPT LETTER $ 103.27, receipt number 333029051 Vance Baker Partial Filing Fee 4/10/13 (ts) (Entered: 04/10/2013) |
| 05/08/2013 | 134 | Letter from Antonio Hudson filed requesting that matter be reinstated. (pjr) (Entered: 05/08/2013) |
| 07/03/2013 | 135 | MOTION to Appoint Counsel by Antonio Hudson.(lh) (Entered: 07/03/2013) |
| 07/08/2013 | 136 | MEMORANDUM AND ORDER - We DENY this request to appoint counsel (Doc. 135.), at this time without prejudice to re-examining this issue as this litigation progresses. We will, however, instruct the defendants to respond to Hudsons motion to reinstate this action, (Doc. 130.), on or before July 19, 2013. Hudson may then file a Reply Brief in support of this motion on or before August 2, 2013. Signed by Magistrate Judge Martin C. Carlson on July 8, 2013. (kjn) (Entered: 07/08/2013) |

| | | |
|---|---|---|
| 07/19/2013 | 137 | BRIEF IN OPPOSITION re 130 MOTION to Reinstate Action MOTION to Appoint Counsel filed by Breckon, Erika Fensermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Dismissal Order, # 2 Documentation from Judg. Fund, # 3 Letter)(Blewitt, Justin) (Entered: 07/19/2013) |
| 07/26/2013 | 138 | LETTER - from Antonio Hudson re: settlement agreement. (jc) (Entered: 07/26/2013) |
| 08/26/2013 | 139 | RECEIPT LETTER $ 9.00, receipt number 333032092 John Legrand partial FF 8/26/13 (ao) (Entered: 08/27/2013) |
| 08/26/2013 | 140 | RECEIPT LETTER $ 14.24, receipt number 333032109 Antonio Hudson partial FF 8/26/13 (ao) (Entered: 08/27/2013) |
| 09/19/2013 | 141 | RECEIPT LETTER $ 20.40, receipt number 333032814 Antonio Hudson partial filing fee 9/19/13 (lh) (Entered: 09/19/2013) |
| 09/23/2013 | 142 | ORDER - The defendant and Attorney Barrett shall promptly notify the Court in writing of any cases that are resolved through mediation, shall complete all mediation sessions by November 1, 2013, and shall provide a comprehensive status report on the outcome of all mediation conferences by November 1, 2013, at which time the defendant shall also provide the court with a list of any cases that have completed the mediation process, but have not settled, so the court may establish a consolidated pre-trial schedule for these actions. Signed by Magistrate Judge Martin C. Carlson on September 23, 2013. (kjn) (Entered: 09/23/2013) |
| 09/25/2013 | 143 | Letter from John Legrand dated 9/17/13 addressed to Joseph Barrett re: settlement offer and change of address. (lh) (Entered: 09/25/2013) |
| 09/25/2013 | | DOCKET ANNOTATION: Updated address on docket for John Legrand per his request to USP Coleman, Florida. (lh) (Entered: 09/25/2013) |
| 10/07/2013 | 144 | MOTION to Appoint Counsel by John Legrand.(lh) (Entered: 10/07/2013) |
| 10/07/2013 | 145 | MEMORANDUM AND ORDER denying 144 Motion to Appoint Counsel. Signed by Magistrate Judge Martin C. Carlson on October 7, 2013. (kjn) (Entered: 10/07/2013) |
| 10/11/2013 | 146 | RECEIPT LETTER $.67, receipt number 333033443 John Legrand partial filing fee 10/11/13 (lh) (Entered: 10/16/2013) |
| 10/31/2013 | 147 | ORDER - The defendant and Attorney Barrett shall promptly notify theCourt in writing of any cases that are resolved through mediation,shall complete all mediation sessions by December 30, 2013, andshall provide a comprehensive status report on the outcome of allmediation conferences by December 30, 2013. Signed by Magistrate Judge Martin C. Carlson on October 31, 2013. (kjn) (Entered: 10/31/2013) |
| 10/31/2013 | 148 | MOTION to Dismiss for Lack of Prosecution *Motion to Dismiss Terrell Johnson* by Breckon, Erika Fensermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 10/31/2013) |
| 10/31/2013 | 149 | BRIEF IN SUPPORT re 148 MOTION to Dismiss for Lack of Prosecution *Motion to Dismiss Terrell Johnson* filed by Breckon, Erika Fensermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski.(Blewitt, Justin) (Entered: 10/31/2013) |
| 11/01/2013 | 150 | ORDER re: 148 MOTION to Dismiss for Lack of Prosecution. IT IS ORDEREDas follows: With respect to this motion the plaintiff shall file a response to the motion in accordance with Local Rule 7.6 on or before November 15, 2013. Pursuant to Local Rule 7.7, the movant may then file a reply brief within 14 days of the filing of any responsive pleading or no later than November 30, 2013. Signed by Magistrate Judge Martin C. Carlson on November 1, 2013. (kjn) (Entered: 11/01/2013) |

| | | |
|---|---|---|
| 11/08/2013 | 151 | RECEIPT LETTER $ 31.35, receipt number 333033980 John Legrand partial FF 11/8/13 (ao) (Entered: 11/08/2013) |
| 11/12/2013 | 152 | RECEIPT LETTER $ 17.12, receipt number 333034135 Antonio Hudson partial filing fee 11/12/13 (lh) (Entered: 11/14/2013) |
| 11/15/2013 | 153 | BRIEF IN OPPOSITION re 148 MOTION to Dismiss for Lack of Prosecution /Motion to Dismiss Terrell Johnson filed by Terrell Johnson. (Attachments: # 1 Proposed Order)(ao) (Entered: 11/15/2013) |
| 11/15/2013 | 154 | RESPONSE by Terrell Johnson to 153 Brief in Opposition to defts' Motion to Dismiss. (ao) (Entered: 11/15/2013) |
| 11/15/2013 | 155 | REPORT AND RECOMMENDATION - IT IS RECOMMENDED that the DefendantsMotion to Dismiss, (Doc. 148 ), be DENIED but the plaintiff be instructed to comply with the local rules of this court in the future. Objections to R&R due by 12/2/2013. Signed by Magistrate Judge Martin C. Carlson on November 15, 2013. (kjn) (Entered: 11/15/2013) |
| 12/02/2013 | 156 | Letter from Antonio Hudson dated 11/26/13 re: reconsideration to reinstate civil action. (lh) (Entered: 12/02/2013) |
| 12/09/2013 | 157 | RECEIPT LETTER $ 3.50, receipt number 333034598 Antonio Hudson partial FF 12/9/13 (ao) (Entered: 12/10/2013) |
| 12/10/2013 | 158 | ORDER denying deft's 148 Motion to Dismiss for Lack of Prosecution; adopting 155 Report and Recommendations. This action is REMANDED to the Mag Judge for further proceedings.Signed by Honorable Edwin M. Kosik on 12/10/13 (ao) (Entered: 12/10/2013) |
| 12/19/2013 | 159 | Letter from Antonio Hudson dated 12/16/13 re: settlement agreement and to reinstate claim. (lh) (Entered: 12/19/2013) |
| 12/19/2013 | 161 | Letter from Antonio Hudson filed requesting that matter be reinstated. (pjr) (Entered: 12/20/2013) |
| 12/20/2013 | 160 | ORDER TO SHOW CAUSE - IT IS ORDERED as follows: On or before January 10, 2014, the defendants shall file a response to this pleading, either clarifying the status of efforts to consummate the settlement, or otherwise responding to the plaintiffs pleadings. Signed by Magistrate Judge Martin C. Carlson on December 20, 2013. (kjn) (Entered: 12/20/2013) |
| 01/02/2014 | | DOCKET ANNOTATION: Doc. 162 deleted. (pjr) (Entered: 01/02/2014) |
| 01/10/2014 | 162 | BRIEF IN OPPOSITION re 130 MOTION to Reinstate Action MOTION to Appoint Counsel filed by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 notice of reconciled payment (Hudson))(Blewitt, Justin) (Entered: 01/10/2014) |
| 01/13/2014 | 163 | RECEIPT LETTER $ 12.63, receipt number 333035374 John Legrand partial FF 1/13/14 (ao) (Entered: 01/14/2014) |
| 01/15/2014 | 164 | REPORT OF MEDIATOR (Settlement Reached with plaintiff Terrell Johnson).(joeb) (Entered: 01/15/2014) |
| 01/15/2014 | 165 | RECEIPT LETTER $ 217.79, receipt number 333035432 Antonio Hudson partial filing fee 1/14/14 (lh) (Entered: 01/15/2014) |
| 01/22/2014 | 166 | ORDER: Plaintiff, Terrell Hohnson, it is hereby ORDERED that this case is dismissed as to this plaintiff only, without prejudice to the right, upon good cause shown within ninety |

| | | |
|---|---|---|
| | | (90) days, to reinstate the action if the settlement is not consummated. The court retains jurisdiction over the settlement agreement. Terrell Johnson terminated.Signed by Honorable Edwin M. Kosik on 1/21/14. (lh) (Entered: 01/22/2014) |
| 01/23/2014 | 167 | ORDER LIFTING STAY Setting deadlines as to 89 MOTION for Partial Summary Judgment MOTION to Dismiss . The plaintiff, John LeGrand shall file a response to the motion in accordance with Local Rule 7.6on or before February 12, 2014. Pursuant to Local Rule 7.7 the movant may thenfile a reply brief within 14 days of the filing of this response, or on or before February 26, 2014. Signed by Magistrate Judge Martin C. Carlson on January 22, 2014. (kjn) (Entered: 01/23/2014) |
| 01/28/2014 | 168 | ORDER modify 167 Scheduling and Briefing Order. It is hereby MODIFIED as follows: 1. With respect to the Defendants motion to dismiss or in the alternative for summary judgment (Doc. 89), the Defendants shall file a brief in support of the motion on or before Friday, February 7, 2014. 2. In accordance with Local Rule 7.6, the Plaintiff shall file a response tothe motion on or before Friday, February 21, 2014. 3. In accordance with Local Rule 7.7, the Defendant may then file a reply brief on or before Friday, March 4, 2014. Signed by Magistrate Judge Martin C. Carlson on January 28, 2014. (kjn) (Entered: 01/28/2014) |
| 02/07/2014 | 169 | STATEMENT OF FACTS re 89 MOTION for Partial Summary Judgment MOTION to Dismiss by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Exhibit(s))(Blewitt, Justin) (Entered: 02/07/2014) |
| 02/07/2014 | 170 | BRIEF IN SUPPORT re 89 MOTION for Partial Summary Judgment MOTION to Dismiss filed by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Unpublished Opinion(s))(Blewitt, Justin) (Entered: 02/07/2014) |
| 02/07/2014 | 171 | ORDER re 170 , 89 MOTION for Partial Summary Judgment MOTION to Dismiss . With respect to the outstanding motion, the plaintiff shall file a response to the motion in accordance with Local Rule 7.6 on or before February 28, 2014. Pursuant to Local Rule 7.7 the movants may then file a reply brief within 14 days of the filing of this response, or on or before March 14, 2014. Signed by Magistrate Judge Martin C. Carlson on February 7, 2014. (kjn) (Entered: 02/07/2014) |
| 02/10/2014 | 172 | MOTION to Appoint Counsel filed by John Legrand.(ams) (Entered: 02/10/2014) |
| 02/10/2014 | 173 | MEMORANDUM AND ORDER denying 172 MOTION to Appoint Counsel filed by John Legrand. Signed by Magistrate Judge Martin C. Carlson on February 10, 2014. (kjn) (Entered: 02/10/2014) |
| 02/18/2014 | 174 | Letter from John Legrand filed re: response due and request for copies. (Attachments: # 1 Letter to John Legrand) (pjr) (Entered: 02/18/2014) |
| 02/18/2014 | 175 | REQUEST dtd 2/12/14 for copies of Complaint and Motions by John Legrand. (ao) (Entered: 02/18/2014) |
| 02/19/2014 | 176 | RECEIPT LETTER $ 2.65, receipt number 333036126 John Legrand Partial filing fee 2/18/14 (ga) (Entered: 02/19/2014) |
| 03/03/2014 | 177 | MOTION for Extension of Time to File Brief and C of S filed by John Legrand.(pjr) (Entered: 03/03/2014) |
| 03/04/2014 | 178 | ORDER granting in part 177 Motion for Extension of Time to File Response/Reply re 89 MOTION for Partial Summary Judgment MOTION to Dismiss . Brief in Opposition due by 3/31/2014 Reply Brief due by 4/14/2014. Signed by Magistrate Judge Martin C. Carlson on March 4, 2014. (kjn) (Entered: 03/04/2014) |

| 03/11/2014 | | Receipt of payment from JOHN LEGRAND in the amount of $7.37 for PLRA CIVIL FILING FEE. Transaction posted on 3/10/2014. Receipt number 333036482 processed by tscott. (jjs, ) (Entered: 03/11/2014) |
|---|---|---|
| 03/12/2014 | 179 | NOTICE by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski *Defendant's Notice Regarding Intent to Contest Negligence* (Blewitt, Justin) (Entered: 03/12/2014) |
| 03/12/2014 | 180 | ANSWER to 1 Complaint by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski.(Blewitt, Justin) (Entered: 03/12/2014) |
| 03/24/2014 | 181 | REQUEST for Documents filed by John Legrand. (Attachments: # 1 Coverletter). (ams) (Entered: 03/24/2014) |
| 04/07/2014 | 182 | MOTION to Amend/Correct 1 Complaint and C of S filed by John Legrand. (Attachments: # 1 Amended Complaint)(pjr) (Entered: 04/07/2014) |
| 04/07/2014 | 183 | RESPONSE and C of S filed by John Legrand to 180 Answer to Complaint. (pjr) (Entered: 04/07/2014) |
| 04/07/2014 | 184 | MOTION for Discovery and C of S filed by John Legrand.(pjr) (Entered: 04/07/2014) |
| 04/07/2014 | 185 | MOTION for Extension of Time to File Brief to 167 Order Lifting Stay, 89 MOTION for Partial Summary Judgment , MOTION to Dismiss , 170 Brief in Support of Motion for Summary Judgment, filed by John Legrand.(pjr) (Entered: 04/07/2014) |
| 04/08/2014 | 186 | ORDER - IT IS ORDERED that the Plaintiff's Motion 185 for Extension of Time to file Brief in Opposition to Defendants Summary Judgment Motion and Motion to Dismiss and also requests copies of various pleadings filed by the defendants is GRANTED. The defendant shall forward the following pleadings to LeGrand: Docs. 88, 89, 90, 91 and 170. The plaintiff shall file his brief in opposition on or before May 5, 2014. The movants reply brief my then be filed within 14 days or no later than May 19, 2014. Signed by Magistrate Judge Martin C. Carlson on 4/8/14. (rc) (Entered: 04/08/2014) |
| 04/08/2014 | 187 | CASE MANAGEMENT ORDER - IT IS ORDERED that the following case management deadlines will govern this case. The parties may consent to have a magistrate judge conduct all proceedings. On or before April 28, 2014, the parties, if there is consent of all, shall file a consent form, signed by all counsel and the plaintiff, consenting to proceed under 28 U.S.C. § 636 before a magistrate judge. All discovery shall be planned and commenced so as to be completed by August 15, 2014. Any discovery-related motion shall be filed on or before August 1, 2014. Dispositive motions may be filed at any time but alldispositive motion must be filed, as well as the supporting briefs, on or before August 15, 2014...SEE ORDER FOR COMPLETE DETAILS. Signed by Magistrate Judge Martin C. Carlson on 4/8/14. (rc) (Entered: 04/08/2014) |
| 04/21/2014 | 188 | BRIEF IN OPPOSITION re 182 MOTION to Amend/Correct 1 Complaint filed by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski.(Blewitt, Justin) (Entered: 04/21/2014) |
| 05/22/2014 | 189 | MOTION to Appoint Counsel filed by John Legrand.(vy) (Entered: 05/22/2014) |
| 05/29/2014 | 190 | MEMORANDUM AND ORDER denying 189 Motion to Appoint Counsel. Signed by Magistrate Judge Martin C. Carlson on May 29, 2014. (kjn) (Entered: 05/29/2014) |
| 06/10/2014 | | Receipt of payment from JOHN LEGRAND in the amount of $17.20 for PLRA CIVIL FILING FEE. Transaction posted on 6/9/2014. Receipt number 333038286 processed by tscott. (jjs, ) (Entered: 06/10/2014) |
| 06/19/2014 | 191 | REPORT AND RECOMMENDATION re 182 MOTION to Amend/Correct 1 Complaint |

| | | |
|---|---|---|
| | | filed by John Legrand - IT IS RECOMMENDED that the plaintiffs motion for leave to file an amended complaint (Doc. 182.) be DENIED. Objections to R&R due by 7/7/2014. Signed by Magistrate Judge Martin C. Carlson on June 19, 2014. (kjn) (Entered: 06/19/2014) |
| 06/19/2014 | 192 | REPORT AND RECOMMENDATION - IT IS RECOMMENDED that the defendants motion for partial summary judgment, (Doc. 89.), be GRANTED and the plaintiffs complaint be dismissed as to the following defendants: Erika Fenstermaker, a grievance coordinator at the prison, Henry Sadowski, Regional Counsel, Warden Ronnie Holt, Captain Breckon, Food Service Administrator Ryan, and Medical Service Director Paone. Objections to R&R due by 7/7/2014. Signed by Magistrate Judge Martin C. Carlson on June 19, 2014. (kjn) (Entered: 06/19/2014) |
| 06/19/2014 | 193 | REPORT AND RECOMMENDATION - In light of this report that payment has been made to the plaintiff pursuant to the terms of this agreement, it is recommended that the plaintiffs motion to reinstate be DENIED. (Doc. 130 .) Objections to R&R due by 7/7/2014. Signed by Magistrate Judge Martin C. Carlson on June 19, 2014. (kjn) (Entered: 06/19/2014) |
| 07/29/2014 | 194 | MOTION for Extension of Time to extend CMO deadlines by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 07/29/2014) |
| 07/29/2014 | 195 | CERTIFICATE OF SERVICE by Breckon, Erika Fenstermaker, Ronnie Holt, Poane, Ryan, Henry Sadowski re 37 MOTION for Default Judgment as to MOTION for Summary Judgment (Blewitt, Justin) (Entered: 07/29/2014) |
| 07/29/2014 | 196 | ORDER - STANDARD CASE MANAGEMENT TRACK: 37 MOTION for Extension of Time to extend CMO deadlines filed by United States Of America - GRANTED. Discovery due by 11/13/2014. Motions due by 11/13/2014. Discovery Related Motions due by 10/23/14. Requests to Extend Discovery Deadline: 30 days prior to expiration of discovery deadline.Signed by Chief Magistrate Judge Martin C. Carlson on 07/29/14. (pjr) (Entered: 07/29/2014) |
| 07/31/2014 | 197 | ORDER ADOPTING REPORT AND RECOMMENDATIONS ; denying 130 Motion to Reinstate; adopting 193 Report and Recommendations.Signed by Honorable Edwin M. Kosik on 7/31/14. (lh) (Entered: 07/31/2014) |
| 07/31/2014 | 198 | ORDER ADOPTING REPORT AND RECOMMENDATIONS ; granting 89 Motion for Partial Summary Judgment; granting 89 Motion to Dismiss; denying 182 Motion to Amend/Correct; adopting 191 Report and Recommendations.; adopting 192 Report and Recommendations. Defendants, Fenstermaker, Sadowski, Holt, Breckon, Ryan and Poane are DISMISSED from this action; and the above-captioned action is REMANDED to the Magistrate Judge for further proceedings. Signed by Honorable Edwin M. Kosik on 7/31/14. (lh) (Entered: 08/01/2014) |
| 08/01/2014 | | ORDER REFERRING CASE to Magistrate Judge Martin C. Carlson; Signed by Honorable Edwin M. Kosik on 7/31/14. (lh) (Entered: 08/01/2014) |
| 08/04/2014 | 199 | ORDER - proposing that the following disclosures be made in these cases pursuant to Rule 26 of the Federal Rules of Civil Procedure. Any party that objects to this proposed discovery directive in a particular case may file an objection to this proposal on or before August 18, 2014. Signed by Magistrate Judge Martin C. Carlson on August 4, 2014. (kjn) (Entered: 08/04/2014) |
| 10/14/2014 | 200 | MOTION for Extension of Time to complete CMO deadlines by Henry Sadowski. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 10/14/2014) |

| 10/14/2014 | 201 | MOTION Objecting to Government's Interrogation filed by John Legrand.(pjr) (Entered: 10/14/2014) |
|---|---|---|
| 10/14/2014 | 202 | MOTION to Appoint Counsel filed by John Legrand.(pjr) (Entered: 10/14/2014) |
| 10/15/2014 | 203 | ORDER granting 200 MOTION for Extension of Time to complete CMO deadlines filed by Henry Sadowski. Deadline to Proceed before a U.S. Magistrate Judge - 11/13/2014. Close of Discovery - 1/13/2015. Dispositive Motions and Supporting Briefs are Due - 1/13/2015. SEE ORDER FOR COMPLETE DETAILS. Signed by Magistrate Judge Martin C. Carlson on October 15, 2014. (kjn) (Entered: 10/15/2014) |
| 10/28/2014 | 204 | MEMORANDUM AND ORDER - 1) The motion for appointment of counsel (Doc. 202) is conditionally GRANTED. The Pro Bono Coordinator for Middle District of Pennsylvania Chapter of the Federal Bar Association shall report to the Court on the progress of identifying pro bono counsel on or before December 14, 2014. A copy of this order will be served upon the Pro Bono Coordinator forMiddle District of Pennsylvania Chapter of the Federal Bar Association. Finally, we note that the United States of America is not listed as a defendantin this case, although it was named as a defendant in the supplement to the plaintiffs complaint. (Doc. 2.) Accordingly, the clerk is directed to add the United States of America as a defendant in this action. Signed by Magistrate Judge Martin C. Carlson on October 28, 2014. (kjn) (Entered: 10/28/2014) |
| 01/05/2015 | | DOCKET ANNOTATION: Plaintiff contacted court re. the pending appointment of counsel via pro bono panel. Deadline for response to interrogatories is 1/5/15. Will be filing a continuation request. (ma) (Entered: 01/05/2015) |
| 01/12/2015 | 205 | MOTION for Extension of Time filed by John Legrand.(pjr) (Entered: 01/13/2015) |
| 01/16/2015 | 206 | ORDER - IT IS HEREBY ORDERED THAT: 1. Discovery and pre-trial litigation deadlines in this action are STAYED pending further order of the Court. 2. Following the anticipated appointment of counsel to represent the plaintiff, or upon further order of the Court, a revised case-management schedule shall issue. 3. The Clerk of Court is directed to send a copy of this order to Stephen M. Greecher, Jr., Esq., the Pro Bono Coordinator for the Middle District of Pennsylvania Chapter of the Federal Bar Association. Mr. Greechershall notify the Court on or before Friday, January 23, 2015, whether he has been able to secure counsel for the plaintiff. Signed by Magistrate Judge Martin C. Carlson on January 16, 2015. (kjn) (Entered: 01/16/2015) |
| 04/10/2015 | 207 | MEMORANDUM ORDER - Accordingly, the plaintiff is hereby advised that the Court has been unable to identify counsel willing to assist in this case, and IT IS THEREFORE ORDERED THAT the Courts prior order conditionally appointing counsel is VACATED. The plaintiff shall be required to continue litigating this action on his own behalf, pro se. Discovery deadline - 8/10/2015. Dispositive Motions and Supporting Briefs are due by 8/10/2015. Signed by Magistrate Judge Martin C. Carlson on April 10, 2015. (kjn) (Entered: 04/10/2015) |
| 05/04/2015 | 208 | NOTICE by UNITED STATES OF AMERICA re 207 Order Lifting Stay, Case Management Order - Standard Track,,,, (Blewitt, Justin) (Entered: 05/04/2015) |
| 07/13/2015 | 209 | MOTION to Compel Discovery by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed Order, # 2 Discovery Requests)(Blewitt, Justin) (Entered: 07/13/2015) |
| 07/13/2015 | 210 | BRIEF IN SUPPORT re 209 MOTION to Compel Discovery filed by UNITED STATES OF AMERICA.(Blewitt, Justin) (Entered: 07/13/2015) |
| 07/27/2015 | 211 | MOTION for Extension of Time to answer interrogatories filed by John Legrand. (Attachments: # 1 attachment)(pjr) (Entered: 07/30/2015) |

| | | |
|---|---|---|
| 07/31/2015 | 212 | MEMORANDUM AND ORDER: Dft's MOTION to Compel Discovery 209 is Granted. Pltf's mtn for exttm to answer 211 is denied. Instead, pltf is ORDERED toprovide the dft with answers to the First Set of Interrogatories on or before8/17/15. If the pltf is unable to furnish complete responses to any question, he shall provide the dft with some explanation regarding the reason for the incomplete response, in accordance with the instructions set forth inthe interrogatories. IT IS FURTHER ORDERED that the Clerk of Court shall send the pltf a copy of the dfts first set of interrogatories (Doc. 209-2.) with this Order. Signed by Magistrate Judge Martin C. Carlson on 07/31/15. (ma) (Entered: 07/31/2015) |
| 08/10/2015 | 213 | MOTION for Extension of Time to Case Management Deadlines by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed Order)(Blewitt, Justin) (Entered: 08/10/2015) |
| 08/10/2015 | 214 | ORDER granting 213 Motion for Enlargement of TIme. Close of Discovery - 8/24/2015. Dispositive Motions and Briefs are due by 9/3/2015. Signed by Magistrate Judge Martin C. Carlson on August 10, 2015. (kjn) (Entered: 08/10/2015) |
| 10/02/2015 | 215 | ORDER - Accordingly, the parties shall notify the Court by October 16, 2015, regarding the status of this case, including whether: (1) the parties wish to have this matter scheduled for trial by this Court, or referred to the District Court for the scheduling of any trial; and (2) whether there are any potentially dispositive motions to be filed, in which case the motions should be filed, along with briefs no later than October 16, 2015. Signed by Magistrate Judge Martin C. Carlson on October 2, 2015. (kjn) (Entered: 10/02/2015) |
| 10/08/2015 | 216 | NOTICE of Appearance by Stephen M. Greecher, Jr on behalf of All Plaintiffs (Greecher, Stephen) (Entered: 10/08/2015) |
| 10/15/2015 | 217 | STATUS REPORT *of all parties* by John Legrand. (Greecher, Stephen) (Entered: 10/15/2015) |
| 10/19/2015 | 219 | ORDER revising case management schedule: Clos of Discovery -12/14/2015. Dispositive Motions and Supporting Briefs are due by 12/14/2015. Deadline to consent to proceed before a U.S. Magistrate Judge 12/14/2015. Signed by Magistrate Judge Martin C. Carlson on October 19, 2015. (kjn) (Entered: 10/19/2015) |
| 12/14/2015 | 220 | STATUS REPORT by John Legrand. (Greecher, Stephen) (Entered: 12/14/2015) |
| 12/14/2015 | 221 | MOTION for Extension of Time to Complete Discovery by John Legrand. (Attachments: # 1 Proposed Order, # 2 Cert of Service, # 3 Certificate of Concurrence)(Greecher, Stephen) (Entered: 12/14/2015) |
| 12/15/2015 | 222 | ORDER granting 221 Motion for Extension of Time to Complete Discovery. Close of Discovery: 2/12/2016. Dispositive Motions and Supporting Briefs are due 2/12/2016. Signed by Magistrate Judge Martin C. Carlson on December 15, 2015. (kjn) (Entered: 12/15/2015) |
| 04/06/2016 | 223 | ORDER - The parties shall notify the Court by April 18, 2016, regarding the status of this case, including whether the parties consent to have this matter scheduled for trial by this court, or referred to the district court for the scheduling of any trial. Signed by Magistrate Judge Martin C. Carlson on 4/6/16. (pw) (Entered: 04/06/2016) |
| 04/18/2016 | 224 | STATUS REPORT by UNITED STATES OF AMERICA. (Blewitt, Justin) (Entered: 04/18/2016) |
| 04/18/2016 | 225 | REPORT AND RECOMMENDATION - IT IS RECOMMENDED that the case be listed for trial at the convenience of the district court. Objections to R&R due by 5/5/2016. |

| | | |
|---|---|---|
| | | Signed by Magistrate Judge Martin C. Carlson on April 18, 2016. (kjn) (Entered: 04/18/2016) |
| 06/29/2016 | 226 | ORDER adopting 225 Report and Recommendation. A pre-trial conference shall be set forthwith. Signed by Honorable Edwin M. Kosik on 6/29/2016. (emksec, ) (Entered: 06/29/2016) |
| 06/29/2016 | | VERBAL ORDER - Case Reassigned to Honorable Malachy E Mannion. Honorable Edwin M. Kosik no longer assigned to the case. (kc) (Entered: 06/29/2016) |
| 07/12/2016 | 227 | SCHEDULING ORDER: Motions in limine with supp. briefs due by 7/29/2016. Final Pretrial Conference set for 8/1/2016 10:00 AM in Scranton before Honorable Malachy E Mannion. Trial set for 8/5/2016 09:30 AM in Scranton before Honorable Malachy E Mannion. Signed by Honorable Malachy E Mannion on 7/12/16. (bs) (Entered: 07/12/2016) |
| 07/13/2016 | 228 | SCHEDULING ORDER: (TRIAL DATE CHANGE) Final Pretrial Conference set for 8/1/2016 10:00 AM in Scranton before Honorable Malachy E Mannion. Trial set for 8/10/2016 09:30 AM in Scranton before Honorable Malachy E Mannion.Signed by Honorable Malachy E Mannion on 7/13/16. (bs) (Entered: 07/13/2016) |
| 07/13/2016 | 229 | NOTICE of Application for Writ by John Legrand (Attachments: # 1 Exhibit(s), # 2 Exhibit(s), # 3 Cert of Service)(Greecher, Stephen) (Entered: 07/13/2016) |
| 07/13/2016 | 230 | WRIT of of Habeas Corpus Ad Testificandum issued as to plaintiff John Legrand that USM produce pltf. on 8/1/16 for FPTC and 8/10/16 for Trial. (bs) (Entered: 07/13/2016) |
| 07/26/2016 | 231 | PRETRIAL MEMORANDUM by John Legrand. (Attachments: # 1 Certificate of Service)(Greecher, Stephen) (Entered: 07/26/2016) |
| 07/26/2016 | 232 | Proposed Findings of Fact by John Legrand. (Attachments: # 1 Cert of Service) (Greecher, Stephen) (Entered: 07/26/2016) |
| 07/26/2016 | 233 | Exhibit List by John Legrand.. (Greecher, Stephen) (Entered: 07/26/2016) |
| 07/26/2016 | 234 | PRETRIAL MEMORANDUM by UNITED STATES OF AMERICA. (Blewitt, Justin) (Entered: 07/26/2016) |
| 07/26/2016 | 235 | Proposed Findings of Fact by UNITED STATES OF AMERICA. (Blewitt, Justin) (Entered: 07/26/2016) |
| 07/26/2016 | 236 | Exhibit List by UNITED STATES OF AMERICA.. (Blewitt, Justin) (Entered: 07/26/2016) |
| 08/01/2016 | 238 | NOTICE of Appearance by Joanne M Hoffman on behalf of UNITED STATES OF AMERICA. (Hoffman, Joanne) (Entered: 08/01/2016) |
| 08/03/2016 | 239 | Exhibit List *Amended* by John Legrand.. (Greecher, Stephen) (Entered: 08/03/2016) |
| 08/12/2016 | 241 | Proposed Findings of Fact by John Legrand. (Attachments: # 1 Certificate of Service) (Greecher, Stephen) (Entered: 08/12/2016) |
| 08/17/2016 | 242 | COURT REPORTER NOTES OF PROCEEDINGS filed by L. Boyanowski, RMR, CRR of Nonjury Trial before Judge Mannion on 8/10/16. In accordance with 28 U.S.C. Section 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Middle District of PA before Judge Mannion on 8/10/16. By s/ L. Boyanowski, RMR, CRR. (Court Reporter Notes are viewable by court staff only). (cr5, ) (Entered: 08/17/2016) |
| 09/06/2016 | 243 | MEMORANDUM (Order to follow as separate docket entry).Signed by Honorable |

| | | Malachy E Mannion on 9/6/16. (bs) (Entered: 09/06/2016) |
|---|---|---|
| 09/06/2016 | 244 | ORDER (memorandum filed previously as separate docket entry), ORDER TERMINATING CASE. (1)Judgment is awarded in favor of the plaintiff and against the defendant in the amount of $2,500.00; and (2)the Clerk of Court is directed to CLOSE this case.Signed by Honorable Malachy E Mannion on 9/6/16. (bs) (Entered: 09/06/2016) |
| 11/02/2016 | 245 | NOTICE OF APPEAL in Prisoner Case by John Legrand. Filing Fee and Docket Fee Paid. Filing fee $ 505, receipt number 0314-3915904. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (Attachments: # 1 Certificate of Service)(Greecher, Stephen) (Entered: 11/02/2016) |
| 11/07/2016 | 246 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of proceedings held on 8/10/16, before Judge Mannion. Court Reporter L. Boyanowski, RMR, CRR, Telephone number 570-499-0038. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/28/2016. Redacted Transcript Deadline set for 12/8/2016. Release of Transcript Restriction set for 2/6/2017. (cr5, ) (Entered: 11/07/2016) |
| 11/07/2016 | 247 | USCA Case Number 16-4035 for 245 Notice of Appeal, filed by John Legrand. USCA Case Manager Tonya (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF). (Tonya) (Entered: 11/07/2016) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/19/2017 11:27:17 | | |
| **PACER Login:** | ta0011:2642369:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:12-cv-00743-MEM |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

## CERTIFICATE OF SERVICE

I, Kevin L. Hall, Esquire, hereby certify that I served a true and correct copy of Appellant, John Legrand's, Amended Appendix-Volume I, via the Court's electronic filing system upon the following:

> J. Justin Blewitt, Jr.
> Assistant U.S. Attorney
> Joanne M. Hoffman
> Special Assistant U.S. Attorney
> 228 Walnut Street, 2nd Floor
> PO Box 11754
> Harrisburg, Pa 17108
> Phone: 717-221-4482
> Fax: 717-221-2246
> Justin.blewitt@usdoj.gov

> TUCKER ARENSBERG, P.C.

Dated:  April 20, 2017          /s/ Kevin L. Hall
                                Kevin L. Hall, I.D. #311826
                                2 Lemoyne Dr., Ste. 200
                                Lemoyne, PA 17043
                                Telephone:  (717) 234-4121
                                Facsimile:  (717) 232-6802
                                khall@tuckerlaw.com
                                *Attorneys for Appellant*